**Opposition to Motion EXHIBIT A**

EDITION: U.S.
CA Canada US United States UK United Kingdom

- Republican Party
- Supreme Court
- Rick Perry 2012
- Elections 2012

More
Log in



October 1, 2011

HUFF
POST POLITICS

THE INTERNET NEWSPAPER: NEWS BLOGS VIDEO COMMUNITY

Like
441K

This is the print preview: Back to normal view »



Marcus Baram
Marcus@huffingtonpost.com Become
a fan of this reporter
GET UPDATES FROM Marcus
Like
759

# Donald Trump Admitted In Deposition That He Exaggerated His Net Worth, Stretched The Truth

First Posted: 04/22/11 08:48 AM ET Updated: 04/22/11 09:15 AM ET

React
>
Important
Funny
Typical
Scary
Outrageous
Amazing
Innovative
Finally

Follow
>
 Donald Trump , GOP Trump , Trump 2012 , Trump Lawsuit , Donald Trump President , President Trump , Trump Deposition , Trump Net Worth , Politics News



*Q: Let me just ask you first about the first sentence there: Trump relentlessly bloviating about his developments -- this is going to be the biggest, best, most amazing -- leads people to assume he exaggerates his net worth. Do you see that?*
*A: Yes.*
*Q: Do you know what bloviating means?*
*A: Well, I'm not sure that there's an exact definition, but I would imagine that's what it means.*
*Q: Exaggeration?*
*A: Could be, yeah.*
*Q: Lying?*
*A: No. [from a deposition given by Donald Trump in a libel lawsuit]*

* * * * *

NEW YORK -- Notorious for his lack of modesty, Donald Trump has long flaunted his wealth and touted his net worth as a multibillionaire.

During his Comedy Central roast, which aired last month, the real estate developer and possible 2012 presidential candidate joked, "What's the difference between Donald Trump's hair and a wet raccoon? A wet raccoon doesn't have seven fucking billion dollars in the bank."

Now that he's considering a campaign on the Republican ticket, he's wielding his bravado as a political cudgel. He recently mocked multimillionaire Mitt Romney's reputation as a successful businessman by declaring himself "many, many, many times Mitt Romney."

Yet Trump has often been accused of exaggerating his wealth, even adding a few zeroes to the actual amount, which may undermine his credibility as a candidate with business credentials.

Despite Trump's own claims that he's worth around $7 billion, last September the most recent Forbes 400 rankings -- which many consider to have overestimated the real estate developer's wealth in the past -- estimated his net worth at $2.4 billion, putting him in a six-way tie for 153rd-richest person in America.

And a deposition in a defamation lawsuit filed by Trump provides numerous examples of him stretching the truth about his success in real estate. Former *New York Times* editor and reporter (and current Huffington Post national editor) Timothy L. O'Brien wrote in his 2005 book, "TrumpNation: The Art of Being the Donald," that the developer was probably worth $150 to $250 million, rather than the typical estimates of $2 to $3 billion. Trump sued O'Brien for libel, claiming that the book's lower figure killed some potential deals and damaged his reputation.

The case was dismissed, but Trump filed an appeal and a decision is pending. Trump's deposition, taken on Dec. 19-20, 2007, was obtained by The Huffington Post and CNN.

In 2005, Trump claimed that he was worth $3.5 billion, but a financial analysis by North Fork Bank estimated his worth at just $1.2 billion. The previous year, when he was claiming a worth in excess of $3 billion, Deutsche Bank estimated his worth much lower, at $788 million.

Asked in the deposition about his statements in 2007 that his net worth was $8 billion, Trump conceded: "I don't know. I don't think so. Well, maybe I'm adding 4 or 5 billion dollars worth, 3 billion, for the value of a brand. But I don't know."

Such comments prompted CNN contributor Jeffrey Toobin to tell "In the Arena" host Eliot Spitzer on Thursday night that the deposition could be used against Trump by his GOP opponents: "They could beat him over the head with this," Toobin said.

Among the deposition's most glaring examples of his fondness for exaggeration, Trump was asked why he claimed in several media accounts that he had a 50 percent interest in the massive Riverside South project on Manhattan's Upper West Side when he actually had a much smaller interest. "I own 30 percent," Trump replied. "But because of the fact I put no money up, that 30 percent is equated to 50 percent."

At another point, he is quizzed about his claim to CNN's Larry King that he earned over $1 milliion from a speech he gave to the Learning Annex. Trump admits that he was actually paid only $400,000 in cash, proffering the novel argument that adding in the annex's promotional expenses puts his payment in the $1 million-plus range.

In November 2007, Trump wrote a letter to the editor of the *Wall Street Journal* to complain about a story on his net worth, explaining that a development in Hawaii was a huge success. "My tower in Waikiki was 100 percent sold out with 729 million in sales, 5 hours, a record," he wrote. Yet he admitted in the deposition that he doesn't actually own the building -- he just has a licensing agreement with the real owners.

At another moment, he is asked about $18.3 million in insurance proceeds he received due to hurricane damage to his Mar-a-Lago resort in Florida in 2005, explaining that he never felt obligated to turn that money over to the club or to spend all the money on repairs.

And he told *Crain's New York Business* in 2004 and 2005 that his Trump Organization has 22,000 employees, but admitted in the deposition that some of those employees are "not directly" on the payroll. Some are "suppliers, including construction workers, people that supply items to your building."

For his part, Trump lawyer Michael Cohen told The Huffington Post that Trump is worth "a lot ... substantially more than what's recorded in *Forbes*."

"They don't take into account the value of the Trump brand, of the mark, one of the most valuable marks that's ever been created," Cohen said. "He has very little debt, triple-A assets. He is going to provide audited financial disclosures when the time comes, if in fact he decides to run -- I think you're going to be shocked by the number that's being released." Those records have yet to be prepared, Cohen said, but Trump does obviously have audited financials year to year."

"I don't think there's any downside," to Trump running for president, Cohen added.

Trump has claimed it is rare for him to file a defamation lawsuit, but O'Brien's lawyers noted the number of times that he has threatened to sue, citing the following targets:

- *The New York Times*
- Rosie O'Donnell
- *Fortune* magazine
- Author Robert Slater
- *George* magazine
- *Wall Street Journal* reporters Neil Barsky and Alex Frangos (for separate stories)
- *The New York Post* (twice)
- Tina Brown (after *Vanity Fair* published a profile that described how Trump keeps a book of Hitler speeches by his bed, prompting Trump to write Brown that writer Marie Brennan "was a sick woman who couldn't see fairness if it was staring her in the face.")
- *The Chicago Tribune* architectural critic Paul Gapp
- *The Los Angeles Times'* David Lazarus

Subscribe to the HuffPost Hill newsletter!

PHOTO GALLERIES



- 10 Tips To Make Your Laptop Live Longer



- Think You're A Facebook Junkie? See How You...



- Despite Weather And Police Clashes, 'Occupy...

- The World's Most Attractive Employers

FOLLOW US

Case 1:11-cv-01413-PLF-VVP   Document 19   Filed 10/13/11   Page 5 of 60 PageID #: 129

# BUSINESS INSIDER
The Wire

Home > Collections > Lawsuit

Ads by Google

## Donald Trump Admits Under Oath That He's Exaggerated How Much Money He's Made

Glynnis MacNicol | April 22, 2011 |   5,953 |   60

Recommend                              .            .           0

### Download Google Chrome

A free browser that lets you do more of what you like on the web

www.google.com/chrome

**Eliot Spitzer** has found a new target.

For much of the week Spitzer has been laser focused on revealing whether **Donald Trump's** finances are actually as good as he says they are.

Last night he and CNN legal analyst **Jeff Toobin** pulled out a transcript of Trump's deposition during the 2007 lawsuit as undeniable proof Trump has been *exaggerating* the size of his funds.

Ads by Google



### Ink Cartridges - $2.95

Free Shipping on Orders Over $100!
Lowest Prices on Ink Cartridges

www.InkjetSuperStore.com/Ink

Look, there were literally dozens of contradictions throughout his deposition. Discrepancies between what Donald Trump says and the facts as presented.

Listen to this exchange in the depositions. The lawyer asks him, have you ever lied in public statements about your properties? Trump says he tries to be truthful, but then he adds this, "I'm no different from a politician running for office. You don't want to say negative things."

Then the lawyer asks him, have you ever exaggerated in statements about your properties? His response, "I think everyone does."

You know what? That's not true.

It's probably a *little bit* true. At least as far as people who've built a brand on being rich go. And that's Trump's brand. It's also why Trump is hedging on disclosing the details, because the truth of Trump's bank account could likely (sadly) do more damage than all his idiotic birthering put together.

The above mentioned lawsuit, by the way, was the one in which Trump sued author Tim O'Brien over the book, "Trump Nation: The Art of Being the Donald" because O'Brien reported, among other things, that Trump was not as rich as he said he was. Oh irony. Suffice to say, it's been a sore spot long before now. Video below.

Ads by Google

### Ink Cartridges - $2.95
Free Shipping on Orders Over $100! Lowest Prices on Ink Cartridges
www.InkjetSuperStore.com/Ink

### California Law Firm
Specializing In Defective Products For 33 Years W/ 98.6% Success Rate!
www.MichaelSilvers.com

**Featured Articles**

**Find More Stories About**

Lawsuit

Lawyer

**Related Articles**

GOSSIP: Today's Wall Street Buzz In 60 Seconds
January 27, 2011





Tim Geithner Explains The 3 Most Important Things To Restore Growth

If You Break The Rules On Google+, You Can Lose All Google Services

Pirate-Loving Roger Friedman Lands At The Hollywood Reporter

More:

Hollywood Giving Up On Bad Movie URLs, Telling Fans To Google It (GOOG)

What's in a (venture capital) website ?

Will Pandora Struggle As The Advertising Market Dries Up?

Yes, Microsoft Did Change The World More Than Apple

The Big Data Conundrum

If Your Dream Is to Get Rich, Don't Try a Startup

## The Water Cooler
80 comments

**KL** on Apr 22, 12:53 PM **said:**

Trump's a deadbeat, anyone who's ever done business with him knows that.

**Tea Bag Hypocrite** on Apr 22, 1:04 PM **said:**

NO!!! Tell me it isn't true. Trump lies? My future president tells lies?

**Obama under oath** on Apr 22, 1:08 PM **said:**

Let's get Obama under oath and see what he admits to. I bet if he actually told the truth (and if not we can go after him hardcore!) it would be a lot worse.

**Hugh Akston** on Apr 22, 1:14 PM **said:**

Oh my Glynnis, if you want to make exaggeration a crime, start with your man Barry Barack Soetoro Saebarkah Duncan Obama. Glynnis, I got one question for your liberalness. Why doesn't Obama just show his long form birth certificate and end the debate once and for all? Why is he spending money to defend such the idiotic birther debate? Why is he turning this idiotic issue into a reason for people to doubt his authenticity? Is he getting something out of this? I think what he gains is YOU. He knows that to get a militant media on his side, he needs to throw YOU a bone. Is your career and you journalistic integrity just Obama's cannon fodder? Hey, take as many as you want for the team. Yes You Can! Don't worry Glynnis, I don't expect you to write an article answering that question or to even post a comment.

**alix** on Apr 22, 1:25 PM **said:**

Hugh, do you think you'll vote for Trump if he runs? I'm sort of wondering if the long-standing national bias against NYC will hurt him. (I'm not saying I'm biased against New Yorkers, but a lot of people are.)

**Click here to comment >>**

* Copyright © 2011 Business Insider, Inc. All rights reserved. Registration on or use of this site constitutes acceptance of our Terms of Service and Privacy Policy.

Disclaimer  |  Index by Keyword  |  Index by Date

**Opposition to Motion EXHIBIT B**

Case 1:11-cv-01413-RL-LVP    Document 19    Filed 10/13/11    Page 8 of 60 PageID #: 132



Getty

### Few Surprised 'Trump University' Is Sued for Fraud

Ujala Sehgal May 07, 2011 25,672 Views Comments (34)

Drawing from the publicity he received from his shows "The Apprentice" and "Celebrity Apprentice," Donald Trump launched an educational program in 2005, "Trump University," that promises mentorships that are "the next best thing" to being Trump's apprentice. So far, over 11,000 people have attended, reports Marcus Baram for The Huffington Post.

However, the for-profit institution is now the target of a class-action lawsuit in federal court and the attorneys general of six states are investigating numerous complaints about it, including Texas, where the Trump Organization ultimately decided not to conduct any seminars.

The lead plaintiff in the class action, Tarla Makaeff, alleges that Trump University's mentors and associates "guide students toward deals in which they have a personal financial interest at stake -- creating a severe conflict of interest, so that the mentors profit while the student does not." Another plaintiff said the seminar promised access to "exclusive" property listings, but he found the listings elsewhere online for a fraction of the cost.

News of the lawsuit has not exactly shocked the media. Gothamist titled its report of the story: "Trump University Shockingly Sued For Trump-ness" and marveled at Makaeff's "straight-faced" quote to the *New York Daily News* that she "relied on the Trump name and Donald Trump's reputation as a real estate mogul. I expected nothing less than the best... Big mistake." Gawker reacted to the lawsuit, "Swindled by Donald Trump! Imagine that!"

Such reactions are more evidence that since Trump's highly criticized birther claims were debunked, if not before, his name has become synonymous

Case 1:11-cv-01413-DLI-VVP Document 19 Filed 10/13/11 Page 9 of 60 PageID #: 123

with exaggerated claims and fraud, two qualities he certainly does not want
associated with an educational system, particularly a for-profit school. As
ex-Trump student Adil Bagirov noted to the Huffington Post, "the industry is
prone to fraud" and "unscrupulous instructors" as it is.

Assistant general counsel for the Trump Organization George Sorial calls
the allegations "completely ridiculous," and Trump has filed a $100 million
counterclaim for defamation against Makaeff, a move that Makaeff's
attorney calls "nothing more than a class intimidation tactic by a bully."

Want to add to this story? Let us know in comments or send an email to the
author at usehgal@theatlantic.com. You can share ideas for stories on the
Open Wire.

## Sources
Trump's 'University' Accused Of Scamming Customers , Marcus Baram,
Huffington Post
Trump University Shockingly Sued For Trump-ness, Ben Yakas, Gothamist
Lawsuit slams Donald Trump's online business school as a ripoff , Douglas
Feiden, New York Daily News
Donald Trump's Scam School Gets Sued, Sergio Hernandez, Gawker

25

Like    738 people like this. Be the first of your friends.

Copyright © 2011 by The Atlantic Monthly Group. All rights reserved.

TOP STORIES

LAWSUITS

# Donald Trump's Scam School Gets Sued

BY SERGIO HERNANDEZ

MAY 4, 2010 12:27 PM

Share     Like   58              15,729   77

A California woman has filed a class-action lawsuit against the unaccredited Trump University claiming she was swindled into spending $60,000 on bogus seminars and a trip to Home Depot. Swindled by Donald Trump! Imagine that!

Tarla Makaeff filed the suit in federal court on Friday. Makaeff says she spent nearly $60,000 on seminars after she was promised a one-year apprenticeship and a "complete" real estate education. Instead, she says the seminars were more like "infomercials," aimed at upselling students to enroll in Trump University's $35,000 "Gold Program."

Her "one-year apprenticeship" turned out to be a three-day workshop that Makaeff says "consisted of no practical insights and no mentorship, but rather excursions to the Home Depot and 'mentors' who either recommend real estate deals they stood to benefit from financially, or quickly disappeared and failed to return calls."

She also says Trump U deceived its students by telling them to raise their credit limits and max out their credit cards to "enter into 'real



Google

estate transactions,'" only to turn around and tell them they should use that credit to pay for the Gold Program. Makaeff went ahead and *did that*, but now says Trump University never warned students they might incur finance charges, interest fees, or late fees by charging the seminar to their cards and that Trump failed to tell them that raising their credit limits or maxing out their cards might damage their credit scores.

Despite her gullibility, Makaeff's claim isn't the only recent attack on Trump U. Three weeks ago, the New York State Education Department accused Trump U of misleading the public and violating state law by calling itself a "university." In January, the Better Business Bureau slammed Trump U with a D-minus rating (although that score is now being reviewed by the BBB).



**GAWKER**                    LOGIN

LATEST **POPULAR** SEARCH

                              487
College Republicans' Stupid
'Race-Based Bake Sale' Is
**JEZEBEL** Exactly What We'd Expect

MICHAEL JA
Here's the            383
Unbelievabl
Michael Jac
Speech

PRIVACY            261
Why You Never Really Log Out
of Facebook

CANDIDATES         258
Lip-Readers Transcribe Rick
Perry's Disturbing Psychobabble

CONFLICTS OF INTERE:
Here's the Ashton      257
Kutcher Laptop That CBS
Banned

the suit had "no merit" and that Trump U plan:
brand name, and the services we otter.""

"This individual consumed every service [she] |
Sexton, Makaeff gave Trump U the five out of f
taped a video testimonial about her experience
Sexton assures us he's looking into it.

**Makaeff's Full Lawsuit:**

We called the Trump Organization to find
out just what sort of snake oil sales scheme
they're running over at Trump U, but they
haven't gotten back to us yet. In the
meantime, if you're that desperate to be The
Donald's next protégé, we'd suggest
auditioning for the next *Apprentice*. At least
all you'll lose there is your dignity.

**UPDATE:** Trump University president
Michael Sexton finally got back to us. He said
"vigorously defend our reputation, company,

chased and then some," he said. According to
s on its customer satisfaction surveys and even
aturally, we asked for a copy of that video and

*ic via Getty Images]*

MORE STORIES...



LATEST **POPULAR** SEARCH

COLLEGE                                      487
College Republicans' Stupid
'Race-Based Bake Sale' Is
Exactly What You'd Expect

RELATED STORIES

MICHAEL JACKSON                              383
Here's the
AudienceThatPaidToSeeOurWorl
• Allegedly Michael Jackson's Drug Addled
Your Free 2011 Horoscope Speech
Stop making the same mistakes Get what's missing in you

PRIVACY                                      261
Why You Never Really Log Out
of Facebook

CANDIDATES                                   258
Lip-Readers Transcribe Rick
Perry's Disturbing Psychobabble

CONFLICTS OF INTEREST                        257
Here's the Ashton
Kutcher Laptop That CBS
Banned

- - -

; Too Similar to Her Actual Stupidity

s Is Destroying Us

: Least We're Not a Ponzi Scheme'

e now

AdChoices ▷

---

DISCUSSION THREADS                FEATURED    ALL    START A NEW THREAD

Thatcornellguy                                04 May 2010 12:33 PM

I don't understand. She enrolled in the most lu    ious, classy, higher ed institution possible.
How does that happen?

J-No  @Thatcornellguy

@Thatcornellguy: Makes me laugh every time I    ays it.

Uncle_Billy_Slumming  @Thatcornellguy

@Thatcornellguy:

It's the heraldic crest he uses in his marketing    it did it. Jackass rampant on a field of fules.

---

About  Help  Forums  Jobs  Legal  Privacy    ermissions  Advertising  Subscribe  Send a tip

**MORE STORIES...**

**Opposition to Motion EXHIBIT C**

**COMPLAINT TRANSMITTAL COVERSHEET**
*(http://arbiter.wipo.int/domains)*

---

### COMPLAINT

Attached is a Complaint that has been filed against you with the WIPO Arbitration and Mediation Center (the **Center**) pursuant to the Uniform Domain Name Dispute Resolution Policy (the **Policy**) adopted by the Internet Corporation for Assigned Names and Numbers (ICANN) on October 24, 1999.

The Policy is incorporated by reference into your Registration Agreement with the Registrar(s) of your domain name(s). Accordingly, when you registered your domain name(s) you also agreed to submit to and participate in a mandatory administrative proceeding in the event that a third party (a **Complainant**) submits a complaint to a dispute resolution service provider, such as the Center, concerning a domain name that you have registered. You will find the name and contact details of the Complainant, as well as the domain name(s) that is/are the subject of the Complaint in the document that accompanies this Coversheet.

You have no duty to act at this time. Once the Center has checked the Complaint to determine that it satisfies the formal requirements of the Policy, the Rules for Uniform Domain Name Dispute Resolution Policy (the **Rules**) and the Center's Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the **Supplemental Rules**), and it has received the required payment from the Complainant, it will forward an official copy of the Complaint to you. You will then have 20 calendar days within which to submit a Response to the Complaint in accordance with the Rules and Supplemental Rules to the Center and the Complainant. Should you so desire, you may wish to seek the assistance of legal counsel to represent you in the administrative proceeding.

- The ICANN Policy can be found at http://www.icann.org/udrp/udrp-policy-24oct99.htm.

- The ICANN Rules can be found at http://www.icann.org/udrp/udrp-rules-24oct99.htm.

- The Center's Supplemental Rules, as well as other information concerning the resolution of domain name disputes can be found at http://arbiter.wipo.int/domains.

Alternatively, you may contact the Center to obtain any of the above documents. The Center can be contacted in Geneva, Switzerland by telephone at +41 22 338 9111, by fax at +41 22 740 3700 or by e-mail at domain.disputes@wipo.int.

You are kindly requested to contact the Center to provide the contact details to which you would like (a) the official version of the Complaint and (b) other communications in the administrative proceeding to be sent.

A copy of this Complaint has also been sent to the Registrar(s) with which you have registered the domain name(s) that are identified in the Complaint.

By submitting this Complaint to the Center we hereby agree to abide and be bound by the provisions of the Policy, Rules and Supplemental Rules.

---

{F0719122.2 }

*Before the:*

### WORLD INTELLECTUAL PROPERTY ORGANIZATION ARBITRATION AND MEDIATION CENTER

| | |
|---|---|
| DONALD J. TRUMP,<br><br>                          Complainants,<br><br>                    v.<br><br>WEB-ADVISO,<br><br>                          Respondent. | **Disputed Domain Names:**<br><br>**trumpindia.com**<br>**trumpmumbai.com**<br>**trumpbeijing.com**<br>**trumpabudhabi.com** |

### COMPLAINT IN ACCORDANCE WITH THE UNIFORM DOMAIN NAME DISPUTE RESOLUTION POLICY

### I. INTRODUCTION

1.   Complainant Donald J. Trump hereby submits this Complaint for decision in accordance with the Uniform Domain Name Dispute Resolution Policy (the Policy), approved by the Internet Corporation for Assigned Names and Numbers (ICANN) on October 24, 1999, the Rules for Uniform Domain Name Dispute Resolution Policy (the Rules), approved by ICANN on October 24, 1999 and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy in effect on December 14, 2009 (the Supplemental Rules).

### II. ADMINISTRATIVE PANEL

2.   Complainant elects to have the dispute decided by a single arbitrator selected from the list of arbitrators that WIPO has authorized to hear such disputes.

{F0719122.2 }

### III.  **THE PARTIES**

**A.**   **Complainant**

3.   The Complainant in this matter is Donald J. Trump, an individual residing in New York, New York.  Complainant can be reached at his place of business c/o The Trump Organization, 725 Fifth Avenue, New York, New York 10022.

4.   Complainant's authorized representatives in this proceeding are its attorneys Fross Zelnick Lehrman & Zissu, P.C., attn:  Todd Martin, 866 United Nations Plaza, New York, New York 10017; telephone number:  212-813-5900; fax number:  212-813-5901; and e-mail address:  tmartin@frosszelnick.com.

5.   Please direct communications in this proceeding to Complainant as follows:

| **Electronic-only material** | **Material including hardcopy** |
|---|---|
| Method: e-mail | Method: facsimile |
| Address: tmartin@frosszelnick.com | Fax: (212) 813-5901 |
| Contact:  Todd Martin, Esq. | Contact: Todd Martin, Esq. |

**B.**   **Respondent**

6.   Complainant requests the transfer of the following four domain names, all of which are under the management and control of a single owner/registrant, Web-Adviso: trumpindia.com, trumpmumbai.com, trumpbeijing.com and trumpabudhabi.com.

7.   According to publicly available Whois information, the registration records for the four domain names each list the Respondent, Administrative and Technical Contact as Web-adviso, J.Y., 556 E. 88th Street, Brooklyn, New York 11236, United States, with an e-mail address of sporting202@yahoo.com and a listed telephone number of +1.6463098421. *See* Exhibit A.

### III.  **THE REGISTRARS**

8.   The registrar for each of the three Infringing Domain Names is GoDaddy.com, Inc.

{F0719122.2 }

9.   The Registrar's contact details are:

GoDaddy.com, Inc.
14455 North Hayden Rd Suite 226
Scottsdale, Arizona 85260
United States
1 480-505-8800
tim@godaddy.com

Printouts from the Internic.net website for the Registrar are attached as <u>Exhibit B</u>.

## IV.   <u>JURISDICTIONAL BASIS FOR THE ADMINISTRATIVE PROCEEDING</u>

10.  This dispute is properly within the scope of the Policy and the Administrative

Panel has jurisdiction to decide the dispute because the Registrar is ICANN-accredited and/or

the registration agreement pursuant to which the Infringing Domain Names are registered

incorporates the Policy.  True and correct printouts of the relevant registration agreement are

attached as <u>Exhibit C</u>.

11.  Respondent is required to submit to a mandatory administrative proceeding under

Paragraph 4(a) of the Policy because:  (a) The Infringing Domain Names are identical to

Complainant's famous TRUMP trademark; (b) Respondent cannot establish any right or

legitimate interest in the Infringing Domain Names; and (c) The Infringing Domain Names

have been registered and are being used in bad faith.

## V.   <u>FACTS GIVING RISE TO THIS ADMINISTRATIVE PROCEEDING</u>

### A.   <u>Complainant's TRUMP Marks</u>

12.  Donald J. Trump ("Complainant") is one of the most well known real estate

developers, hoteliers, authors and television personalities in the world.  His portfolio includes

residential real estate, commercial real estate, golf courses, casinos, hotels, and other

properties, spread across the United States and around the world.  Among the iconic

properties owned, operated or affiliated with the Complainant are the Trump Tower on Fifth

Avenue, The Trump Building at 40 Wall Street, Trump World Tower at the United Nations

Plaza, Trump Park Avenue at 59th Street and Park Avenue, Trump Parc and Trump Parc East at Central Park South, Trump Place on the Hudson River, and Trump Palace. Complainant also is associated with several casinos, including three in Atlantic City, New Jersey: Trump Taj Mahal, Trump Plaza and Trump Marina. *See* <u>Exhibit D</u>.

13.   Complainant is an accomplished and best selling author. Complainant has had numerous best sellers including *The Art of the Deal*, which is considered a business classic, *The Art of the Comeback*, *The America We Deserve*, *How To Get Rich*, *Think Like a Billionaire*, *Trump 101*, *Why We Want You To Be Rich*, *Think Big*, *Never Give Up* and *Think Like a Champion*. Many of these titles have been translated and sold in both India and China, and have been translated into many languages, including Arabic. *See* <u>Exhibit E</u>.

14.   Complainant is part owner of the Miss Universe Organization which conducts the Miss Universe, Miss USA, and Miss Teen USA pageants. *See* <u>Exhibit F</u>. These pageants have been broadcast in markets around the world, including in the U.A.E., India and China.

15.   Complainant is also the star and executive producer of the NBC television shows *The Apprentice* and *The Celebrity Apprentice*. These two shows have aired for a combined 9 seasons and have been among the most popular televisions shows broadcast in the United States since the premiere of the franchise in 2004. *See* <u>Exhibit G</u>. These shows have been broadcast in countries around the world, including in the U.A.E., India and China.

16.   For more information on all of Complainant's holdings and business interests, please see his website at www.trump.com. True and correct printouts of the homepages for above listed websites and the registration records for those domain names are attached as <u>Exhibit H</u>.

17.   Through the widespread, extensive use of the TRUMP trademark in connection with his various businesses and the expenditure of large sums in promoting the TRUMP brand on television, in print advertisements, on the Internet and in other media,

{F0719122.2 }

Complainant's TRUMP mark has become uniquely associated with Complainant and his goods and services, and has attained considerable fame and widespread acclaim in the United States and throughout the world.  As a result, Complainant's TRUMP Marks represent enormous goodwill.

18.  In addition to the extensive use of the TRUMP mark, Complainant has obtained numerous trademark registrations throughout the world in connection with its hotels, real estate and related goods and services.  For example, Complainant owns the following trademark registrations in the United States, China and the UAE:

| Mark | Country | Class | Registration No. | Registration Date |
|---|---|---|---|---|
| TRUMP | U.S. | 42 | 2,240,310 | April 20, 1999 |
| TRUMP | U.S. | 32 | 2,413,984 | December 19, 2000 |
| TRUMP | U.S. | 41 | 2,431,539 | February 27, 2001 |
| TRUMP | U.S. | 41 | 3,391,095 | March 4, 2008 |
| TRUMP | U.S. | 33 | 3,456,507 | July 1, 2008 |
| TRUMP | U.S. | 36, 37 | 3,526,411 | November 4, 2008 |
| TRUMP | U.S. | 16 | 3,655,340 | July 14, 2009 |
| TRUMP | U.S. | 43 | 3,483,760 | August 12, 2008 |
| TRUMP | U.S. | 20 | 3,563,198 | January 20, 2009 |
| TRUMP | U.S. | 25 | 3,687,022 | September 22, 2009 |
| TRUMP | U.S. | 14 | 3,245,415 | May 22, 2007 |
| TRUMP | U.S. | 28 | 3,321,143 | October 23, 2007 |
| TRUMP | India | 36, 37 | 1419912 | February 8, 2006 |
| TRUMP | India | 42 | 1494175 | October 6, 2006 |

| Mark | Country | Class | Registration No. | Registration Date |
|---|---|---|---|---|
| TRUMP (CHUAN PU) in Chinese Characters<br><br>川普 | China | 44 | 6674373 | May 7, 2010 |
| TRUMP (CHUAN PU) in Chinese Characters<br><br>川普 | China | 43 | 6674374 | May 7, 2010 |
| TRUMP (CHUAN PU) in Chinese Characters<br><br>川普 | China | 37 | 6674377 | April 14, 2010 |
| TRUMP (CHUAN PU) in Chinese Characters<br><br>川普 | China | 36 | 6674378 | April 14, 2010 |
| TRUMP ATTACHÉ | U.A.E. | 45 | 103575 | May 19, 2010 |
| TRUMP INTERNATIONAL HOTEL AND TOWER, PALM JUMEIRAH | U.A.E. | 36 | 85016 | November 12, 2007 |
| TRUMP INTERNATIONAL HOTEL AND TOWER, PALM JUMEIRAH | U.A.E. | 37 | 82615 | February 7, 2008 |

{F0719122.2 }

True and correct copies of printouts from the USPTO's publicly available website evidencing the U.S. registrations are attached as Exhibit I. Complainant also owns registrations for Complainant's TRUMP mark throughout the rest of the world. A printout illustrating a representative sample of Complainant's other trademark registrations is attached as Exhibit J.

19. In 2007, Complainant's son, an Executive Vice President with The Trump Organization, announced plans to build TRUMP-branded hotels and luxury condominiums in Mumbai and Bangalore, India. News reports of Donald Trump Jr's visit to India were published as early as July 2, 2007. *See* Exhibit K. There have also been published reports of Complainant's purported plans to begin another development project in Mumbai, India as recently as October 2010. *See* Exhibit L.

20. In 2008, it was reported that Complainant was in talks with Hydra Properties to develop a mixed-use residential and hotel tower on Abu Dhabi's Reem Island. *See* Exhibit M.

21. Complainant's exclusive rights in the TRUMP trademark have been recognized in several WIPO decisions that ordered the transfer of infringing domain names to Complainant. *See, e.g., Donald J. Trump v. Mediaking LLC d/b/a Mediaking Corporation and Aaftek Domain Corp.*, WIPO Case No. D2010-1404 (ordering the transfer of trumplasvegas.com and stating that "Complainant had rights in the TRUMP trademark long before it announced plans to construct the Trump International Hotel Las Vegas, and Complainant was already well-known for the operation of hotels and casinos before its specific plans with respect to that hotel were announced."); *Donald J. Trump v. Maciel*, WIPO Case No. D2005-0918 ("The distinctive quality of the TRUMP mark, as evidenced by registration and use, is beyond question."); *Donald J. Trump v. Fountainhead Entertainment LLC*, WIPO Case No. D2004-0429 ("Given the fame of the TRUMP mark… such individuals are likely to be confused as to the source or sponsorship of the site"); *Donald J. Trump v. Sandra Long Consulting*, WIPO Case No. D2007-1226 ("through Complainant's longstanding use of the TRUMP mark

{F0719122.2 }

in domain names and web addresses the public has come to expect that domain names incorporating the mark be the Complainant.")

**B.     Respondent's Improper Registration and Use of the Infringing Domain Names**

22. Respondent registered all four of the Infringing Domain Names on September 20, 2007, shortly after reports were published announcing Donald Trump Jr.'s planned speaking engagement in India, at a time when Complainant was preparing to announce/ shortly after Complainant announced plans to begin construction of two properties in India and at least 12 years after Complainant first began using the TRUMP mark in the United States and a full year after Complainant first secured rights to the TRUMP mark in the India.

23. Upon information and belief, Respondent is using the websites associated with each of the Domain Names for what it purports to be parody websites:

> Welcome to the Fan, parody and news site. You find the best content works by fan produced parodies as well as industry-locale news.

In reality, however, none of the content posted at any of the three websites was developed for Respondent's websites. All of the video "parodies" posted at Respondent's websites were originally created by third-parties and posted at YouTube.com. A link to each video was then posted at the infringing websites by the Administrator for each of the websites. *See* Exhibit N. Although the postings at the websites claim that they were written by the Administrator, this only refers to the entries themselves (which contain no parodic content), as all of the videos were created by third-parties for use at other online venues. The creators of the third-party videos have no known connection to or affiliation with the Respondent.

24. Similarly, the information contained in the "RE News" sections of each of the websites is nothing more than news feeds from Google News generated by the keywords, "real estate." *See* Exhibit O. There is absolutely no original "news" content from the Respondent at any of the Infringing websites.

{F0719122.2}

25.  Upon information and belief, Respondent registered the Infringing Domain Names to capitalize on Complainant's fame and notoriety and to sell each of the Infringing Domain Names to Complainant at a profit.  As stated by Respondent's representative John Yung, in an email to Complainant's counsel on November 8, 2010:

> Webadviso agrees to negotiate with your organization in hopes of reaching a more mutually agreeable terms.  Under the advisement from numerous internet professionals and legal sources, Webadviso believes the domain names, the large internet traffic from the site, and the development programming labor/work that has gone into building the site have significant value.  We hope that your organization recognizes these attributes in your effort to negotiate with Webadviso.  (sic)

Exhibit P.

26.  Complainant offered to pay Respondent $100 to cover the transfer and registration costs for the Infringing Domain Names, but this offer was rejected by Respondent's representative William Ng on November 4, 2010.  See Exhibit Q.  By rejecting Complainant's reasonable offer to pay the registration and transfer costs associated with the Infringing Domain Names and then requesting greater compensation for the domains, Respondent made clear that it seeks to unfairly profit from its improper registration of the Infringing Domain Names.

### VII.  GROUNDS FOR THIS ADMINISTRATIVE PROCEEDING

### i.      The Infringing Domain Names are Confusingly Similar to Complainant's Mark

27.  The Infringing Domain Names are confusingly similar to Complainant's TRUMP trademarks.  The Infringing Domain Names consist of nothing more than Complainant's registered trademark, and some combination of the geographic terms "Abu Dhabi," "Mumbai," "India" and "Beijing" and the generic .com generic top level domain ("gTLD") extension

28.  The gTLD indicator ".com" cannot be taken into consideration when judging confusing similarity.  *Foundation Le Corbusier v. Mercado M.*, WIPO Case No. D2004-0723, at § 6.A.

{F0719122.2 }

29. Furthermore, the addition of the geographical indicators "Abu Dhabi," "Mumbai," "India" and "Beijing" to Complainant's TRUMP trademark "add[s] to rather than diminish[es] the likelihood of confusion" because "[t]he addition of a place name to a trademark . . . is a common method for indicating the location of a business enterprise identified by the trademark or service mark." *Six Continents Hotels, Inc. v. Dkal*, WIPO Case No. D2003-0244, at §8.B; *see also Starwood Hotels & Resorts Worldwide, Inc. v. Domaincar*, WIPO Case No. D2006-0136, at § 6.A ("[T]he geographical descriptors . . . actually increase" likelihood of confusion "because they relate directly to places where the Complainant has developed or might develop its core business through hotels and other leisure services"); *Six Continents Hotels, Inc. v. Ramada Inn*, WIPO Case No. D2003-0658 ("[T]he addition of the suffix 'Michigan' is apt to suggest that the Complainant's [Holiday Inn Hotels] are provided in that particular location.").

30. Given the reputation and renown of Complainant's TRUMP mark, most Internet users who see the Infringing Domain Names are likely to immediately recognize Complainant's Mark, and assume that the Infringing Domain Names and the websites associated with them are owned, controlled or approved by Complainant. In addition, consumers and other third parties who search the Internet for legitimate information on Complainant or about the businesses he owns and controls may be directed to the Internet addresses incorporating the Infringing Domain Names, creating a probability of confusion. *See GA Modefine S.A. v. O'Flynn*, WIPO Case No. D2000-1424; *see also Volvo Trademark Holding*, WIPO Case No. D2002-0521.

31. Upon being redirected to Respondent's website from the Infringing Domain Names, consumers would have reasonably believed that they are either the Complainant's websites or are somehow related to or approved by Complainant, when that is not the case.

**B.    The Respondent Has No Legitimate Interest in The Infringing Domain Names**

32. Respondent cannot demonstrate or establish any legitimate interest in the Infringing Domain Names. Although Respondent has posted a disclaimer at the websites associated with each of the Infringing Domain Names claiming that the sites are meant as parody and news and information websites, Respondent's actual use of the websites does not support any legitimate claim to the Infringing Domain Names.

33. Indeed, Respondent is a frequent cyber-squatter, having been found liable of cybersquatting by courts in the United States, including *Webadviso v. Bank of America Corp.*, 2009 WL 5177997 (S.D.N.Y. Dec. 31, 2009); 2010 WL 521117 (S.D.N.Y. Feb. 16, 2010). By its own admission in those court documents, Webadivso is a "'domainer' who seeks to 'acquire high value domain names and park them with domain parking service providers to generate pay-per-click revenue' or to build websites." *Webadviso v. Bank of Am.*, 2010 WL 521117, at *1. "Webadviso has a history of registering domain names that include well-known trademarks." *Id* at *2. Despite any statements to the contrary, Respondent has made clear its desire to profit from the registration of the Infringing Domain Names and has no legitimate interest in the Infringing Domain Names.

34. Since Complainant's adoption and extensive use of the TRUMP mark in 1997 predates Respondent's first use of the Infringing Domain Names, the burden is on Respondent to establish his rights or legitimate interests in the Infringing Domain Names. *See PepsiCo, Inc. v. Amilcar Perez Lista d/b/a Cybersor*, WIPO Case No. D2003-0174. Complainant has not granted Respondent any license, permission, or other right by which Respondent could own or use any domain name incorporating Complainant's TRUMP marks. Certainly, the Infringing Domain Names are not, nor could they be contended to be, the name or nickname of the Respondent, nor are they in any other way identified with or related to any rights or legitimate interests of the Respondent.

{F0719122.2 }

35. Registration of the Infringing Domain Names occurred <u>after</u> Complainant had made extensive use of the TRUMP mark; <u>after</u> Complainant had obtained numerous registrations for its TRUMP mark; and <u>after</u> Complainant announced plans for real estate projects in Mumbai and Bangalore, India. Given these facts, Respondent clearly was on notice of Complainant's rights before it adopted Complainant's trademark as its domain name. *See generally Chanel, Inc. v. Buybeauty.com*, WIPO Case No. D2000-1126 (Given fame and substantial use, "no actual or contemplated bona fide or legitimate use of the Domain Name could be claimed by Respondent.").

36. Nothing in any of the four Infringing Domain Names themselves indicates that the associated websites feature criticism of, news about or parodies relating to the Complainant. Hence, the use of Complainant's TRUMP mark in the Infringing Domain Names illegitimately diverts internet traffic to Respondent's websites. *Monty and Pat Roberts Inc. v. J Bartell*, WIPO Case No. D2000-0300. Furthermore, the sites themselves contain no original content, and appear to have been roughly assembled by Respondent in an attempt to conform to some misguided notion of fair use.

37. Respondent is not commonly known by any of the Infringing Domain Names at issue. The disclaimer posted at the websites associated with the Domain Names is insufficient to avoid any consumer confusion. The confusion will already exist before it becomes clear to any visitor to the Infringing Domain Names that the sites purport to provide news and information along with parody videos of the Complainant. The misleading choice of the Infringing Domain Names:

> suggesting as it does some connection with the Complainant, will have already achieved the desired result by the time an Internet browser arrives at the Respondent's website. The Domain Name "bait" will have already successfully "hooked" the Internet browser – by the time the browser realizes that he or she has not arrived at a web site operated by the Complainant, he or she will have already been exposed to the promotional material relating to [the Infringing Domain Names.] The Respondent's choice of the Domain Name has thus created a

> likelihood of confusion between the Domain Name and the Complainant's mark, of the kind commonly referred to as "initial interest confusion" (as found, for example, in the very recent decision of *David Foox v. Kung Foox and Bill Hicks*, WIPO Case No. D2008-0472). Confusion of that kind cannot be "cured" by posting a "fine print" disclaimer on the Respondent's website. The disclaimer comes too late to negate the effect of the browser's initial mistaken impression.

*World Natural Bodybuilding Federation, Inc. v. Daniel Jones TheDotCafe*, WIPO Case No. D2008-0642, at §6.D.  Respondent's use of the TRUMP trademark in the text of each of the Infringing Domain Names for the purposes stated in the disclaimer cannot and should not be considered a fair use.

38.  Complainant, having made a prima facie showing "of absence of rights or legitimate interests in the Domain Name on the part of the Respondent, the evidentiary burden shifts to the Respondent to show, by plausible, concrete evidence, that the Respondent does have a right or a legitimate interest in the Domain Name." *Id.*

39.  Respondent's use of the Infringing Domain Names demonstrates neither a bona fide offering of goods or services nor a legitimate interest.  Failing to disclose the lack of any relationship with the Complainant at Respondent's websites fails any test for a *bona fide* use of the domain names incorporating Complainant's TRUMP trademarks.  *See Oki Data Americas, Inc. v. ASD, Inc.*, WIPO Case No. D2001-0903.  Respondent in this matter is using the Infringing Domain Names to promote services that are not only unauthorized by Complaint, but which compete directly with the Complainant.  There are also no disclaimers at the websites that mention the lack of any relationship with the Complainant.  Accordingly, any sale or promotion of such services by Respondent would fail the fair use requirements..

40.  Respondent has no rights in the TRUMP Mark.  Respondent was well aware of the fame of the TRUMP marks as it made use of the Infringing Domain Names and obviously hoped that its use of the Infringing Domain Names would cause traffic to be directed to its

website so that it could profit from such use. There is no reason that Respondent can point to that would support its need to use the Infringing Domain Names.

C.   **The Respondent Registered And Is Using The Infringing Domain Names In Bad Faith**

   *1.   Respondent Registered the Infringing Domain Names in Bad Faith.*

   41. Complainant is one of the most recognizable individuals in the world, and his TRUMP marks enjoy international recognition. It is therefore inconceivable that Respondent was unaware of Complainant's trademarks when he obtained the Infringing Domain Names. *Heineken Brouwerijen B.V. v. Mark Lott*, WIPO Case No. D2000-1487, at § 6(3) (finding bad faith where complainant's international fame precludes innocent registration of a confusingly similar domain name). Respondent's use of Complainant's marks at the Infringing Domain Names is clear proof that Respondent was and is aware of the fame of the TRUMP marks.

   42. The fact that Respondent registered the confusingly similar Infringing Domain Names without authorization is, in and of itself, evidence of bad faith. *See, e.g., Veuve Cliquot*, WIPO Case No. D2000-0163, at § 6 (bad faith is found where a domain name "is so obviously connected with such a well-known product that its very use by someone with no connection with the product suggests opportunistic bad faith").

   43. Even non-commercial websites can divert traffic meant for Complainant's website and have a commercial impact on the Complainant, evidencing bad faith. *PETA v. Doughney*, 263 F.3d 359, 365 (4th Cir. 2001); *Council of American Survey Research Orgs. v. The Consumer Information Org.*, WIPO Case No. D2002-0377.

   44. No relationship exists between Respondent and Complainant or any of Complainant's licensees, agents or affiliated companies that would give rise to any license, permission, or authorization by which Respondent could own or use the Infringing Domain

Names, which incorporate and are confusingly similar to Complainant's Mark. Respondent is not commonly known by any of the Infringing Domain Names, as discussed above.

45. Since Complainant's Mark is so well-known and Respondent has no rights therein, the only reason that Respondent could have for registering and using the Domain Names, consisting of nothing more than the TRUMP mark plus geographic terms is that Respondent knew of Complainant's Mark and wanted to trade on Complainant's renown to lure consumers to its websites.

     2.    *Respondent's Bad Faith Use of the Infringing Domain Name*

46. Where, as here, Complainant's Mark is well known and recognized, the registration and commercial use of a domain name wholly incorporating the mark further evidences the Respondent's bad faith. *Guerlain S.A. v. PeiKang*, WIPO Case No. D2000-0055. *See also Veuve Cliquot*, WIPO Case No. D2000-0163 at § 6 (bad faith is found where a domain name "is so obviously connected with such a well-known product that its very use by someone with no connection with the product suggests opportunistic bad faith").

47. The facts set forth above clearly demonstrate that Respondent is acting in bad faith. By registering and using the Infringing Domain Names, Respondent has unfairly capitalized on the goodwill and fame of Complainant's Mark and improperly benefited financially in violation of the Policy, paragraph 4(b)(iv), which provides relief for a trademark owner when "by using the domain name, [Respondent has] intentionally attempted to attract, for commercial gain, Internet users to [its] web site . . . , by creating a likelihood of confusion" with Complainant's Marks "as to the source, sponsorship, affiliation, or endorsement of [its] web site . . . or of a product or service on [its] web site . . . ."

48. Respondent has earned revenue directly by redirecting consumers to its websites, by its unauthorized use of Complainant's TRUMP mark in its Infringing Domain Names and otherwise profiting from the consumer confusion that is the inevitable result of Respondent's

misappropriation of Complainant's Mark. *See, e.g., Chinmoy Kumar Ghose v. ICDSoft.com & Maria Sliwa*, WIPO Case No. D2003-0248 ("it could never be a legitimate or fair use to select a domain name which is confusingly similar to another person's trade or service mark, with a view to misleadingly attracting visitors to a website linked to that domain name"); *Ciccone v. Parisi*, WIPO Case No. D2000-0847 ("[u]se which intentionally trades on the fame of another cannot constitute a 'bona fide' offering of goods or services").

49. In view of the foregoing, Complainant has met the requirements of the Policy by demonstrating not only its own legitimate interest in the TRUMP marks as evidenced by its use and registration of the marks, but also that Respondent has no legitimate interests in the marks and that Respondent's sole basis for using and registering the Infringing Domain Names is to profit unlawfully therefrom. Accordingly, Complainant is entitled to the remedy requested below.

## VII. **REMEDIES REQUESTED**

50. Based on the foregoing, Complainant has established that (i) the Infringing Domain Names are identical and/or confusingly similar to Respondent's well-known TRUMP Mark, (ii) Respondent has no legitimate right or interest in the Infringing Domain Names, and (iii) Respondent registered and is using the Infringing Domain Names in bad faith. Accordingly, Complainant requests that the Infringing Domain Names immediately be transferred to Complainant.

## VIII. **MUTUAL JURISDICTION**

51. In accordance with Paragraph 3(b)(xiii) of the Rules for Uniform Domain Name Dispute Resolution Policy, Complainant agrees, with respect to any challenge that may be made by Respondent to a decision by the Administrative Panel to transfer the Infringing Domain Name, to the jurisdiction of the courts of New York, where the Respondent is located.

{F9719122.2}

made by Respondent to a decision by the Administrative Panel to transfer the Infringing

Domain Name, to the jurisdiction of the courts of New York, where the Respondent is

located.

### IX.  OTHER LEGAL PROCEEDINGS

52.  Complainant has not commenced, engaged or terminated any other legal

proceedings concerning the Infringing Domain Names.

### X.  COMMUNICATIONS

53.  Copies of the Complaint and cover sheet prescribed by the Supplemental Rules

were sent to Respondent on December 17, 2010 by email to the following email address:

sporting202@yahoo.com.

54.  A copy of this Complaint was sent to the Registrar by email addressed to

tim@godaddy.com and domaindisputes@godaddy.com on December 17, 2010.

### XI.  CERTIFICATION

55.  Complainant agrees that its claims and remedies concerning the registration of the

Infringing Domain Names, the dispute, or the dispute's resolution shall be solely against the

domain-name holder and waives all such claims and remedies against (a) the dispute-

resolution provider and panelists, except in the case of deliberate wrongdoing, (b) the

Registrar, (c) the registry administrator and (d) the Internet Corporation for Assigned Names

and Numbers, as well as their directors, officers, employees and agents.

56.  Complainant certifies that the information contained in this Complaint is to the

best of Complainant's knowledge complete and accurate, that this Complaint is not being

presented for any improper purpose, such as to harass, and that the assertions in this

Complaint are warranted under the Rules for Uniform Domain Name Dispute Resolution

Policy and under applicable law, as it now exists or as it may be extended by a good-faith and

reasonable argument.

{P0719122.2 }

Respectfully submitted,

Dated:    New York, New York        FROSS ZELNICK LEHRMAN
           December 17, 2010               & ZISSU, P.C.

By: _____

Todd Martin

866 United Nations Plaza
New York, New York 10017
(212) 813-5900
(212) 813-5901
tmartin@frosszelnick.com

Attorneys for Complainant

{F0719122 2}

**Opposition to Motion EXHIBIT D**

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

See a sample reprint in PDF format.       Order a reprint of this article now

# THE WALL STREET JOURNAL.
WSJ.com

MARKETS     MAY 18, 2009

# Trump on His Business Operations

By ALEX FRANGOS

Donald Trump described his business operations in a December 2007 deposition as part of his legal case against author Timothy L. O'Brien. Mr. O'Brien's book, "TrumpNation: The Art of Being the Donald," cited anonymous sources close to Mr. Trump that his net worth was around $250 million, not the many billions that Mr. Trump claims. Mr. Trump sued Mr. O'Brien and his publisher in Camden, N.J., state court claiming defamation and lost business.

**More**

Trump on Trump: Testimony Offers Glimpse of How He Values His Empire

Here are some additional details that emerged from the case:

## Trump on Brand Value

The 62-year-old developer told Mr. O'Brien that he was worth $6 billion. But it emerged during the deposition that Mr. Trump had told his bankers and New Jersey Casino officials that he was worth around $3.6 billion. This all occurred around the same time period in 2004 and 2005.

Mr. Trump said the $3.6 billion figure that he told the banks didn't "include anything having to do with branding," he said in the deposition. "There are those that say the value of the brand is very, very valuable," he said. Asked if he keeps his net worth documents nearby, he said: "I do keep one actually on my desk, hidden." In an interview Sunday, Mr. Trump said his net worth is now above $5 billion, not including the brand value.

## Trump on Being 'Sold-Out'

Mr. Trump told The Wall Street Journal in November 2007 that he sold all 1,282 units at his Las Vegas condo project that he owns with casino and hand-truck magnate Phil Ruffin. There were $1.3 billion in proceeds coming from that project, he told The Journal and other news outlets, including CNBC.

In the deposition one month later, he said he had deposits for around 900 units. Mr. O'Brien's lawyer, Andrew Ceresney, asked whether Mr. Trump was caught in a lie?

"That's not a lie," Mr. Trump said. He said that he was holding on to the rest of the units as an investment. "I'm a buyer also, essentially."

## On Sales per Square Foot

At the condo and hotel project in Las Vegas, Mr. Trump had told reporters on several occasions that the project sold for $1,300 a square foot on average.

At the deposition, the lawyer, Mr. Ceresney, asks if that sales figure is true.

"For some units it is, yes. We got some -- we sold -- we got 1,300 -- I averaged on some units $1,300 a foot," Mr. Trump said.

Case: 1:11-cv-01412-DLI-VVP   Document 19   Filed 10/13/11   Page 35 of 60 PageID #: 159
http://online.wsj.com/article/SB124261160260029087.html#printMode

Mr. Ceresney then asked: "Do you understand the concept of an average, Mr. Trump?

Mr. Trump's lawyer objected to the form of the question. Then Mr. Trump said: "Well, I'm saying on certain units I averaged $1,300 a foot."

### Trump on Accounting

Asked if he understands the concept behind GAAP, or generally accepted accounting principles, the set of rules used by businesses, he said, "No. I'm not an accountant."

At one point a lawyer asked Mr. Trump: "Are you familiar with the concept of net present value?" Net present value is a key measure used in real estate to estimate the worth of an asset in today's dollars based on its future cash flow and the time-value of money.

"The concept of net present value to me would be the value of the land currently after debt," Mr. Trump said. He added, "Well, to me, the word 'net' is an interesting word. It's really -- the word 'value' is the important word. If you have an asset that you can do other things with but you don't choose to do them -- I haven't chosen to do that."

In an interview Sunday, Mr. Trump says that he stands by his answers and that he leaves financial reporting to his accounts.

### On Trump Tower

One of Mr. Trump's most prominent buildings is Trump Tower, the black glass skyscraper he built in the 1980s on Fifth Avenue and 57th Street in Manhattan.

According to the deposition, in 2006 a Forbes magazine reporter calculated that Mr. Trump's portion of the tower was worth $288 million. To do that, the reporter estimated the building generated $17.5 million of cash flow a year. The deposition shows, according to Mr. Trump's internal financial statements presented by Mr. O'Brien's lawyer that the building had a net loss of $587,730 that year. And including depreciation, amortization and interest expenses, the financial statements showed the operating income was about $4 million.

Asked if he knows how to calculate operating income, he said: "I don't do that. I really don't." Mr. Trump said in the interview Sunday that he stands by his answers and that he leaves financial reporting to his accounts. With regard to Trump Tower, he says a recent lease he signed with luxury retailer Gucci is one of the most lucrative in the world.

In the deposition, he also pointed out in the discussion of Trump Tower's income statement that the statement didn't take into account that he occupies two and half floors there for his headquarters. "I pay no rent, which you have to put a value on too, I guess; right?" Referring to his three adult children -- Ivanka, Eric and Donald Jr. -- who work for him in Trump Tower : "Maybe I'll move my children into a less expensive location."

### Trump on Using Email

Asked if he uses computers or personal electronic devices, Mr. Trump told Mr. O'Brien's lawyers he doesn't own a computer at work or at home. Nor does he have a BlackBerry. He relies on his staff to send emails. "I generally would write letters or make telephone calls," he said. "Sometimes I'll just write a note to somebody. I don't do the email thing."

**Write to** Alex Frangos at alex.frangos@wsj.com

Copyright 2011 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com

**Opposition to Motion EXHIBIT E**

Case 1:11-cv-01413-DLI-VVP   Document 19   Filed 10/13/11   Page 38 of 60 PageID #: 162

# Eric Trump

From Wikipedia, the free encyclopedia

**Eric Fredrick Trump** (born January 6, 1984) is the third child of Donald J. Trump and Ivana Trump, and is executive vice president, real estate development and mergers and acquisitions, at The Trump Organization, Trump Tower. He is also the founder and chairman of The Eric Trump Foundation (http://www.erictrumpfoundation.com) .

## Contents

- 1 Early life and education
- 2 Career
    - 2.1 The Trump Organization
    - 2.2 The Eric Trump Foundation
- 3 References
- 4 External links

**Eric F. Trump**



| | |
|---|---|
| **Born** | January 6, 1984 |
| | New York City, New York, U.S. |
| **Occupation** | Executive vice president |
| **Years active** | 2006–present |
| **Parents** | Donald J. Trump and Ivana Trump |
| **Website** | |

The Trump Organization (http://www.trump.com)
The Eric Trump Foundation
(http://www.erictrumpfoundation.com)

## Early life and education

Trump was born in New York City. He has two siblings, Donald Jr. and Ivanka, and two half-siblings, Tiffany, from his father's marriage to Marla Maples, as well as a younger half-brother, Barron, from his father's current marriage to Melania Knauss-Trump.

In 2002, Trump graduated from The Hill School, where he remains an active board member.[1] He joined The Trump Organization in 2006, after graduating with honors from Georgetown University in Washington, D.C., with a degree in finance and management and minor in psychology.[2]

## Career

### The Trump Organization

As Executive Vice President of Development and Acquisitions, Trump is actively involved in all aspects of real estate development, both nationally and internationally. From acquisition and development to sales and marketing functions, he plays a pivotal role in more than 70 active real estate Trump projects around the world.

Most recently, Trump oversaw the acquisition of the Kluge Winery and Vineyard in Charlottesville, Virginia, resulting in the development of Eric Trump Wine Manufacturing, LLC.

Alongside his father, Trump is also responsible for the expansion of the *Trump National Golf Club* portfolio of properties and is involved in all construction, design, membership marketing and daily operations to ensure Trump's brand standards are met. Currently, Trump directly oversees Trump Golf properties in New York, New Jersey, Pennsylvania, Florida and California.

Case 1:11-cv-01413-DLI-VVP   Document 19   Filed 10/13/11   Page 39 of 60 PageID #: 162

Trump is a prominent fixture in business and has appeared as a speaker for international business and real estate conferences, as well as media outlets such as NBC, CNBC, FOX, Fox Business and The New York Post to analyze or comment on economic and development matters affecting the global economy.

Trump is also a task advisor and boardroom judge on *The Apprentice* and *The Celebrity Apprentice* and was prominently featured this season on *Donald J. Trump's Fabulous World of Golf*, which documents the "behind-the-scenes" workings of the Trump Organization and Trump Golf.

### The Eric Trump Foundation



Five years ago, Trump and his friends created The Eric Trump Foundation (ETF) with the idea that young adults can do more for the community. The foundation strives to improve the lives of children battling life-threatening diseases at Saint Jude Children's Hospital. To date, ETF has nearly $3 million toward this mission and has established itself as a leading global philanthropy by maintaining a lean infrastructure that has allowed ETF to sustain an annual expense ratio of less than 4%. Trump picked Saint Jude Children's Hospital as his beneficiary because no child is ever denied treatment due to their inability to pay.

The main fundraiser for the foundation is the annual golf invitational held at Trump National Golf Club, Westchester, New York, every September. Here 30 golf foursomes compete for one-of-a-kind prizes, including Trump Golf and Hotel packages, as well as A-list celebrity experiences, NFL, NHL, MLB, NBA and NASCAR packages, high-end automobiles and exclusive vacations, followed by an evening dinner and live auction. Notable hosts have included Jimmy Fallon and Bret Michaels.

With plans to expand this Golf Invitational to all Trump National properties within the coming years, ETF aims to raise even more money for Saint Jude Children's Hospital. The foundation also generates donations from a permanent online *Charity Buzz* auction site.

Eric Trump at the 4th Annual ETF Golf Invitational

## References

1. ^ "Celebrity Prep Schools" (http://www.celebrityprepschools.com/part5.htm) . http://www.celebrityprepschools.com /part5.htm. Retrieved November 23, 2006.
2. ^ "Eric Trump, American Royalty" (http://www.cbsnews.com/stories/2003/06/09/48hours/main557757.shtml) . *CBS News*. June 9, 2003. http://www.cbsnews.com/stories/2003/06/09/48hours/main557757.shtml. Retrieved November 23, 2006.

## External links

- Eric Trump Foundation (http://www.erictrumpfoundation.com/)
- The Eric Trump Foundation Charity Buzz Auction (http://www.charitybuzz.com/auctions/erictrump)

Retrieved from "http://en.wikipedia.org/wiki/Eric_Trump"
Categories: Living people | 1984 births | American construction businesspeople | American people of Czech descent | American people of German descent | American people of Scottish descent | American real estate businesspeople | Businesspeople from New York City | Georgetown University alumni | The Hill School alumni | People from New York City | Trump family

Case 1:11-cv-01413-DLI-VVP   Document 19   Filed 10/13/11   Page 40 of 60 PageID #: 164

- This page was last modified on 31 August 2011 at 23:29.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. See Terms of use for details.

  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

**Opposition to Motion EXHIBIT F**



THE TRUMP ORGANIZATION

Alexis L. Robinson
Staff Attorney
arobinson@trumporg.com

October 27, 2010

**Via E-mail and Registered Mail, RRR**

Webadviso
P.O. Box 130323
New York, NY 10013
*sporting202@yahoo.com*

Re:     *trumpmumbai.com, trumpindia.com*

Gentlemen:

I am writing on behalf of Donald J. Trump, the well-known businessman, real estate developer, and star of the television show *The Apprentice.*

The Trump® name is internationally known and famous as a result of Mr. Trump's long, extensive, and high-profile business activities. Mr. Trump is the owner of the Trump® name as a trademark, as well as many trademarks that incorporate the Trump® name.

With this background in mind, it has come to my attention that you have registered the domain names *trumpmumbai.com* and *trumpindia.com* (the "**Domain Names**"). Your unauthorized use of such Domain Names constitutes willful trademark infringement and cyber piracy. Such unauthorized use of the Trump® name as described above will inevitably cause confusion in the public's mind and dilute and tarnish the value of the Trump® mark. Your use of the Trump® mark violates Mr. Trump's common law and federal trademark rights, including, inter alia, under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125. The Lanham Act provides that Mr. Trump may recover (1) your profits, (2) any damages sustained by Ms. Trump, and (3) the costs of bringing an action against you (which may be tripled by the reviewing court).

Additionally, your illegal registration and use of the infringing Domain Names subjects you to liability under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("**ACPA**"). The ACPA renders a person liable in a civil action who, in bad faith, registers a domain name that is identical or confusingly similar to the trademark of another person. Your liability to Mr. Trump under the ACPA is in the amount of up to $100,000 per domain name registration. 15 U.S.C. § 1117(d).

Mr. Trump considers this to be a very serious matter and has authorized our legal team to take all necessary and appropriate actions to bring an immediate halt to your blatant and unauthorized use of his trademark. In the interest of avoiding what will certainly be a costly litigation process for you, we are prepared to offer you the one-time opportunity to rectify this matter by providing us with your prompt written assurances, to be received no later than **November 4, 2010**, that:

(1) you have immediately ceased all uses of Mr. Trump's name and the Trump® trademark; and

(2) you agree not to associate Mr. Trump's name and/or the Trump® trademark with you or your commercial activities in any way, at any point in the future; and

(3) you will immediately transfer your infringing Domain Names to my client.

If we do not receive these assurances by **November 4, 2010**, we will pursue all remedies available to us at law or in equity against you.

I look forward to your prompt written response. Please contact me at your earliest convenience if you would like to discuss this matter further. This letter is sent without waiver of or prejudice to my client's rights with respect to this matter, all of which are hereby expressly reserved.

Very truly yours,

Alexis Robinson



THE TRUMP ORGANIZATION

Alexis L. Robinson
Staff Attorney
arobinson@trumporg.com

November 4, 2010

**Via Email**
Webadviso
sporiting202@yahoo.com

William Ng
SEO Consultant
william.angy@gmail.com

     **Re**: *trumpindia.com* and *trumpmumbai.com*

Gentlemen:

I am in receipt of your email dated November 4, 2010.  In consideration for your client's immediate transfer of the domain names *"trumpindia.com"* and *"trumpmumbai.com"* (the **"Domain Names"**) to the Trump Organization, we would be willing to pay your client $100.00, the reasonable sum of all transfer and registration costs you incurred in registering the Domain Names.

Please advise us on or before November 8, 2010 if the above solution is acceptable, in which event you will be contacted by our IT personnel to begin the transfer process for the Domain Names.  If you do not reply or refuse our offer, we will be compelled to promptly take such legal action as is appropriate to protect our client's interests.

This letter is sent without waiver of or prejudice of my client's rights with respect to this matter, all of which are hereby expressly reserved.

Very truly yours,

Alexis Robinson

**Opposition to Motion EXHIBIT G**

*Before the:*

## WORLD INTELLECTUAL PROPERTY ORGANIZATION
## ARBITRATION AND MEDIATION CENTER

| | |
|---|---|
| Donald J. Trump,<br>725 Fifth Avenue,<br>New York, New York 10022<br><br>**(Complainant)**<br><br>-v-<br><br>J. Taikwok Yung, Web-adviso<br>556 E 88th St.<br>Brooklyn, NY 11236<br><br>**(Respondent)** | **Case No:** D2010-2220<br><br><br><br>**Disputed Domain Name*[s]*:**<br><br>trumpabudhabi.com<br>trumpbeijing.com<br>trumpindia.com<br>trumpmumbai.com |

### RESPONSE
(Rules, para. 5(b))

### I. Introduction

[1.]   On December 22, 2010, the Respondent received a Notification of Complaint and Commencement of Administrative Proceeding from the WIPO Arbitration and Mediation Center (the **Center**) by e-mail informing the Respondent that an administrative proceeding had been commenced by the Complainant in accordance with the Uniform Domain Name Dispute Resolution Policy (the **Policy**), approved by the Internet Corporation for Assigned Names and Numbers (**ICANN**) on October 24, 1999, the Rules for Uniform Domain Name Dispute Resolution Policy (the **Rules**), approved by ICANN on October 30, 2009, and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the **Supplemental Rules**). The Center set January 11, 2011 (extension granted until January 17, 2011) as the last day for the submission of a Response by the Respondent.

## II. **Respondent's Contact Details**
(Rules, para. 5(b)(ii) and (iii))

[2.]   The Respondent's contact details are:

Name:      J. Taikwok Yung

Address:   556 E 88th St., Brooklyn, NY 11236

Telephone: 1.646.309.8421

Fax:       1.484.251.5115

E-mail:    sporting202@yahoo.com

[3.]   The Respondent's authorized representative in this administrative proceeding is:

Authorized representative: J. Taikwok Yung

Contact details: 556 E 88th St., Brooklyn, NY 11236

Telephone: 1.646.309.8421

Fax: 1.484.251.51

E-mail: sporting202@yahoo.com

[4.]   The Respondent's preferred method of communications directed to the Respondent in this administrative proceeding is:

Electronic-only material

Method:    e-mail

Address:   sporting202@yahoo.com

Contact:   J. Taikwok Yung

Material including hardcopy (where applicable)

Method:    post/courier

Address:   556 E 88th St., Brooklyn, NY 11236

Fax:       1.484.251.51

Contact:   J. Taikwok Yung

2

### III. <u>Response to Statements and Allegations Made in Complaint</u>

[5.] The Respondent would like to establish that the at-issue domains and its corresponding website contains the group work of a number of TV fanatics that have develop legitimate parody/satire fanworks all over the internet. Since their works are well known to each other on sites like youtube, the group of fans and some "fanwork" authors together with the Respondent decided to find a way to put together all their works on the at-issue domains with information, news and commentary in a Blog-content style.

[6.] The Respondent would like to clarify that "trump" is a generic English word with official entries in both the Oxford English dictionary (EXHIBIT A) and the Merriam-Webster English dictionary (EXHIBIT B). To simply put, the Complainant have no exclusive right to the usage of a single English word "trump" because its a generic English word. Similarly, the Complainant cannot register to claim trademark ownership to any other one singular English word like "I", "android", "tree", "trumping", "trumpet" or other words because those word is such a generic part of the English language. Rhetorically speaking, if the Respondent can own and trademark the words "I", "android", "tree", "trumping" and "trumpet", then no one person and no business in the world can use those generic English words in combination with any other words in naming their products, services and domain names, which in itself, just like claiming ownership of the word "trump", is frivolous. The Respondent point out the word "android" because its a name of the world famous Google mobile operating system product and Google owns the domain "android.com". Since "android" is a generic English word, this does not prevent other internet users from registering domains names like:

> androidpeople.com
>
> helloandroid.com
>
> androidtutorials.org
>
> androidwizard.net
>
> android-tutorial.com
>
> tutorialforandroid.com
>
> androidboss.com
>
> whyandroid.com

androidphonecentral.com

androidappsdevelopertutor.com

androidclip.com

androidcore.com

androidcommunity.com

droidnova.com

learn-android.com

talkandroid.com

androidtapp.com

androidforums.com

androidcompetencycenter.com

[7.] In response to the Complainant assertion in paragraph 19 and 20 of the complaint that the Complainant party is making plans to build "hotels and luxury condominiums in Mumbai and Bangalore, India." and that should be supporting reasons to their right to the at-issue domains is absurd. Please see (Complainant EXHIBIT L), which was omitted by the Complainant in the initial submission of the complaint. It clearly shows in the title and body of the article that the Complainant party "may" make plans in India, meaning not "definite". The Respondent forwards the point that these "may" or "might" or "in talks" articles are just hype and are used generically for speculation and since its "speculative" in nature, its even more "speculative" to consider the Complainant should have rights to the at-issue domains based on these speculative articles. Whats even more absurd, the complaint states and suggests that Trump Jr's visit to a vacation spot in another country should entitle them to that city's, location's or country's domain name with the "trump" word combined with it. Please see (EXHIBIT C), illustrating an article that Donald Trump "may" be considering for a frivolous run for the US Presidency. Naturally speaking, articles that suggests "might" be running for President or "considering" running for President should not entitle the Complainant to another bunch of domain names as well.

[8.] The Respondent, Web-adviso, is a "domainer" web development group where the group look to acquire high value and interesting domain names and initially park them with domain parking service providers (i.e. GoDaddy) to generate and maintain internet traffic with pay-per-click revenue services while the website is under construction. The pay-per-click ad display is an example of

4

the industry practice of the default setup with GoDaddy's new domain registration procedure. This is widely known and accepted as a way to "show something" to patrons of newly registered "under new construction" domain websites so as to not alienate internet patrons and internet traffic with an "error 404 not found" page. For the record, the Respondent registered the at-issue domains with GoDaddy.com registrar on Thursday Sept. 20, 2007 for (trumpbeijing.com; trumpindia.com; trumpmumbai.com) and on Thursday Sept. 27, 2007 for (trumpabudhabi.com).

[9.] The Respondent would like to point out that the Complainant filed their complaint with deficiencies, where the complaint was missing (Complainant EXHIBIT L). The Respondent notified the Case Manager of this situation immediately on January 4th, 2011, 13 days after the official commencement of administrative proceedings by email (EXHIBIT D). The Respondent regards this as a conniving tactic by the Complainant party to handicap the Respondent with incomplete materials for the complaint document in addition to the timing of their submission of their complaint to overlap the Christmas and New Years holiday so as to ruin the Respondent's holiday time-off work. The Respondent asks the Panel to seriously consider this as supporting reasons to rule against the Complainant.

[10.] The Respondent would like to made the Panel aware of some omitted information in the Complainants characterization of the bogus negotiations before the filing of the complaint. On (EXHIBIT E) and (EXHIBIT F), it shows a legal rep sent the initial contact letters threatening legal action against the Respondent with the ridiculous offer of $100 and $150 respectively, which were declined. After the letters, there were verbal negotiations in which the Respondent party never offer to sell or solicited a price for the domain names. During the course of negotiations, the Complainant legal representative, Alexis Robinson, even said to effects of "Mr. Trump would rather spend millions to get your domains, so you would get nothing, NOTHING!". To that, the Respondent took it as meaning no money.

[11.] May the panel of this arbitration be made aware that there are over 17,000 registered domain names with "trump" in the prefix, suffix, or some combination in the spelling of the domain names as illustrated in the (EXHIBIT G). This

clearly shows and here the Respondent iterates that the Complainant does not have rights to domain names where the English word "trump" is spelled with in combination to an infinite number of other alphabet characters, words or numbers such as "trumpet.com and trumpon.com". See Donald J. Trump v. eStore of New York, D2007-0119 (WIPO March 26, 2007) (" the Panel observes that the TRUMP trademark is also an English word with multiple meanings (including, for example, to "produce a sound as if from a trumpet"; "playing card in the suit that has been declared trumps"; "outdo"; "proclaim or announce with or as if with a fanfare")")

[12.] For the other reasons discussed elsewhere herein, please let the Panel find that the at-issue domain names is comprised of a commonly used terms in English and that Respondent can establish rights or legitimate interests in the disputed domain names pursuant to Policy a($(ii) on such basis. See CRS Tech. Corp.v. Condenet,Inc.o FA93547 (Nat. Arb. Forum Mar. 28,2000) (CONCIERGE is not so associated with just one source that only that source could claim a legitimate use of the mark in connection with a website.); see also Zercktl Holding v. Beyonet Servs. D2000-0161 (WIPO May 12,2000) ("Common words and descriptive terms are legitimately subject to registration as domain names on a 'first-come, first-served basis'.").

[13.] The Complainant bolsters about various media and business accomplishments as success. Ironically, when the Respondent research on them more closely and objectively it shows numerous failures including the filing of a number of bankruptcies with the Complainant's casino businesses (EXHIBIT H) and the abysmal low ratings of the Complainant's two shows "The Celebrity Apprentice" and the Season 10 of "The Apprentice" not even ranking in the TOP 20 spot (EXHIBIT I).

**A.   <u>Whether the domain name*[s] [is/are]* identical or confusingly similar to a trademark or service mark in which the Complainant has rights:</u>**

[14.] The Respondent would like to assert that from the day of registration of the at-issue domains to the present, there is no legitimate trademark registration for the complete spelling of the at-issue domains. Furthermore, the Complainant have never own or use the MARKS.... trumpmumbai, trumpmumbai.com,

6

trumpabudhabi, trumpabudhabi.com, trumpbeijing, trumpbeijing.com,
trumpindia, trumpindia.com. See Donald J. Trump v. eStore of New York,
D2007-0119 (WIPO March 26, 2007) ("it would be improper for the Panel to
compare the relevant portion of the Disputed Domain Name (i.e.,
"trumpfurniture") to the mark TRUMP FURNITURE for purposes of
ascertaining the existence of "confusing[] similar[ity]" under Paragraph 4(a)(i)
of the Policy, because Complainant has not shown that it has rights in the mark
TRUMP FURNITURE.")

[15.] The Respondent refutes the Complainant's point that the authors of the
fanworks shown on the at-issue domains have no association with the
Respondent. On the contrary, the Respondent have association with all the
authors and contacts each other for ideas and new ways to promote each other's
"fanworks" of satire. As shown in the blog entry in (EXHIBIT J opinions),
there's a censored collection of submitted comments from some of the authors of
fanworks with their internet names shown. Censored because of some of the
strong language that have been submitted in regards to how low-budget and
cheap the latest season of "The Apprentice" was.

[16.] To refute the Complainant's statement in paragraph 22 of the complaint,
please let the record show that the Complainant provide no proof and there's no
structures build or currently under construction in China (Beijing), India
(Mumbai) and the United Arab Emirates (Abu Dhabi) that bears or would bear
the English word "trump". The Respondent would point out anything stated
concerning properties construction in paragraph 22 of the complaint or anything
to that effect are just hearsay.

[17.] To refute the Complainant's arguments in paragraph #23-24# of the
complaint, please let the Panel be respectfully be reminded that dedicated online
video hosting services like YouTube.com have made it possible to freely
"outsource" the hardware resource intensive work of video hosting to the
average Internet user. As anyone can see in the parody and comedy videos
shown on the Respondent's website, the videos are rather crude and low-budget
amateur works with low resolution and all are hosted freely on Youtube to
provide the bandwidth and video hosting resources. The parody/satire
commentary videos (EXHIBIT K) and commentary (EXHIBIT J) content

7

authors/creators are all contributors/administrators to the at-issue domain site and want to gather and exchange their work and ideas on the at-issue domain websites. In other words, what you see on the at-issue domain websites is what you get and to argue that "the creators of the third party videos have no known connection to or affiliation with the Respondent" by the Complainant is clearly ridiculous because the Complainant doesn't know who "we" (Administrators: content authors, website builders and contributors) are by our various Internet names and how we interact and work together to build and structure the site and Admin accounts.

[18.] To refute the Complainant's comments in paragraph #24# of the complaint, the Respondent admits that the News section is an RSS feed from Google on Real Estate. RSS is a well known and widely accepted technology to provide "Real Simple Syndication" of news headlines. Even so, the website never claims to be provider of all original news. As the Respondent stated over and over again, the at-issue domain websites are satire/parody site with comedic and commentary contents developed and put together by fans containing a mix of original and fan-made works.

[19.] To refute the statements paragraph #25# of the complaint, the Respondent would like to point out that it was the Complainant party that first solicited the Respondent party to sell the domains with 2 legal letters by the Complainant legal representative Alexis Robinson. Although the Complainant tries to take the quote in their complaint in paragraph 25 out of context, the two letters (EXHIBIT E and F) and (EXHIBIT L) show the Respondent party never solicited a price to sell the domains but offered only "to negotiate with your organization (Complainant) in hopes of reaching a more mutually agreeable terms." The Complainant, trying to twist the truth of the matter in saying "it seeks to unfairly profit from its improper registration of" the at-issue domains is just ridiculous when the Respondent party never ask any party to sell the at-issue domains at all.

[20.] To refute the statements in paragraphs 29 of the complaint, the Respondent would like to reiterate that the Complainant party had never use or register the at-issue domains and they never had active promoted, owned or advertise the words trumpbeijing, trumpmumbai, trumpindia, and trumpabudhabi in any of

8

their businesses.  In addition, at the time of registration, there was no registered trademarks of the at-issue domain names and the Complainant party have no assets, businesses or offices in China, India or the U.A.E.

[21.]  To refute the statements in paragraphs 30 to 31 of the complaint, let the record show in (EXHIBIT M meta-tags) illustrates the meta tags used to direct the search engine with keywords tag (<meta name="keywords" content="Fan, parody, news" />) and the description tag (<meta name="description" content="Welcome to the site about Fan and Parody work about the locale and people with news.  The content and site is NOT endorsed by Donald Trump, the Trump Organization or the shows "The Apprentice"/"The Celebrity Apprentice" ").  The point here is that search engines will appropriately display and categorize the at-issue domain sites based on the meta-keywords and meta-descriptions and will not mistakenly confuse any consumer searching legitimately for the Complainant's information.  Let the record also show that neither the Complainant nor the Respondent could find or provide any truthful exhibits that would show legitimate search results for Complainant's information containing the at-issue domains' sites.  The truth of the matter is, giving the aforementioned reasons and exhibits or lack of, no consumer would be confused by their search nor will there be any consumer be improperly misdirected because the technology (meta tags) has been set to prevent such confusion or misdirection.

[22.] The Respondent admits to the Complainant's point that the web site is haphazardly put together.  But it only furthers the Respondent's argument that such style, design, and logo use differences between the Respondent's at-issue domain websites with the Complainant's website will not confuse any consumer that the at-issue domains and its website have an official endorsement or sponsorship by the Complainant.

[23.]  With the aforementioned reasons, facts and arguments stated for the Respondent, please let the Panel find that the Complainant does not have absolute rights to the generic English word "trump" in combination to an infinite number of alphanumeric words and characters.

9

**B.** **Whether the Respondent has rights or legitimate interests in respect of the**
**domain name*[s]*:**

[24.] In response to paragraph 32 of the complaint, the Respondent has
established clear legitimate interest in the at-issue domains with the heading
tagline and also with meta-tag for search engines uses with words "fan, parody
and news" and indeed the at-issue domains' sites provide a mix of original and
fan-produced parody, satire and commentary contents.

[25.] In response to paragraph 33 of the complaint, the Respondent would like
to provide a full picture of the truth of the matter where the case Webadviso v.
Bank of America Corp is still unresolved in the 2nd Circuit of Federal Appeals
court with the case number 10-292 and 10-1307. The court and the Plaintiff
have reason to believe the defendant in the case produced fabricated and
questionable evidence to mislead the court in the lower court case 09cv5769
SDNY and therefore have been granted the appeal to the 2nd Circuit. Since the
matter is still unresolved in the 2nd circuit and has been put out of context by the
Complainant, the Respondent respectfully ask the Panel to disregard the
Complainant statements in paragraph 33 of the complaint.

[26.] As to paragraph 36 to 37 of the complaint, the Respondent admits that in
comparison to the Complainant various sites and design, the Respondent's at-
issue domain sites seem "roughly assembled" subjectively speaking. However,
that only furthers the Respondent's view that in a side by side comparison of the
look and feel of the at-issue domains' website with the website style of the
Complainant's, it clearly illustrates a dramatic difference that would help the
consumer distinguish both Parities' websites and not to confuse them as shown
in (Complainant EXHIBIT N) and (Respondent EXHIBIT N trump sites
trump.com and trumpnetwork.com). First off, the Complainant's sites all display
a dark elegant themed-background where the Respondent's at-issue domain
website show a white background with either a blue, green, orange or grey
simplistic colored theme. Secondly, the Complainant's website are well
designed with the use of Flash movies that dynamically show moving and
changing images or videos while the Respondent's at-issue domain websites uses
blog entries to generally display static HTML. Thirdly, all the Complainant's
website show some form of pictorial logo use while the Respondent's have none.

10

In other words, the look, feel, the common design style and logo use of the Complainant's websites clearly distinguishes itself and would clearly would not confuse any consumer between the Complainant's websites with the Respondent's at-issue domain sites which is used in a manner thats non-commercial to provide parody content, satire commentary and information.

[27.] In response to paragraph 34 to 40 of the complaint, the Respondent argues that the at-issue domains use the MARK trumpbeijing, trumpindia, trumpmumbai and trumpabudhabi as a parody/satire, commentary and information site with a mix of original and fanwork contents mainly about the show "The Apprentice". There are statements on the site that states, "the content and site is NOT endorsed by Donald Trump, the Trump Organization and the shows "The Apprentice"/"The Celebrity Apprentice" ". To clarify and stopped the spread of ignorance by the Complainant party, the Respondent's at-issue domain sites does NOT "bait" or "hooked" the browser or Internet users with any scripts or function call (Javascript or Flash or XHTML) that would automate the opening of the of the at-issue domains from any other sites. Since the Complainant have never actively advertised or promoted or registered to use the at-issue domains, the consumer or the Internet user will have to know beforehand the full URL address of the at-issue domains which also would imply the beforehand knowledge that its a parody/satire site by the Respondent.

[28.] The Respondent would like to forward that the at-issue domains are used in a legitimate noncommercial way without the intent for commercial gain and also used not to misleadingly divert consumers. The at-issue domains have nothing to sell that would confuse the consumer. What's more, there are no ads displayed. There are no requests for financial support on the Respondent's at-issue domains' sites. As illustrated in (Complainant EXHIBIT N), an exhibit with errors, shows on the top-line "Fan, Parody and News" stating clearly any internet patrons that the site contains satire, commentary and informational materials. Furthermore, the front-page of the site shows a video of an impersonator saying the tag-line "You're Hired!", a young man in a suit wearing a wig. On a more correct illustration of the website in (EXHIBIT O front-page), it shows a new blog entry that shows the newly released TV ratings for the season 1 to 10 of "The Apprentice"/"The Celebrity Apprentice". Let the record show that this line should of been shown in the (Complainant's EXHIBIT N) as

11

seen in (EXHIBIT O front-page). In another article in the lower portion of the site, there's a blog article stating, "Welcome to the Fan, parody and news site. You find the best content works by fan produced parodies as well as industry locale news." This clearly defines no confusion as to the origins and authors of the at-issue domains' website.

[29.] With the aforementioned reasons, facts and arguments stated for the Respondent, please let the Panel find that the Respondent is making a legitimate non-commercial use of the domain names, without intent for commercial gain misleadingly to divert consumers.

**C.** **The domain names have been registered and are being used NOT in bad faith.**

[30.] To refute the states in section C of the complaint in general, the at-issue domains' sites does have a disclaimer. Please see the (EXHIBIT M metatags), showing the source code of the at-issue domains' sites containing meta-keywords and meta-descriptions tags with respective values, "Fan, Parody and News" and "The content and the site is not endorsed by Donald Trump, the Trump Organization or the shows "The Apprentice"/"The Celebrity Apprentice" ". In addition, there's a tag-line in the Frontpage section that states "The content and sites is NOT endorsed by the Donald Trump, the Trump Organization and the shows "The Apprentice"/"The Celebrity Apprentice"". The complainant fails to show this in their exhibits by having that sentence being overlapped by the youtube video which nevertheless is showing properly and truthfully as illustrated in (EXHIBIT O frontpage).

[31.] To refute the statements in paragraph 46 of the complaint, the referenced cases are inapplicable to this situation because the at-issue domains are used as parody/satire, commentary and information content site. Also, the MARK in question is not the English word "trump" but the MARKS trumpbeijing, trumpindia, trumpmumbai and trumpabudhabi which the Complainant does not own globally anywhere. See Donald J. Trump v. eStore of New York, D2007-0119 (WIPO March 26, 2007) ("it would be improper for the Panel to compare the relevant portion of the Disputed Domain Name (i.e., "trumpfurniture") to the

mark TRUMP FURNITURE for purposes of ascertaining the existence of "confusing[] similar[ity]" under Paragraph 4(a)(i) of the Policy, because Complainant has not shown that it has rights in the mark TRUMP FURNITURE.")

[32.] To refute the statements in paragraph 47 to 49 of the complaint, the Respondent again does not sell anything or put up ads or ask for donations on the website. There is no revenues earned to the at-issue domains. Basically, its non-commercial and the characterization of the at-issue domains to have made financial gains is plainly absurd.

[33.] The Respondent would like to point out that there is no evidence to suggest that Respondent registered the disputed domain name for the purposes of selling it to the Complainant or a third-party. In all the submitted Complainant exhibits, there's no evidence showing that the Respondent named or solicited a selling price and the Respondent never contacted the Complainant initially. Also, no competitors of the Complainant were contacted about the at-issue domains. See Sutherland Institute v. Continuative LLC, D2009-0693 (WIPO July 10, 2009) ("Those expressly enumerated criteria of bad faith reflect the Policy's principal concern with conduct that takes unfair advantage of trademark owners for purposes of commercial advantage.").

[34.] As stated similarly earlier, the at-issue domains will not and cannot divert traffic meant for the Complainant because the Complainant have never been known for or promoted or register to use the at-issue domains before the Respondent, therefore no pre-exisitng traffic. In addition, with the perfection of search engine technology with the use of meta-tag information keywords and descriptions, neither Parties can produce evidence that legitimate search results for Complainant information from top search engines is contaminated with the search result entries for the at-issue domains' sites. Please note that the Complainant has provided alot of exhibits to proof ownership of the English word "trump", but the Complainant have purposely left out evidence exhibits to support a number of points and statements as discussed in aforementioned sections. Lastly, the at-issue domains' sites does not confuse the consumer with clear statements that are present to state no sponsorship or endorsements by the Complainant, with clear frontpage taglines, and listings of articles showing the

13

website provides a mix of original and "FANWORK" parody/satire, commentary and information contents. All in all, the Respondent respectfully submit that the Respondent have fulfill the burden that the at-issue domains are registered and used in **good faith** for non-commercial purposes and have legitimate interests.

[35.] With the aforementioned reasons, facts and arguments stated for the Respondent, please let the Panel find that 1. the Complainant and the Respondent are not competitors and 2. the domain names were NOT registered by the Respondent in an intentional attempt to attract for commercial gain, Internet users to the Respondent's web site by creating a likelihood of confusion with the Complainant's mark as to the sponsorship and endorsement of the Respondent's web site.

## V. Administrative Panel

[36.] The Respondent elects to have the dispute decided by a single-member Administrative Panel

## VI. Other Legal Proceedings

[37.] No other legal proceedings that have been commenced or terminated in connection with or relating to the domain name(s) that (is/are) the subject of the Complaint.

## VII. Communications

[38.] A copy of this Response has been sent or transmitted to the Complainant on January 17, 2011 by email to tmartin@frosszelnick.com

[39.] This Response is submitted to the Center in electronic form, including any annexes, in the appropriate format.

## VIII. Payment

[40.] In view of the Complainant's designation of a single-member Panel and the Respondent's designation of a single-member Panel, the Respondent hereby submits payment in the amount of USD $0.

14

## IX. **Certification**

[41.] The Respondent agrees that, except in respect of deliberate wrongdoing, an Administrative Panel, the World Intellectual Property Organization and the Center shall not be liable for any act or omission in connection with the administrative proceeding.

[42.] The Respondent certifies that the information contained in this Response is to the best of the Respondent's knowledge complete and accurate, that this Response is not being presented for any improper purpose, such as to harass, and that the assertions in this Response are warranted under the Rules and under applicable law, as it now exists or as it may be extended by a good-faith and reasonable argument.

Respectfully submitted,

J. Taikwok Yung

Date: January 17, 2011

15