UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WEB-ADVISO and J. TAIKWOK YUNG,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP,<br><br>Defendant. | CV 11-1413 (DLI) (VVP) |
| DONALD J. TRUMP,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>WEB-ADVISO and J. TAIKWOK YUNG,<br><br>Counterclaim-Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANT/COUNTERCLAIM-PLAINTIFF DONALD J. TRUMP'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

James D. Weinberger (*jweinberger@fzlz.com*)
Todd Martin (*tmartin@fzlz.com*)
Leo Kittay (*lkittay@fzlz.com*)
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, NY 10017
Tel:  (212) 813-5900
Fax:  (212) 813-5901

*Attorneys for Defendant/Counterclaim-
   Plaintiff Donald J. Trump*

DATE OF SERVICE:  March 16, 2012

{F0889305.7 }

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION .......................................................................................................1

STATEMENT OF FACTS ..........................................................................................2

    A.  Donald J. Trump and the Trump Mark ........................................................2

    B.  Yung's Bad Faith Registration and Use of the Infringing Domain Names ........................4

    C.  Trump's Successful Uniform Domain Name
        Dispute Resolution Proceeding Against Plaintiff Web-adviso ...........................6

    D.  Yung Lost a Case with Nearly Identical Facts in the Second Circuit ................................6

    E.  Yung Owns A Vast Array of Suspicious Domain Names ..................................7

LEGAL BACKGROUND ............................................................................................7

    A.  Standard on Summary Judgment .................................................................7

    B.  Trademarks Generally ..................................................................................8

    C.  Federal Law Trademark Infringement and Unfair Competition ....................8

    D.  Federal Cybersquatting ...............................................................................9

ARGUMENT ...............................................................................................................9

I.      TRUMP HAS PROTECTABLE RIGHTS IN THE TRUMP MARK ...................9

II.    YUNG'S USE OF THE TRUMP MARK
       IS LIKELY TO CAUSE CONFUSION .............................................................11

    A.  The TRUMP Mark is Strong ......................................................................12

    B.  The Parties' Marks are Identical ................................................................13

    C.  The Goods and Services are Identical.........................................................14

    D.  There is No "Gap" to Be Bridged ...............................................................15

    E.  Intentional Interest Confusion is Evident ...................................................15

F.     Yung's Actions Give Rise to an Inference of Bad Faith ...............................................16

G.    The Infringing Websites are of Poorer Quality
Than the TRUMP-Brand Websites.....................................................................................18

H.    The Sophistication of Consumers Increases a Likelihood of Confusion....................18

I.      Yung's Baseless Defenses .........................................................................................19

III.    YUNG'S ACTS CONSTITUTE CYBERSQUATTING UNDER THE ACPA ................20

CONCLUSION..............................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*,
    360 F.3d 125 (2d Cir. 2004)..................................................................................14-15

*C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*,
    753 F.2d 14 (2d Cir. 1985)........................................................................................15

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)....................................................................................................7

*Centaur Communications v. A/S/M Communications*,
    830 F.2d 1217 (2d Cir. 1987)....................................................................................12

*Clinique Laboratories, Inc. v. Dep Corp.*,
    945 F. Supp. 547 (S.D.N.Y. 1996)............................................................................19

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*,
    No. 04 Civ. 4099 (DLC), 2005 WL 1164073 (S.D.N.Y. May 18, 2005) ................20

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*,
    440 F. Supp. 2d 249 (S.D.N.Y. 2006)................................................................12, 16

*Erchonia Corp. v. Bissoon*,
    410 F. App'x 416 (2d Cir. 2011) ..............................................................................10

*ESPN, Inc. v. Quiksilver, Inc.*,
    586 F. Supp. 2d 219 (S.D.N.Y. 2008)......................................................................20

*Estee Lauder Inc. v. The Gap, Inc.*,
    108 F.3d 1503 (2d Cir. 1997)....................................................................................12

*Frederick Warne & Co. v. Book Sales Inc.*,
    481 F. Supp. 1191 (S.D.N.Y. 1979)...........................................................................9

*General Media Communications, Inc. v. Crazy Troll, L.L.C.*,
    No. 06 Civ. 40581 (LAK), 2007 WL 102988 (S.D.N.Y. Jan. 16, 2007)................25

*Genesee Brewing Co. v. Stroh Brewing Co.*,
    124 F.3d 137 (2d Cir. 1997)......................................................................................10

*Gruner + Jahr USA Publishing v. Meredith Corp.*,
    91 F.2d 1072 (2d Cir. 1993) ......................................................................................13

*Gucci America, Inc. v. Gucci,*
   No. 07 Civ. 6820 (RMB), 2009 WL 8531026 (S.D.N.Y. Aug. 5, 2009)................................20

*Henry Siegel Co. v. M & R International Manufacturing Co.,*
   4 U.S.P.Q.2d 1154, 1987 WL 123838 (T.T.A.B. 1987) ..........................................14

*Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,*
   832 F.2d 1311 (2d Cir. 1987)...............................................................19

*International Bancorp, L.L.C. v. Societe Des Baines De Mer,*
   192 F. Supp. 2d 467 (E.D. Va. 2002) ......................................................13

*La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.,*
   495 F.2d 1265 (2d Cir. 1974).................................................................8

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*
   799 F.2d 867 (2d Cir. 1986)..............................................................9, 15

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.,*
   426 F.3d 532 (2d Cir. 2005).............................................................13, 20

*Lucas Nursery & Landscaping, Inc. v. Grosse,*
   359 F.3d 806 (6th Cir. 2004) ..............................................................22

*McGregor-Doniger, Inc. v. Drizzle, Inc.,*
   599 F.2d 1126 (2d Cir. 1979)..............................................................18

*Morningside Group Ltd. v. Morningside Capital Group, L.L.C.,*
   182 F.3d 133 (2d Cir. 1999).............................................................15, 18

*Nabisco v. Warner-Lambert Co.,*
   32 F. Supp. 2d 690 (S.D.N.Y. 1999)........................................................7

*Omega S.A. v. Omega Engineering, Inc.,*
   228 F. Supp. 2d 112 (D. Conn. 2002) ..................................................13, 20

*Paddington Corp. v. Attiki Importers & Distributors, Inc.,*
   996 F.2d 577 (2d Cir. 1993)...............................................................12

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,*
   469 U.S. 189 (1985)..................................................................9, 11, 12

*Perfect Fit Industries, Inc. v. Acme Quilting Co.,*
   618 F.2d 950 (2d Cir. 1980)...............................................................20

*Polaroid Corp. v. Polarad Electronics Corp.*,
  287 F.2d 492 (2d Cir. 1961)................................................................11

*Prime Publishers, Inc. v. American-Republican, Inc.*,
  160 F. Supp. 2d 266 (D. Conn. 2001) ...............................................14

*Savin Corp. v. Savin Group*,
  391 F.3d 439 (2d Cir. 2004)...............................................9-10, 11, 15

*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*,
  202 F.3d 489 (2d Cir. 2000)................................................................13

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
  588 F.3d 97 (2d Cir. 2009)...............................................................8, 9

*Stern Electronics, Inc. v. Kaufman*,
  523 F. Supp. 635 (E.D.N.Y. 1981) .......................................................8

*Stern Electronics, Inc. v. Kaufman*,
  669 F.2d 852 (2d Cir. 1982)..................................................................8

*Surf Line Hawaii, Ltd. v. Ahakuelo*,
  13 U.S.P.Q.2d 1975, 1989 WL 201651 (D. Haw. 1989) ....................14

*TCPIP Holding Co. v. Haar Communications, Inc.*,
  244 F.3d 88 (2d Cir. 2001)..................................................................13

*TCPIP Holding Co. v. Haar Communications Inc.*,
  No. 99 Civ. 1825 (RCC), 2004 WL 1620950 (S.D.N.Y. July 19, 2004)...................7

*Trump v. Web-Adviso*,
  WIPO Case No. D2010-2220 ..........................................................1, 25

*Versace S.p.A. v. Versace*,
  No. 01 Civ. 9645 (PKL), 2003 WL 22023946 (S.D.N.Y. Aug. 27, 2003) ..............7

*Virgin Enterprises, Ltd. v. Nawab*,
  335 F.3d 141 (2d Cir. 2003)....................................................12, 14, 15

*Web-adviso v. Bank of America Corp.*,
  No. 09 Civ. 05769 (DC), 2010 WL 521117 (S.D.N.Y. Feb. 16, 2010) ...........6, 7, 17

*Web-adviso v. Bank of America Corp.*,
  Nos. 10-292, 2011 WL 5067689 (2d Cir. Oct. 10, 2011). .............7, 17, 23

*Weight Watchers International, Inc. v. Luigino's, Inc.*,
    423 F.3d 137 (2d Cir. 2005)...................................................................19

*Wella Corp. v. California Concept Corp.*,
    558 F.2d 1019 (C.C.P.A. 1977) ..........................................................14

**RULES**

Fed. R. Civ. P. 41 .........................................................................................2

Fed. R. Civ. P. 56 .........................................................................................7

**STATUTES**

15 U.S.C. § 1065 ...................................................................................4, 5, 9

15 U.S.C. § 1072 .......................................................................................16

15 U.S.C. § 1114 .........................................................................................8

15 U.S.C. § 1115 ......................................................................................4, 9

15 U.S.C. § 1125 .................................................................................. *passim*

15 U.S.C. § 1127 .........................................................................................8

17 U.S.C. § 101 *et seq.*...........................................................................5, 18

**TREATISE**

J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* (4th ed. 2011) ...... *passim*

**MISCELLANEOUS**

Jess Stein, *The Random House Dictionary of the English Language* (1967) ................................11

Defendant/Counterclaim-Plaintiff Donald J. Trump ("Trump") submits this memorandum of law and the accompanying declarations of Eric F. Trump ("Trump Decl.") and James D. Weinberger ("Weinberger Decl.") in support of this motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the two claims for declaratory judgment brought by Plaintiffs/Counterclaim-Defendants Web-adviso and J. Taikwok Yung (collectively, "Yung") and Trump's counterclaims for federal trademark infringement, unfair competition and their state law counterparts, and for federal cybersquatting.

## INTRODUCTION

This motion seeks resolution of a straightforward case of cybersquatting. Yung, an admitted internet "domainer" who "acquire[s] interesting and high value domain names" (Complaint ("Compl.") ¶ 3), registered hundreds of internet domain names including four that contain Trump's protected TRUMP name and trademark, namely *trumpmumbai.com*, *trumpindia.com*, *trumpbeijing.com* and *trumpabudhabi.com* (collectively, the "Infringing Domain Names"). He then attempted to sell them back to Trump for a profit. Yung's actions are a classic example of cybersquatting, and the parties have already arbitrated their dispute in a Uniform Dispute Resolution Procedure ("UDRP") before an arbitration panel of the World Intellectual Property Organization ("WIPO"). In that arbitration, *Trump v. Web-Adviso*, WIPO Case No. D2010-2220, the panel found that each of the Infringing Domain Names was confusingly similar to the TRUMP trademark, Yung had no legitimate interest therein, and Yung registered and was using them in bad faith, all in violation of the applicable rules governing domain name registration. The panel therefore ordered the Infringing Domain Names to be transferred to Trump.

Rather than accept the reasoned findings of the arbitration panel, Yung filed this frivolous declaratory judgment action in an attempt to persuade the Court that the world-famous TRUMP trademark is somehow invalid or unenforceable and that the Infringing Domain Names do not infringe the TRUMP trademark. Trump was then forced to assert counterclaims for, *inter alia*, cybersquatting, trademark infringement and unfair competition under federal law.

{F0889305.7 }

This is not Yung's first trip to the dance, having lost a nearly identical motion to that brought here in a nearly identical case against Bank of America and Merrill Lynch in the Southern District of New York regarding domain names that Yung registered containing indicia of the two banks.  In the appeal – in which Yung was represented by counsel – the Second Circuit held that Yung "registered the domain names in bad faith and thereby violated ACPA."[1] In addition, public records show that Yung owns scores of other domain names containing registered trademarks of well-known companies, such as *barclayscapitallehman.com*, *bofalehman.com*, *citigroupwachovia.com*, *elilillyimclone.com*, *goldmansachgroup.com*, *hulufriend.com*, *indiasovereignwealthfund.com*, *milanvogue.com*, *nybusinessweek.com*, *silversurfergame.com*, and *xbox360sdk.com*.  It strains credulity to imagine that Yung has registered these domain names for any purpose other than to practice cybersquatting.

In short, Yung is a serial cybersquatter and infringer.  Trump now moves for summary judgment on all of Yung's declaratory judgment claims and for partial summary judgment on Counterclaims I, II and IV-VI in order to reclaim the Infringing Domain Names.[2]

## STATEMENT OF FACTS

### A.      Donald J. Trump and the TRUMP Mark

Donald Trump is one of the most well known real estate developers, hoteliers, authors and television personalities in the world.  (Eric Trump Decl. ¶ 9.)  His portfolio includes residential and commercial real estate, golf courses, casinos, hotels and other properties, across the U.S. and around the world.  (*Id.* ¶ 10.)  Among the iconic properties owned, operated or affiliated with Trump are the Trump Tower on Fifth Avenue, The Trump Building at 40 Wall

---

[1] "ACPA" refers to the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(2), which imposes civil liability for cybersquatting.

[2] Trump does not seek summary judgment on his counterclaims for federal and state trademark dilution (Counterclaims III and VII, respectively) here because, *inter alia*, the relief available under such claims is duplicative of the relief available under the claims included in the motion. In the event this motion is granted in full, Trump will request that the Court dismiss all remaining counterclaims without prejudice pursuant to Fed. R. Civ. P. 41(a)(2) and (c), completely resolving the action.

Street, Trump World Tower at the United Nations Plaza, Trump Park Avenue at 59th Street and Park Avenue, Trump Parc and Trump Parc East at Central Park South, Trump Place on the Hudson River and Trump Palace.  (*Id.*)  Trump is also associated with casinos, including the Trump Taj Mahal, Trump Plaza and Trump Marina in Atlantic City, New Jersey.  (*Id.*)  A typical real estate development by The Trump Organization, Trump's privately owned company, involves a collective financial investment of many millions of dollars.  (*Id.* ¶ 11.)  Trump is also the accomplished author of best-selling books including *The Art of the Deal*, hailed as a business literature classic, *The Art of the Comeback*, *The America We Deserve*, *How To Get Rich*, *Think Like a Billionaire*, *Trump 101*, *Why We Want You To Be Rich*, *Think Big*, *Never Give Up* and *Think Like a Champion*.  (*Id.* ¶ 12.)  For the last seven years, Trump has added to his celebrity by starring and executive producing *The Apprentice* and *The Celebrity Apprentice*, television shows broadcast in the U.S. by the NBC television network.  (*Id.* ¶ 13.)  These shows have aired for a combined eleven seasons, spun off several international editions and been among the most popular shows broadcast in the United States since the franchise's premiere in 2004.  (*Id.*)

Moreover, for many years, Trump, through his designee The Trump Organization, has offered a wide range of goods and services under the TRUMP mark and TRUMP-related marks (collectively, the "TRUMP Mark"), including but not limited to clothing, accessories, golf courses and clubs, food and beverages, restaurants, home furnishings and periodicals.  (*Id.* ¶ 4 & 5.)  Through the widespread, extensive use of the TRUMP Mark in connection with various businesses and the expenditure of large sums in promoting the TRUMP brand on television, in print advertisements, on the Internet and in other media, the TRUMP Mark has become uniquely associated with Trump and his goods and services, and has attained extraordinary fame and widespread acclaim in the U.S.  (*Id.* ¶ 15.)  As a result, the TRUMP Mark represents to Trump enormous goodwill.  (*Id.*)

In addition to the common law rights acquired through extensive use of the TRUMP Mark, Trump owns and The Trump Organization manages and administers numerous trademark registrations for the TRUMP Mark for goods and services ranging from hotels and real estate to

vodka, clothing and jewelry. (*Id.* Exh. 1.) These registrations are all valid, subsisting and in full force and effect, and constitute *prima facie* evidence of Trump's exclusive ownership of the TRUMP Mark. 15 U.S.C. § 1115(b). Further, some of these registrations have become incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065, and therefore serve as conclusive evidence of the registered marks' validity. (Weinberger Decl. Exh. 1.)

In order to market, advertise and promote the TRUMP brand, Trump makes extensive use of the TRUMP Mark on the internet. (Eric Trump Decl. ¶ 17.) Information about and images of nearly all TRUMP-branded goods and services, including real estate projects, can be accessed through the main website for The Trump Organization, *www.trump.com*. (*Id.*) Trump's websites are high-quality, professionally designed interfaces containing first-class photography, consumer information and marketing. (*Id.* ¶ 18 & Exh. 2.) Many offer interactive functions aimed at high-end consumers and professionals. (*Id.*) In addition, consumers can check rates and book rooms at TRUMP-branded hotels by accessing Trump's property-specific websites. (*Id.*) Trump uses TRUMP-formative domain names that combine the TRUMP Mark followed by a geographic location so as to indicate to consumers that the website concerns TRUMP-branded real estate projects in that location. (*Id.* ¶ 19 & Exh. 3.) These include: *trumpchicago.com*; *trumphollywood.com*; *trumptoronto.ca*; *trumpwaikiki. com*; *trumpsoho.com*; *trumpistanbul. com.tr* and *trumpwaikiki.com*. (*Id.*)

### B.   Yung's Bad Faith Registration and Use of the Infringing Domain Names

In 2007, Trump's son Donald Trump, Jr., an Executive Vice President of The Trump Organization, announced plans to build TRUMP-branded hotels and luxury condominiums in Mumbai and Bangalore, India. (*Id.* ¶ 21.) The media reported his visit to India in advance of that project as early as July 2, 2007. (*Id.* Exh. 4.) This real estate development project is still underway. (*Id.* ¶ 21.)

Shortly thereafter, Yung – an admitted "domainer" looking to "acquire interesting and high-value domain names" (Compl. ¶ 3) – registered the Infringing Domain Names and placed

nearly identical websites on each (the "Infringing Websites").  (*See* Weinberger Decl. Exhs. 2 & 3.)  Each Infringing Domain Name incorporates the mark TRUMP in its entirety and merely adds the name of a geographic location, *e.g.*, *trumpbeijing.com*.  (*Id.*)  Given that Trump's practice is to add the name of a geographic location to the mark TRUMP to form domain names, *e.g.*, *trumpwaikiki.com*, and use these domain names to market, advertise and promote the TRUMP brand, the Infringing Domain Names are confusingly similar to the TRUMP Mark.  (*See* Eric Trump Decl. ¶ 19.)

The Infringing Websites themselves merely contain links to random and scattered third-party videos about Trump from sites including *www.youtube.com* and news feeds generated by *www.google.com*.  (*See* Weinberger Decl. Exhs. 3 & 5 (Exhibit O).)  There is no evidence that Yung is connected to or affiliated with the third-parties who created the videos, and his use of their content is likely without authorization in violation of the U.S. Copyright Act, 17 U.S.C. § 101 *et seq*.  (*Id.* Exh. 2 (Pl. Resp. Interrog. 15).)

Yung's communications with Trump strongly suggest that he registered the Infringing Domain Names to capitalize on Trump's fame and notoriety and to profit from selling them to Trump.  When Trump offered in October 2010 to settle the dispute with Yung for $100 to cover registration and transfer costs, Yung refused, demanding more money.  (Eric Trump Decl. Exhs. 7 & 8.)  Yung's e-mail to Trump's counsel read in part:

> Webadviso agrees to negotiate with your organization in hopes of reaching a [sic] *more mutually agreeable terms*.  Under the advisement from numerous internet professionals and legal sources, Webadviso believes the domain names, the large internet traffic from the site, and the development programming labor/work that has gone into building the site have *significant value*.  We hope that your organization recognizes these attributes in your effort to negotiate with Webadviso.

(*Id.* Exh. 8 (emphasis added).)

**C.      Trump's Successful Uniform Domain Name Dispute
          Resolution Proceeding Against Plaintiff Web-adviso**

Unable to resolve his dispute directly with Yung, on December 17, 2010, Trump

commenced a UDRP arbitration proceeding against Plaintiff Web-adviso to recover the

Infringing Domain Names, filing a complaint before WIPO and alleging that the Infringing

Domain Names were registered and being used in bad faith.[3]  (Weinberger Decl. Exh. 4.)  Web-

adviso, in a submission signed by Yung, opposed the UDRP.  (*Id.* Exh. 5.)  In a decision dated

March 5, 2011, the arbitration panel rejected Web-adviso's contentions and determined:  (i) the

Infringing Domain Names were identical or confusingly similar to the TRUMP Mark, (ii) Web-

adviso had no rights or legitimate interests in the Infringing Domain Names, and (iii) the

Infringing Domain Names were registered and being used in bad faith.  (*Id.* Exh. 6.)  The panel

ordered Yung to transfer the Infringing Domain Names to Trump.  (*Id.*)

Refusing to accept the decision, Yung initiated this action on the last day of the 10-day

window provided for appeals pursuant to Paragraph 4(k) of the UDRP Policy, effectively

blocking the transfer of the Infringing Domain Names to Trump pending the resolution of this

action.  (*See* Compl.)

**D.      Yung Lost a Case with Nearly Identical
          Facts in the Second Circuit**

In 2008, shortly after Bank of America announced that it was acquiring brokerage firm

Merrill Lynch, Yung registered several domain names featuring combinations of Bank of

America and Merrill Lynch indicia.  (*See id.* Exh. 7 (*Web-adviso v. Bank of Am. Corp.*, No. 09

Civ. 05769 (DC), 2010 WL 521117 (S.D.N.Y. Feb. 16, 2010)).)  After refusing to turn over the

domain names, Yung sought declaratory relief, just as he has here, and lost on summary

judgment.  (*Id.*)  Yung appealed the decision, which dealt only with federal cybersquatting, and,

---

[3] Bad faith use and registration in violation of the UDRP is very similar, but not identical to, a
claim for federal cybersquatting under Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).
As discussed in Section III, below, although the legal standards differ slightly, the same
underlying facts are relevant to both claims.

in October 2011, the Court of Appeals for the Second Circuit affirmed.  (*Id.* Exh. 8 (*Bank of Am.*, Nos. 10-292, 10-1307, 2011 WL 5067689, at *2 (2d Cir. Oct. 10, 2011).)  The court noted:

> [Yung's] business model relied upon diverting internet users (presumably, among others, those who were attempting to access the websites of Bank of America and Merrill Lynch) to his own website—which contained content that could tarnish the infringed marks, or at the very least was not what the searchers sought to find—in order to profit from the "pay-per-click revenue" that their increased web traffic would bring his site.

(*Id.*)

### E.      Yung Owns A Vast Array of Suspicious Domain Names

In addition to the Infringing Domain Names and those at issue in the *Bank of America* case, Yung owns scores of other domain names containing registered trademarks of third parties. These include:  *asiafinancialtimes.com*, *barclayscapitallehman.com*, *bofalehman.com*, *citigroup wachovia.com*, *elilillyimclone.com*, *goldmansachgroup.com*, *hulufriend.com*, *indiasovereign wealthfund.com*, *ironmantoy.com*, *milanvogue.com*, *nybusinessweek.com*, *silversurfergame.com*, *xbox360sdk.com*.  (*Id.* Exh. 9.)

## LEGAL BACKGROUND

### A.      Standard on Summary Judgment

Summary judgment shall be granted if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In deciding a summary judgment motion, the facts are viewed in the light most favorable to the non-moving party.  *Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 694 (S.D.N.Y. 1999).  Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is regularly granted in trademark cases brought under Sections 32 and 43 of the Lanham Act.  *See, e.g.*, *TCPIP Holding Co. v. Haar Commc'ns Inc.*, No. 99 Civ. 1825 (RCC), 2004 WL 1620950 (S.D.N.Y. July 19, 2004); *Versace S.p.A. v. Versace*, No. 01 Civ. 9645 (PKL) (THK), 2003 WL 22023946 (S.D.N.Y. Aug. 27, 2003).

**B.      Trademarks Generally**

A trademark is a designation used "to identify and distinguish" the goods of a person.

*See* Lanham Act § 45, 15 U.S.C. § 1127.  Trademarks warrant protection because they:

> identify one seller's goods and distinguish them from goods sold by others; . . .
> signify that all goods bearing the trademark come from or are controlled by a
> single, albeit anonymous source . . . and are of an equal level of quality; [act a]s a
> prime instrument in advertising and selling the goods, . . . [and constitute] the
> objective symbol of the good will that a business has built up.  Without the
> identification function performed by trademarks, buyers would have no way of
> returning to buy products that they have used and liked.

1 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Comp.* § 3.2 at 3-4 (4th ed. 2011)

("*McCarthy*").

**C.      Federal Law Trademark Infringement and Unfair Competition**

Section 32(1) of the Lanham Act imposes civil liability for infringement of a registered

trademark on:

> [a]ny person who shall, without the consent of the registrant . . . use in commerce
> any reproduction, counterfeit, copy, or colorable imitation of a registered mark in
> connection with the sale, offering for sale, distribution, or advertising of any
> goods or services on or in connection with which such use is likely to cause
> confusion, or to cause mistake, or to deceive . . . .

15 U.S.C. § 1114(1)(a).  To sustain a trademark infringement claim, a trademark owner must

show that (1) its valid, registered trademark is being used by another party without authorization,

and (2) the use "would likely cause confusion as to the origin or sponsorship of the [user]'s

goods with [the owner]'s goods."[4]  *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d

---

[4] The Infringing Domain Names were registered in 2007.  There is no genuine issue as to
priority, since the TRUMP Mark has been used continuously since at least as early as 1985 for,
*inter alia*, real estate services.  (*See* Eric Trump Decl. Exh. 1.).  *See, e.g.*, *Stern Elecs., Inc. v.
Kaufman*, 523 F. Supp. 635, 640 (E.D.N.Y. 1981), *aff'd*, 669 F.2d 852 (2d Cir. 1982)
("Generally, the first person to use a mark 'obtains an enforceable right to exclude others from
using it, as long as the initial appropriation and use are accompanied by an intention to continue
exploiting the mark commercially.'" (citing *La Societe Anonyme des Parfums Le Galion v. Jean
Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974))).  Moreover, Trump's incontestable
registrations for the TRUMP Mark constitute conclusive proof of the priority dates stated therein.
(Weinberger Decl. Exh. 1.)  *See* Section I.A., below.

97, 114 (2d Cir. 2009).   Confusion results when consumers are confused as to the source, sponsorship, affiliation or identification of the purported infringer's products and services.   *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871-72 (2d Cir. 1986).[5]

### D.    Federal Cybersquatting

The Anti-Cybersquatting Consumer Protection Act ("ACPA") of the Lanham Act, 15 U.S.C. § 1125(d)(2), imposes civil liability for cybersquatting.   In order to establish an ACPA violation, the trademark owner must prove that (1) it possesses a valid, protectable trademark, (2) the infringing domain names are identical or confusingly similar to that mark, and (3) the alleged infringer used the domain names with the bad faith intent to profit from the goodwill associated with the mark.  15 U.S.C. § 1125(d)(1)(A).

## ARGUMENT

## I.    TRUMP HAS PROTECTABLE RIGHTS IN THE TRUMP MARK

Trump's numerous federal registrations for the TRUMP Mark span a wide range of goods and services.   (*See* Eric Trump Decl. Exh. 1.)   Moreover, some of Trump's federal registrations have become incontestable, meaning the TRUMP Mark cannot be challenged on the basis of descriptiveness or lack of secondary meaning.  (Weinberger Decl. Exh. 1.)[6]  Thus, Yung's assertion that the TRUMP Mark is invalid fails *as a matter of law*.  *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 205 (1985) (incontestable marks cannot be challenged based on descriptiveness or lack of secondary meaning); *Savin Corp. v. Savin Grp.*, 391 F.3d

---

[5]  Claims for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), require proof of the same elements and are measured by identical standards, except that the trademark owner need only have common law rights to the mark rather than statutory rights resulting from registration.  *See Starbucks*, 588 F.3d at 114; *Frederick Warne & Co. v. Book Sales Inc.*, 481 F. Supp. 1191, 1198 (S.D.N.Y. 1979).

[6]  Under the Lanham Act, a mark becomes incontestable when it has been registered and continuously used for at least five years and the trademark owner attests to this in a filing in the U.S. Patent & Trademark Office.  15 U.S.C. § 1065.  As a matter of law, once a mark has become incontestable, the registration is "*conclusive* evidence of the validity of the registered mark."  15 U.S.C. § 1115(b) (emphasis added).  For federally registered marks that have not become incontestable, the registration constitutes *prima facie* evidence of validity.  15 U.S.C. § 1115(a).

439, 451 (2d Cir. 2004) (given incontestable registrations for personal name SAVIN "we need not tarry with the first prong of the infringement test").

Trump's statutory rights to the TRUMP Mark are supported by extensive common law. Trump has engaged in widespread use of the TRUMP Mark in interstate commerce such that it is one of the most well-known trademarks in the world.  Trump's high-profile real estate, casino, hotel and golf properties have annual revenues in the tens of millions of dollars and are known the world over.  Trump spends millions of dollars annually in promoting and advertising TRUMP-branded goods and services.  (Eric Trump Decl. ¶ 20).  Trump and his TRUMP-branded goods and services are the frequent subjects of unsolicited media coverage in national and international markets.  (*Id*.)  He expends significant resources every year enforcing and protecting his intellectual property rights in the TRUMP Mark, which, as evidenced in part by the instant dispute, has been frequently plagiarized and counterfeited.  (*Id*.)  Finally, the TRUMP Mark, used for more than 26 years, has been popularized by Trump's best-selling books and by the hit television shows in which he stars, *Apprentice* and *Celebrity Apprentice*.  (*Id*.)  This is more than sufficient to demonstrate common law protection of the mark.  *See Erchonia Corp. v. Bissoon*, 410 F. App'x 416, 418 (2d Cir. 2011) (determining whether mark was entitled to common law protection based on an inquiry into secondary meaning using the following factors: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use."); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 n.4 (2d Cir. 1997) ("The crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an article because of its source.").

Yung's pleading alleges that the TRUMP Mark is "generic" because it is a common English word.  This is a red herring.  First, TRUMP is not a generic term for real estate services, hotels or any other relevant good or service; rather, it has other, commonly known, discretionary

meanings.[7]  *See* 2 *McCarthy* § 12:1 at 12-5 ("Certainly, a term can be a generic name of one thing but be a valid trademark for some *other* product.").  Second, TRUMP can serve as a trademark even though it is a common English word:

> Some of the strongest marks are "common words" found in the dictionary.  For example, SHELL, CAMEL, and APPLE . . . are intrinsically strong because they are arbitrary when applied to gasoline, cigarettes and computers, respectively.

2 *McCarthy* § 11:87 at 11-236 – 11-237.  TRUMP is arbitrary when applied to, *inter alia*, real estate services, and it is well settled that personal names with dictionary meanings may be found to be distinctive.  *Savin Corp.*, 391 F.3d at 451 (in context of dilution claim).  And Trump's incontestable registrations for the TRUMP Marks (Weinberger Decl. Exh. 1) establish this conclusively, as a mater of law.  *Park 'N Fly*, 469 U.S. at 205.

Accordingly, there is no genuine issue of fact in dispute that Trump's rights in the TRUMP Mark satisfy the first element of federal trademark infringement, unfair competition and cybersquatting.

## II.   YUNG'S USE OF THE TRUMP MARK IS LIKELY TO CAUSE CONFUSION

The second prong of Trump's infringement claim is likelihood of confusion.  To assess the likelihood of confusion between two marks, the courts employ the eight-factor test set forth in *Polaroid Corp. v. Polarad Electronics, Corp.*, 287 F.2d 492, 495 (2d Cir. 1961):  (1) the senior mark's strength, (2) the marks' degree of similarity, (3) the proximity of the parties' goods and services in the marketplace, (4) the likelihood that the junior user will bridge any gap

---

[7] TRUMP is defined in part as:

> 1. Cards.  a. any playing card of a suit that for the time outranks the other suits, such a card being able to take any card of another suit.  b. Often, trumps. (construed as sing.) the suit itself.  2. Informal. a fine person; brick.  3. Cards. To take with a trump.  4. to excel; surpass; outdo.  5. Cards.  a. to play a trump.  b. to take a trick with a trump.  6. trump up, to devise deceitfully or dishonestly, as an accusation; fabricate:  Try as they might they were unable to trump up a convincing case against him. [unexplained var. of TRIUMPH]  - trumpless, adj.

Jess Stein, *The Random House Dictionary of the English Language* 1520 (1967).

between it and the senior user, (5) actual confusion, (6) the junior user's intent in adopting its mark, (7) the quality of the junior user's product, and (8) the sophistication of buyers. *Id.* In balancing these factors, "courts generally should not treat any single factor as dispositive, . . . [but rather] focus on the ultimate question of whether consumers are likely to be confused." *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 274 (S.D.N.Y. 2006).

### A. The TRUMP Mark is Strong

The TRUMP Mark is extremely strong due to Trump's incontestable registrations and decades-long, exclusive use in connection with a wide array of goods and services, extensive publicity and advertising and indisputable, international renown. One court explained:

> [T]he distinctiveness or "strength" of a mark measures its capacity to indicate the source of the goods or services with which it is used. The greater the distinctiveness of the mark, the greater the likelihood that prospective purchasers will associate the same or a similar designation found on other goods, services, or businesses with the prior user.

*Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997) (citation omitted). Because Trump has incontestable registrations for the TRUMP Mark, Yung cannot assert that the mark is descriptive or lacks secondary meaning. *Park 'N Fly, Inc.*, 469 U.S. at 205. Moreover, virtually all of the six factors relevant to determining strength (the same as those relevant to determining secondary meaning) weigh heavily in Trump's favor: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark and (6) length and exclusivity of the mark's use." *Centaur Commc'ns v. A/S/M Commc'ns*, 830 F.2d 1217, 1222 (2d Cir. 1987) (*overruled on other grounds by Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 585 (2d Cir. 1993)); *see Virgin Enters., Ltd. v. Nawab*, 335 F.3d 141, 148 (2d Cir. 2003) ("If a mark has been long, prominently and notoriously used in commerce, there is a high likelihood that consumers will recognize it from its prior use."). The TRUMP Mark enjoys enormous renown throughout the world thanks to Trump's public activities; millions of dollars spent annually on

advertising and promoting TRUMP-brand goods and services; constant unsolicited coverage of Trump and his business exploits in newspapers, magazines, and the internet worldwide; hundreds of millions of dollars in annual revenue received by Trump, The Trump Organization and their affiliated companies; numerous attempts – such as the instant case – to infringe the TRUMP Mark; and 26 years of continuous and exclusive use.  (*See* Eric Trump Decl. ¶ 20 & Exh. 1.)

### B.      The Parties' Marks are Identical

The similarity of the marks is a key factor in determining likelihood of confusion.  *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005).  "To apply this factor, courts must analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and the 'totality of factors that could cause confusion among prospective purchasers.'"  *Id.* (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 91 F.2d 1072, 1078 (2d Cir. 1993)).[8]  Moreover, similarity is regularly found where the accused infringer merely adds generic or descriptive matter to the mark at issue.  *Id.*; *see Omega S.A. v. Omega Eng'g, Inc.*, 228 F. Supp. 2d 112, 127 (D. Conn. 2002) ("The accused 'omegatime.com' and 'omegawatch.com' are confusingly similar to plaintiff's mark OMEGA used on watches").[9]

Yung's Infringing Domain Names each incorporate the mark TRUMP in its entirety, strongly indicating a likelihood of confusion.  *Int'l Bancorp, L.L.C. v. Societe Des Baines De Mer*, 192 F. Supp. 2d 467, 482 (E.D. Va. 2002) (presuming confusion where junior user's domain name contains senior user's mark "verbatim or with insignificant variations").  Moreover, Yung merely adds a geographic term, such as "Abu Dhabi" or "Beijing."[10]  "It is a

---

[8] Use of a word as a domain name is use as a "mark."  *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88 (2d Cir. 2001).

[9] In the cybersquatting context, *confusingly similar* means that the trademark owner's mark and the domain name are so similar in sight, sound or meaning that they could be confused.  4 *McCarthy* § 25:78 at 25-352 – 25-353.

[10] Courts ignore the generic top-level domain name extension ".com" in such analyses because it has no source identifying function separate from the rest of the URL.  *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 498 (2d Cir. 2000).

general rule that the addition of . . . descriptive matter to one of two otherwise confusingly similar marks will not serve to avoid a likelihood of confusion between them," even where the descriptive matter is a geographic term. *Henry Siegel Co. v. M & R Int'l Mfg. Co.*, 4 U.S.P.Q.2d 1154, 1987 WL 123838 (T.T.A.B. 1987) (finding infringement for CHIC vs. L.A. CHIC); *see Surf Line Haw., Ltd. v. Ahakuelo*, 13 U.S.P.Q.2d 1975, 1989 WL 201651 (D. Haw. 1989) (same for JAMS vs. HAWAIIAN JAMS); *Wella Corp. v. Cal. Concept Corp.*, 558 F.2d 1019 (C.C.P.A. 1977) (same for CONCEPT vs. CALIFORNIA CONCEPT).

Adding only a geographic term is confusing in this context for two other reasons: (1) Trump's core businesses relate to real estate, an industry which relies heavily on geographic terms to distinguish particular properties, and (2) Trump composes domain names for property developments worldwide by adding a geographic term to the mark TRUMP, as with, for example, *trumpchicago.com*, *trumphollywood.com*, *trumptoronto.ca* and *trumpwaikiki.com*. *See Prime Publishers, Inc. v. Am.-Republican, Inc.*, 160 F. Supp. 2d 266, 280 (D. Conn. 2001) ("We do not believe the Defendant's addition of a generic or geographic term such as 'ct' [abbreviation for Connecticut] is sufficient to distinguish the domain name from Plaintiff's protected mark."). Given the TRUMP Mark's reputation and renown, most Internet users who see the Infringing Domain Names will immediately recognize the TRUMP Mark, and assume that the Infringing Domain Names and Infringing Websites are owned, controlled or approved by Trump. *Id.* ("An internet user might reasonably assume that 'ct' was added to the Plaintiff's mark by the Plaintiff to identify its geographic location." (citation omitted)).

### C.   The Goods and Services are Identical

Yung's Infringing Websites compete directly for internet users with Trump's legitimate websites. The closer the secondary user's goods are to those marketed under the senior user's brand, the more likely that the consumer will mistakenly assume a common source. *Virgin*, 335 F.3d at 150. Courts look to the products' nature and the relevant market structure. Because the Court must "determine whether the two products have an overlapping client base that creates a *potential* for confusion," *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 134 (2d Cir.

2004) (emphasis added), Trump need not show that the infringing products compete directly in order to prevail, *Virgin*, 335 F.3d at 150.  Nevertheless, here the goods and services at issue are identical:  informational web pages about Trump and TRUMP-brand goods and services. Consumers who search the Internet for information on Trump or businesses he owns and controls may be directed to the Infringing Domain Names.  Because not one of the Infringing Domain Names indicates in any way that it is anything other than the domain name for a legitimate TRUMP-brand website, consumers likely visit the infringing site incorrectly believing that the website was originated, sponsored or approved by Trump.

> **D.**     **There is No "Gap" to Be Bridged**

Bridging the gap is a factor designed to protect the senior user's interest in being able to "preserv[e] avenues of expansion and enter[] into related fields" at some future time.  *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir. 1985).  Here, the parties offer the same products, namely, informational web pages related to Trump, so the "gap" is already bridged and the harm already underway.  *See, e.g.*, *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 141 (2d Cir. 1999).

> **E.**     **Intentional Interest Confusion is Evident**

In the domain name context, courts find consumer confusion "when a consumer who searches for the [trademark owner]'s website with the aid of a search engine is directed instead to [another party's] site because of a similarity in the [two] website addresses."  *Savin Corp*, 391 F.3d at 462 n.13.  When such confusion – dubbed "initial interest confusion" – occurs as a result of "intentional deception," the factor weighs in favor of the trademark owner.  *Id.*  "[I]t is irrelevant under [15 U.S.C. § 1125(d)] that confusion about a Web site's source or sponsorship could be resolved by visiting the Web site identified by the accused domain name."  4 *McCarthy* § 25:78 at 25-353.  Finally, "it is black letter law that actual confusion need not be shown to prevail under the Lanham Act."  *Lois Sportswear*, 799 F.2d at 875.

Here, nearly every web-user who visits the Infringing Websites suffers initial interest confusion.  Websites with legitimate TRUMP-formative domain names enjoy hundreds of

thousands of visits a year.  (Eric Trump Decl. ¶ 19.)  The Infringing Domain Names appear to ordinary internet users as legitimate TRUMP-owned domain names.[11]  There is no evidence in the record to suggest that any of the consumers who have visited the Infringing Websites did so for any purpose other than to visit a legitimate TRUMP-owned website.  Indeed, there is no evidence to suggest that Yung has advertised or promoted the sites *in any way*.[12]  (*See* Weinberger Decl. Exh. 2 (Pl. Resp. Doc. Reqs. 1-3 & Interrog. 14).)  Given this evidence, there cannot be any serious dispute that virtually every third-party visiting an Infringing Website intends to visit a legitimate TRUMP-owned site.

###    F.    Yung's Actions Give Rise to an Inference of Bad Faith

The inquiry into willfulness or bad faith "considers whether the [alleged infringer] adopted its mark with the intention of capitalizing on the [senior user's] reputation and goodwill and on any confusion between his and the senior user's product."  *De Beers*, 440 F. Supp. 2d at 278.  "If there is proof of defendant's intent and purpose to trade on another's goodwill by using a similar mark to cause confusion, then the court will follow the alleged infringer's judgment and find a likelihood of confusion."  4 *McCarthy* § 23:110 at 23-350.

Yung's is a blatant example of bad faith infringement.  He admits that his "purpose is to acquire interesting and high value domain names."  (Compl. ¶ 3.)[13]  The "interest" and "high value" exist solely because the mark TRUMP is contained in the domain names.  Yung posts

---

[11] The Infringing Domain Names themselves do not indicate that they identify gripe, parody or commentary websites.  Rather, they resemble legitimate TRUMP-brand websites.

[12] Yung admits both that no documents exist that evidence expenses related to the Infringing Websites and that he has had no expenses from operating the Infringing Websites.  (*See* Weinberger Decl. Exh. 2 (Pl. Resp. Doc. Req. 2 & Interrog. 14).)  Furthermore, in response to document requests for "[d]ocuments sufficient to evidence all matters concerning the development and management of the Domain Names, Websites, and the Websites' content" and "[d]ocuments sufficient to evidence all communications between You and third parties concerning the Domain Names, Websites, and the Websites' content," Yung objected and produced no documents that show he promoted or advertised the Infringing Websites in any way. (*Id.* Exh. 2 (Pl. Resp. Doc. Reqs. 1 & 3).)

[13] Yung had constructive notice of each of Trump's registrations.  *See* 15 U.S.C. § 1072.

third-party generated and often entirely unrelated content on each website in an attempt to bolster his position in any subsequent litigation, while his chief goal is to hold each site until Trump learns of the infringement and offers Yung large sums to transfer the domain names. That Yung explicitly justifies the high price sought by touting the sites' web traffic (Eric Trump Decl. Exh. 8) is particularly egregious because he chooses to ignore that nearly all these visitors must have come to the site assuming that it is a legitimate TRUMP-brand site.

His past litigation against Bank of America and his current domain name portfolio corroborate Yung's bad faith and ongoing *modus operandi*. Then-Southern District (and now U.S. Court of Appeals) Judge Denny Chin found that Yung "registered defendants' domain names with the intent to sell them back to defendants for his own profit, as he sought to 'cash in' on the publicity generated by the merger." (Weinberger Decl. Exh. 7 (*Bank of Am.*, 2010 WL 521117, at *2-3 (Yung "sent an e-mail soliciting an offer for one of the domain names and suggesting that it was worth '7 figures.'")).) The Second Circuit agreed, finding Yung "registered the domain names in bad faith and thereby violated the ACPA," and affirmed. (*Id.* Exh. 8 (*Bank of Am.*, 2011 WL 5067689, at *2).) Finally, public records show that Yung owns scores of additional domain names containing registered trademarks of third parties, including: *asiafinancialtimes.com*, *barclayscapitallehman.com*, *bofalehman.com*, *citigroupwachovia.com*, *elilillyimclone.com*, *goldmansachgroup.com*, *hulufriend.com*, *indiasoverignwealthfund.com*, *ironmantoy.com*, *milanvogue.com*, *nybusinessweek.com*, *silversurfergame.com*, *xbox360sdk.com*. (*Id.* Exh. 9.)

Yung defends against allegations of bad faith by asserting that his Infringing Domain Names "are not for sale to anybody." (Compl. ¶ 14; *see* Weinberger Decl. Exh. 2 (Pl. Resp. Interrog. 3).) However, Yung's written negotiation with Trump's counsel in which he demanded a "significant value" in exchange for the Infringing Websites plainly belies this claim. (Eric Trump Decl. Exh. 8.)

### G.    The Infringing Websites are of Poorer Quality Than the TRUMP-Brand Websites

Yung's Infringing Websites are inferior to Trump's and tarnish Trump's reputation every time a consumer visits an Infringing Website.  *Morningside Grp.*, 182 F.3d at 142.  Trump's sites are high-quality, professionally designed interfaces containing first-class photography, consumer information and marketing.  (Eric Trump Decl. ¶ 18 & Exh. 2.)  Many offer interactive functions aimed at high-end consumers and professionals.  (*Id.*)  On the other hand, the Infringing Websites are of poor quality, are not aimed at any particular readership, and contain nothing more than links to online third-party videos and news feeds pulled from Google, apparently without proper attributions.  (Weinberger Decl. Exhs. 2 (Pl. Resp. Interrog. 15 ("some video contents are from YouTube.com")), 3 & 5 (Exhibit O).)  *See* U.S. Copyright Act, 17 U.S.C. § 101 *et seq.*  The Infringing Websites offer no original news or parody content authored by Yung.  (Weinberger Decl. Exhs. 2 (Pl. Resp. Interrog. 15), 3 & 5 (Exhibit O).)

### H.    The Sophistication of Consumers Increases a Likelihood of Confusion

Although neither party has submitted evidence of the sophistication of the relevant consumers, namely, internet users (including those in foreign, non-English speaking countries), even a sophisticated internet user would suspect that the Infringing Domain Names were affiliated with or sponsored by Trump because they contain the mark TRUMP and a geographic location in precisely the same format as Trump's legitimate domain names.  *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979) ("In some cases, of course, as where the products are identical and the marks are identical, the sophistication of buyers cannot be relied on to prevent confusion.").  And "it is irrelevant . . . that confusion about a Web site's source or sponsorship could be resolved by visiting the Web site identified by the accused domain name" (4 *McCarthy* § 25:78 at 25-353), meaning that Yung's acts cannot be justified by the fact that legitimate Trump sites can also be visited online.

## I.        Yung's Baseless Defenses

Yung's primary basis for proving that the Infringing Domain Names are not confusingly similar is that the Infringing Websites contain a disclaimer.  (*See* Weinberger Decl. Exh. 2 (Pl. Resp. Interrog. 11).)  The disclaimer reads:

> The content and this website has **NOT** been approved by Donald Trump, or by the Trump Organization, or by the shows "The Apprentice"/"The Celebrity Apprentice". [sic]

*Id.*  However, the confusion has already occurred by the time the consumer arrives at the site.  4 *McCarthy* § 25:78 at 25-358.   Moreover, courts have held that disclaimers are frequently ineffective at dispelling confusion.  *See Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1316 (2d Cir. 1987) (holding that infringer has affirmative duty to provide "evidence sufficient to demonstrate that any proposed material would significantly reduce the likelihood of consumer confusion").   There is no indication that Yung can carry his "heavy burden to show that [his] disclaimer . . . will significantly reduce a likelihood of confusion." *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 556 (S.D.N.Y. 1996); *see Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 143-44 (2d Cir. 2005) (holding that alleged infringer did not prove disclaimer would dispel likelihood of confusion, reversing district court).

Yung also claims that the content on the Infringing Websites is protected speech.  (*See* Weinberger Decl. Exh. 2 (Pl. Resp. Interrog. 10).)   This is another red herring.  Trump is not attempting to stop Yung's speech, only to prevent him from attracting internet users by using the TRUMP Mark in a confusing manner.[14]   Given that there is no evidence that any of the Infringing Websites' visitors came to the site for any reason other than to visit a legitimate TRUMP-brand website, this appears to be what Yung is doing.[15]   (*See id.* Exh. 2 (Pl. Resp. at Doc. Req. 1-3 & Interrog. 14).)

---

[14] This dispute does not concern Yung's right to display the content of the Infringing Websites under a non-infringing domain name.

[15] *See supra* note 12.

Because all of the *Polaroid* factors favor Trump, and because Yung has no evidence to prove otherwise, there is no genuine issue of material of fact in dispute that a likelihood of confusion exists, entitling Trump to judgment on Counterclaims I, II, V and VI.[16]

## III.   YUNG'S ACTS CONSTITUTE CYBERSQUATTING UNDER THE ACPA

A domain name registrant commits cybersquatting by registering a domain name identical or confusingly similar to another's valid and protectable trademark and uses the domain name with the bad faith intent to profit from the goodwill associated with the trademark.  As established in Sections I and II above, respectively, the TRUMP Mark is a valid and protectable trademark and the Infringing Domain Names are confusingly similar to the TRUMP Mark.[17]  To

---

[16] Trump's Counterclaims V and VI (state unfair competition and deceptive and unfair trade practices) "mirror" the federal claims.  *ESPN, Inc. v. Quiksilver, Inc.*, 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008) (unfair competition); *see Gucci Am., Inc. v. Gucci*, No. 07 Civ. 6820 (RMB), 2009 WL 8531026, at *23 n.17 (S.D.N.Y. Aug. 5, 2009) (unfair competition and deceptive and unfair trade practices "analyzed under the same standard").  Indeed,

> it is easier for a [trademark owner] to establish the protectability of a mark for a New York common law unfair competition claim than to do so under Lanham Act Section 43(a).  Under New York law, a plaintiff does not have to establish that a trade name has acquired secondary meaning within the relevant market to prevail.  Rather, the plaintiff needs only to establish a likelihood of customer confusion.

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, No. 04 Civ. 4099 (DLC), 2005 WL 1164073, at *7 n.6 (S.D.N.Y. May 18, 2005) (citation omitted).  Thus, even if the Court found the TRUMP Mark descriptive (and it cannot, given the mark's incontestability), it is still entitled to protection under state unfair competition law, which otherwise embraces the federal likelihood of confusion analysis.  *See Louis Vuitton*, 426 F.3d at 539 n.5; *see also Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 953 (2d Cir. 1980) ("New York law has concerned itself principally with whether or not the public is likely to be confused") (citations omitted).  And, as set forth in Section II, above, there can be no genuine dispute that Trump has established a likelihood of confusion given that the Parties are using identical marks on identical goods sold to identical consumers.

[17] Indeed, "the ACPA states that liability is 'without regard to the goods or services of the parties" and turns only on whether the trademark and domain name "are so similar in sight sound, or meaning that they could be confused."  4 *McCarthy* § 25:78 at 25-355.  Furthermore, forming the "accused domain name [by adding] generic or descriptive matter to the mark will usually not prevent a finding of confusing similarity."  *Id.* (citing *Omega S.A.*, 228 F. Supp. 2d at 127 (The accused "omegatime.com" and "omegawatch .com" are confusingly similar to plaintiff's mark OMEGA used on watches).  This is especially true where Yung mimicked Trump's typical protocol for forming domain names.

satisfy the only additional element required under the ACPA, Trump must show that Yung has registered the Infringing Domain Names in bad faith, *i.e.*, to profit from the fame of the TRUMP Mark.  The ACPA statute lists the following factors relevant in determining if a domain name has been used in bad faith, 15 U.S.C. § 1125(d)(1)(B)(i), and each of them weighs in Trump's favor:

- *The trademark or other intellectual property rights of the person, if any, in the domain name.*  Yung is unable to demonstrate any rights in the TRUMP Mark other than that he registered the Infringing Domain Names.  (*See* Weinberger Decl. Exh. 2 (Pl. Resp. Doc. Req. 4).)  However, registering "a domain name from a registrar does not (contrary to popular, nonlegal, folklore) give the user any 'official' right to use that domain name free from legal claims."  4 *McCarthy* § 25:73:60 at 25-243.   In effect, he concedes that Yung has no rights in the TRUMP Mark.

- *The extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person.*  The Infringing Domain Names do not consist of Yung's legal names.  (*See* Weinberger Decl. Exh. 2 (Pl. Resp. Doc. Req. 5).)

- *The person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services.*  Yung has produced no documentary evidence that he has used the TRUMP Mark in connection with the offering of any goods or services prior to registration.  (*See id.* (Pl. Resp. Doc. Req. 6).)

- *The person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name.*  Yung asserts that the Infringing Websites contain "some news, commentary and criticism" in the hope that this Court will be unable to discern a cybersquatter from a disgruntled consumer.  (*See id.* (Pl. Resp. Interrog. 1).)  One Court of Appeals observed:

> The paradigmatic harm that the ACPA was enacted to eradicate—the practice of cybersquatters registering several hundred domain names in

> an effort to sell them to the legitimate owner of the mark—is simply
> not present [in a disgruntled customer's website.] . . . One of the
> ACPA's main objectives is the protection of consumers from slick
> internet peddlers who trade on the names and reputations of
> established brands.  The practice of informing fellow consumers of
> one's experience with a particular service provider is surely not
> inconsistent with this ideal.

*Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810-11 (6th Cir. 2004)

(affirming dismissal in favor of defendant who registered *lucasnursery.com* and

posted her complaints about plaintiff); *see* 4 *McCarthy* § 25:78.  Yung's sites contain

no self-generated news, commentary or criticism regarding Trump.  As discussed

above, the purported news is composed of a news feed from Google News (shown

without attribution) automatically generated by the keywords "real estate,"

commentary and criticism in the form of third-party videos about Trump (shown

without attribution, likely in violation of U.S. copyright laws), and self-generated

musings about matters unrelated to Trump.  (*See* Weinberger Decl. Exhs. 3 & 5

(Exhibit O).)  Far from creating a legitimate Trump "gripe site," Yung has merely

posted recycled and meaningless content to evade liability.  Indeed, one leading

scholar warns of such conduct precisely:  "one who otherwise exhibits the behavior of

a cybersquatter should not be permitted to avoid the Anti-Cybersquatting Act merely

by using the challenged domain name to identify a Web site on which the person has

posted a picture of the trademarked product with vapid text . . . ."  4 *McCarthy*

§ 25:78 at 25-375.

- *The person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site.*  Yung registered the Infringing Websites shortly after news reports that Trump may develop properties in India and mimicked the

construction of Trump's legitimate domain names, with no indication in the Infringing Domain Names that these are purported parody, news or gripe sites. (Weinberger Exhs. 2 (Exhibit A) & 3; Eric Trump Decl. Exh. 4.)

- *The person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct.*  Yung refused to transfer the Infringing Domain Names for $100, which would cover the transfer and registration costs.  (Eric Trump Decl. Exh. 7.)  Instead, he sought a "significant value" due to "the large internet traffic from the site[s]" (*id.* Exh. 8), even though no evidence suggests that he ever promoted or earned revenue from them (*see* Weinberger Decl. Exh. 2 (Pl. Resp. Req. 3 & Interrogs. 13 & 14)).[18]

- *The person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties.*  A search has revealed that Yung own scores of additional domain names containing registered trademarks of third parties, including: *asiafinancialtimes.com*, *barclayscapitallehman.com*, *bofalehman.com*, *citigroup wachovia.com*, *elilillyimclone.com*, *goldmansachgroup.com*, *hulufriend.com*, *india soverignwealthfund.com*, *ironmantoy.com*, *milanvogue.com*, *nybusinessweek.com*, *silversurfergame.com*, *xbox360sdk.com*.  (*Id.* Exh. 9.)  It is difficult to conceive of a legitimate purpose for registering this collection of domain names other than to sell them to the trademark owners for a profit in violation of the ACPA.  (*See id.* Exh. 8 (*Bank of Am.*, 2011 WL 5067689, at *2 ("[Yung] clearly had the intention to profit

---

[18] *See supra* note 12.

from the goodwill associated with the trademarks that comprised the domain names.")).)

- *The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.* Because Trump is one of the most well known real estate developers, hoteliers, authors and television personalities in the world, because he has invested many millions of dollars to promote the TRUMP Mark in connection with various goods and services, and because the TRUMP Mark enjoys worldwide recognition, the TRUMP Mark is likely famous pursuant to Section 43(c)[19] of the Lanham Act.[20]

In short, there is no genuine issue of material fact in dispute as to Yung's liability for cybersquatting under the ACPA.

In a last-ditch effort to avoid liability, Yung alleges that Trump engaged in "reverse domain name hijacking" in seeking to obtain the Infringing Domain Names. (*See* Compl. ¶ 18.) Reverse domain name hijacking occurs when one misuses the dispute resolution policy in a "bad faith attempt to deprive a registered domain name holder of a domain name." Rules for Uniform Domain Name Dispute Resolution Policy, ¶ 1. However, Yung cannot support this claim. (*See* Weinberger Decl. Exh. 2 (Pl. Resp. Interrog. 5).)[21] Given that, as explained above and as the WIPO Panel found, the Infringing Domain Names "are confusingly similar," Yung has "no rights or legitimate interests in the [Infringing] Domain Names," and "the [Infringing] Domain Names have been registered and are being used in bad faith," Yung has no claim for reverse

---

[19] As stated above, Trump does not raise his dilution claims here and will request that the Court to dismiss such claims without prejudice if this motion is successful. *See supra* note 2.

[20] There is no evidence showing bad faith with respect to the remaining factor, which relates to the provision of material and misleading false contact information when applying for domain name registration.

[21] Elsewhere, Yung alleges that Trump's demand letter was sent "to harass" and that a Trump representative contacted Yung regarding "a bogus offer to settle." (*See* Compl. ¶¶ 14 & 15.) Yet Yung provides no basis for these allegations. (Weinberger Decl. Exh. 2 (Pl. Resp. Interrog. No. 4).)

domain name hijacking.  WIPO Case No. D2010-2220, at 7-9; *see Gen. Media Commc'ns, Inc. v. Crazy Troll, L.L.C.*, No. 06 Civ. 40581 (LAK), 2007 WL 102988, at *7 (S.D.N.Y. Jan. 16, 2007).

## CONCLUSION

In sum, there is no genuine dispute that Trump has protectable rights in the TRUMP Mark and that the Infringing Domain Names for an identical product are likely to cause confusion as to source, entitling Trump to relief under both federal and state law.  Nor is there any dispute that Yung's actions regarding the Infringing Domain Names constitute textbook cybersquatting.  Accordingly, Trump's motion for partial summary judgment should be granted in its entirety.

Dated: March 16, 2012         FROSS ZELNICK LEHRMAN & ZISSU, P.C.
      New York, New York

By: _____
    James D. Weinberger (*jweinberger@fzlz.com*)
    Todd Martin (*tmartin@fzlz.com*)
    Leo Kittay (*lkittay@fzlz.com*)
866 United Nations Plaza
New York, NY 10017
Tel:  (212) 813-5900
Fax:  (212) 813-5901

*Attorneys for Defendant/Counterclaim-*
  *Plaintiff Donald J. Trump*