UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x

WEB-ADVISO, J. TAIKWOK YUNG, *pro se*,          :
                                                :
                        Plaintiff-Counterclaim  :
                        Defendant,              :          **OPINION AND ORDER**
                                                :          11-cv-1413 (DLI) (VVP)
        -against-                               :
                                                :
DONALD J. TRUMP,                                :
                                                :
                        Defendant-Counterclaim  :
                        Plaintiff.              :
                                                :
---------------------------------------------------------------- x

**DORA L. IRIZARRY, U.S. District Judge:**

*Pro se* plaintiff-counterclaim defendant J. Taikwok Yung, who purportedly does business under the name Web-adviso ("Plaintiff"),[1] brought this action against defendant-counterclaim plaintiff Donald J. Trump ("Defendant") seeking a declaration that he is entitled to use the internet domain names trumpabudhabi.com, trumpbeijing.com, trumpindia.com and trumpmumbai.com (collectively, the "Domain Names"), because his use of the Domain Names does not infringe on any of Defendant's trademark rights or violate the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).  (*See* Compl., Dkt. Entry 1, ¶¶ 2, 17-23.)  Defendant brought counterclaims against Plaintiff for:  1) federal trademark infringement; 2) federal unfair competition; 3) federal trademark dilution; 4) violation of the ACPA; 5) New York State law unfair competition; 6) violation of New York State Deceptive and Unfair Trade Practices Act; and 7) New York State law trademark dilution.  (*See* Counterclaim, Dkt. Entry 4, ¶¶ 26-60.)

---

[1] It does not appear that Web-Adviso is an entity with a separate legal existence from Yung. Therefore, the court uses the term Plaintiff to refer to Yung personally and Yung as his d/b/a, Web-Adviso, interchangeably.

Defendant moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on Plaintiff's declaratory judgment claims and Defendant's counterclaims for federal and state trademark infringement, federal and state unfair competition and violation of the ACPA. (*See* Mem. in Supp. of Def.'s Mot. for Partial Summ. J., Dkt. Entry 39 ("Def.'s Mem."), at 1.) Plaintiff opposed the motion. (*See* Pl.'s Aff. in Opp'n to Def.'s Mot. for Partial Summ. J., Dkt. Entry 44 ("Pl.'s Opp'n").) For the following reasons, Defendant's motion is granted with respect to the ACPA claim and denied as moot as to all other claims.

## BACKGROUND

Plaintiff is a self-described "domainer," which he defines as somebody who "acquire[s] interesting and high value domain names and park[s] them initially with domain parking service providers and/or build[s] the website, if feasible, with interesting content which takes significant time to program, customize and debug the back-end codes." (Pl.'s Opp'n ¶ 27.) Plaintiff explains that getting "high quality" domain names means "getting domain names that make sense, easy to remember, concise in spelling and convey a knowledge of quality of the internet in its name." (*Id*.) Besides the Domain Names, Plaintiff owns almost 200 other domain names, many of which contain names of well-known businesses, such as barclayscapitallehman.com, citigroupwachovia.com, goldmansachsgroup.com, hulufriend.com, milanvogue.com, silversurfergame.com and xbox360sdk.com. (Decl. of James D. Weinberger in Supp. of Def.'s Mot. for Partial Summ. J, Dkt. Entry 41 ("Weinberger Decl."), Ex. 9.)

Defendant is, among other things, a real estate developer and hotelier. (*See* Decl. of Eric F. Trump in Supp. of Def.'s Mot. for Partial Summ. J., Dkt. Entry 40 ("Trump Decl."), ¶ 9.) He has authored several books and hosts the nationally broadcast television shows *The Apprentice* and *The Celebrity Apprentice*. (*Id.* ¶¶ 12-13; Compl. ¶ 4.) In connection with his business

interests, Defendant has registered his last name in capital letters, "TRUMP," as a trademark with the United States Patent and Trademark Organization ("USPTO").  (*See* Trump Decl. Ex. 1.)  He has used this mark, personally and through a privately held business entity, The Trump Organization, to promote myriad goods and properties, including residential buildings, hotels, golf courses, clothing and home furnishings.  (*See id.* ¶¶ 4-5, 10.)  Defendant also has affirmed to the USPTO that he has used the TRUMP mark continuously for five years or more in connection with hotel services, bottled water and golf course services.  (*See* Weinberger Decl. Ex. 1.)

Defendant also holds various domain names that he uses to promote his "brand."  (Trump Decl. ¶ 17.)  While the "main website" for The Trump Organization is located at trump.com, Defendant also holds domain names with the word "trump" followed by a geographic location, which promote "TRUMP-branded" real estate projects in the location indicated by the domain name.  (*Id.* ¶¶ 17-19.)  These domain names include trumpchicago.com, trumphollywood.com and trumpistanbul.com.tr, promoting real estate bearing the TRUMP mark in Chicago, Illinois, Hollywood, Florida, and Istanbul, Turkey, respectively.  (*Id.* ¶ 19.)

In 2007, Defendant's son, who is an Executive Vice President of the Trump Organization, announced plans to build TRUMP-branded hotels and condominiums in Mumbai and Bangalore, India.  (*Id.* ¶ 21 & Ex. 4.)  Subsequently, in September and November 2007, Plaintiff registered the Domain Names, trumpbeijing.com, trumpindia.com, trumpmumbai.com and trumpabudhabi.com.  (Pl.'s Opp'n ¶ 16.)  Plaintiff states that the websites are not run for profit and host political and non-political commentary, satire and "shared complaints of the poor quality ultra-low budget reality TV show 'The Apprentice.'"  (*Id.* ¶¶ 5, 17.)  The websites contain disclaimers that they are not affiliated with Defendant, such as:  "The content and this website has [sic] NOT been approved by Donald Trump, or by the Trump Organization, or by

the shows 'The Apprentice'/'The Celebrity Apprentice.'"  (*Id.* ¶ 6 & Ex. C.)

On October 27, 2010, an attorney representing the Trump Organization wrote a letter to Plaintiff asserting that his use of trumpmumbai.com and trumpindia.com violated Defendant's common law and federal trademark rights, and subjected Plaintiff to liability under the ACPA. (Trump Decl. Ex. 5.)  The letter threatened Plaintiff with litigation if he did not transfer the domain names to Defendant.  (*Id.*)  By e-mail dated November 4, 2010, Plaintiff declined to comply with Defendant's demands, but consented to negotiate "in the hope of reaching a more mutually beneficial agreement."  (*Id.* Ex. 6.)  The same day, counsel for the Trump Organization offered to pay $100 for trumpmumbai.com and trumpindia.com to cover "reasonable" transfer and registration costs incurred by Plaintiff.  (*Id.* Ex. 7.)  On November 8, 2010, Plaintiff replied that he "agrees to negotiate with your organization in hopes of reaching a more mutually agreeable terms [sic] . . . .  [Plaintiff] believes the domain names, the large internet traffic from the site, and the development programming labor/work that has gone into building the site have significant value."  (*Id.* Ex. 8.)

On December 17, 2010, Defendant brought an arbitration proceeding against Plaintiff before the World Intellectual Property Organization pursuant to the Uniform Domain Name Resolution Policy ("UDRP"), asserting that the Domain Names infringed on the TRUMP mark. (Weinberger Decl. Ex. 4, ¶ 50.)  Plaintiff opposed Defendant's claims.  (*See id.* Ex. 5.)  On March 5, 2011, the arbitrator ruled in favor of Defendant, and directed that Plaintiff transfer the Domain Names to Defendant.  (*Id.* Ex. 6 at 9.)  In a written decision, the arbitrator found that the Domain Names were confusingly similar to the TRUMP trademark, Plaintiff had no legitimate interest in the Domain Names, and Plaintiff had registered and used the Domain Names in bad

faith. [2]  (*Id.* at 6-9.)

On March 22, 2011, Plaintiff filed the instant action seeking a declaration that he is entitled to use the Domain Names because they do not infringe on Defendant's trademarks or violate the ACPA.  (*See* Compl. ¶¶ 2, 17-23.)  Defendant brought counterclaims against Plaintiff for:  1) federal trademark infringement pursuant to Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); 2) federal unfair competition pursuant to Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); 3) federal dilution pursuant to Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); 4) violation of the ACPA; 5) unfair competition under New York State common law; 6) violation of New York State Deceptive and Unfair Trade Practices Act pursuant to Section 349 of the New York State General Business Law; and 7) New York State law trademark dilution under Section 360-*l* of the New York State General Business Law.  (*See* Counterclaim ¶¶ 26-60.)

Defendant moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on both of Plaintiff's declaratory judgment claims and Defendant's counterclaims for federal and state trademark infringement, federal and state unfair competition and violation of the ACPA.  (*See* Def.'s Mem. 1.)  Defendant contends that there is no genuine issue of material fact that:  1) he has a protectable right in the TRUMP mark; 2) Plaintiff's use of the mark is likely to cause confusion; and 3) Plaintiff is a "cybersquatter" under the ACPA.  (*See id.*)  Plaintiff opposed the motion, contending that:  1) the word "trump" is generic; 2) Plaintiff

---

[2]  The parties have not addressed the implications of the UDRP proceeding on this action, but it appears that it has no precedential value.  As one court in this circuit has explained:  "[t]he UDRP process has been described as 'adjudication lite' because the proceedings are handled entirely upon written submissions and the arbitration panel has total discretion to determine the application of precedent and rules of evidence.  The UDRP decisions are not binding on the courts."  *Gen. Media Comm'ns, Inc. v. Crazy Troll, LLC*, 2007 WL 102988, at *4 (S.D.N.Y. Jan. 16, 2007) (internal citation omitted).

does not run the websites at issue for profit and has not tried to sell the Domain Names; 3) the websites do not cause confusion because they contain disclaimers explaining that they are not affiliated with Defendant; 4) the First Amendment to the United States Constitution and the ACPA's safe harbor provision entitles Plaintiff to maintain the allegedly infringing websites because they are used for parody and commentary; and 5) Defendant's claims are barred by the doctrine of laches.  (*See generally* Pl.'s Opp'n.)

## **LEGAL STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*.  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation." *Kerzer v. Kingly Mfg.*, 156 F. 3d 396, 400 (2d Cir. 1998).  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F. 3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Grp., Inc.*, 859 F. 2d 1108, 1114 (2d Cir. 1988)).

In addition, the court holds *pro se* pleadings to "to less stringent standards than formal

pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). The court construes them "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006) (per curiam) (emphasis omitted).

## DISCUSSION

## I.    Anti-Cybersquatting Consumer Protection Act

The ACPA was enacted to protect consumers and holders of distinctive trademarks from "cybersquatting," which "involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners." *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F. 3d 489, 493 (2d Cir. 2000). The ACPA imposes civil liability on a person who, "without regard to the goods or services of the parties":

> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>
> (ii) registers, traffics in, or uses a domain name that –
>
>> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or]
>>
>> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark.

15 U.S.C. § 1125(d)(1)(A). Thus, Defendant must show that: (1) the TRUMP mark is either distinctive or famous; (2) the Domain Names are identical or confusingly similar to the TRUMP mark; and (3) Plaintiff had a bad faith intent to profit from use of the mark. *See Sporty's Farm L.L.C.*, 202 F. 3d at 497-99.

### A.    "Distinctive" or "Famous"

Under the ACPA, the court "must first determine whether [the mark at issue] is a distinctive or famous mark and thus entitled to the ACPA's protection." *Id.* at 497. There is no

genuine issue of material fact that the TRUMP mark is distinctive and entitled to the ACPA's protection.[3]  Prior to Plaintiff registering the Domain Names in 2007, Defendant attested to the USPTO that the TRUMP mark was incontestable when used in hotel services, bottled water and golf club services, because Defendant had registered and continuously used the mark in connection with these goods and services for at least five years.  (*See* Weinberger Decl. Ex. 1; *see also* Trump Decl. Ex. 1.)  The USPTO accepted and acknowledged Defendant's attestation.  (*See* Weinberger Decl. Ex. 1.)  This serves as "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark" in connection with hotel services, bottled water and golf club services, subject to certain exceptions enumerated in the Lanham Act. 15 U.S.C. § 1115(b).  It also entitles Defendant "to a presumption that its registered trademark is inherently distinctive."  *Sporty's Farm L.L.C.*, 202 F. 3d at 497 (quoting *Equine Techs., Inc. v. Equitechnology, Inc.*, 68 F. 3d 542, 545 (1st Cir. 1995)).  Thus, Plaintiff cannot argue that the TRUMP mark lacks secondary meaning.  *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 191, 203 (1985) (action to enjoin the infringement of an incontestable mark cannot be defended on grounds that mark is descriptive and lacks secondary meaning).

Reading his submissions liberally, Plaintiff attempts to rebut the presumption of distinctiveness by asserting that the word "trump" is not entitled to protection because it is a generic "dictionary word" that means "any playing card of a suit that for the time outranks other suits, such a card being able to take any card of another suit."  (Pl.'s Opp'n ¶ 5; Compl. ¶ 21.)

---

[3] Because it is distinctive, the court need not decide whether the TRUMP mark is also famous. *See Prime Publishers, Inc. v. American-Republican, Inc.*, 160 F. Supp. 2d 266, 277 (D. Conn. 2001) ("In contrast to the Federal Trademark Dilution Act ('FTDA'), 15 U.S.C. § 1125(c), which protects marks that are both famous and distinctive from dilution, a mark needs only one of those qualities to merit protection under the ACPA.").

This argument is meritless.

Under the Lanham Act, "no incontestable right shall be acquired in a mark which is the generic name *for the goods or services or a portion thereof, for which it is registered*."  15 U.S.C. § 1065(4) (emphasis added).  In other words, a term is only generic to the extent that it "name[s] the species or object to which the mark applies."  *Nabisco, Inc. v. PF Brands, Inc.*, 191 F. 3d 208, 215 (2d Cir. 1999), *abrogated on other grounds*, *Moseley v. Secret Catalogue, Inc.*, 537 U.S. 418 (2003).  However, an otherwise generic term can become non-generic, and entitled to protection, when used in connection with goods or services unrelated to its generic meaning.  *See* J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition*, § 12:1 (4th ed.) ("Certainly, a term can be a generic name of one thing but be a valid trademark for some *other* product.  For example:  APPLE is a generic name for the edible fruit of the apple tree, but is a trademark for computers." (footnote omitted)).  When an otherwise generic term is used as a trademark for a good or service that bears little or no relationship to its ordinary generic meaning, it becomes "arbitrary and fanciful," and thus is inherently distinctive.  *See Virgin Enters. Ltd. v. Nawab*, 335 F. 3d 141, 148-49 (2d Cir. 2003) ("In relation to the sale of consumer electronic equipment, the VIRGIN mark is inherently distinctive, in that it is arbitrary and fanciful; the word 'virgin' has no intrinsic relationship whatsoever to selling such equipment.");  *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F. 2d 1072, 1075-76 (2d Cir. 1993) ("An arbitrary term is one that has a dictionary meaning – though not describing the product – like IVORY for soap.");  *Omega S.A. v. Omega Eng'g, Inc.*, 228 F. Supp. 2d 112, 123 (D. Conn. 2002) ("The Court has no doubt that the marks 'omega' and 'O', as used in connection with the manufacture and sale of watches, clocks, and electronic timing equipment, are inherently distinctive.  The meanings associated with the word 'omega' and letter 'O' do not suggest time

9

or watches.").

Here, the generic dictionary definition of trump is unrelated to any good or service for which the TRUMP mark is used by Defendant. The word "trump" is defined in the dictionary as, *inter alia*, "all the cards of a suit. . . that if legally played will win over a card that is not of this suit" and "to get the better of." *Webster's Third New International Dictionary (Unabridged)*, 2455 (1993). There is no intrinsic connection between these generic definitions and hotel services, bottled water or golf course services, for which the TRUMP mark has become incontestable. These dictionary definitions also bear no relation to the other goods and products for which the TRUMP mark has been registered, but has not yet become incontestable, such as real estate services, vodka, magazines, restaurant services and furniture. (*See* Trump Decl. Ex. 1.) The TRUMP mark is arbitrary in these contexts because it is derived from Defendant's last name, not from any colloquial use relating to card games or getting the better of somebody. (*See* Trump Decl. ¶ 14.) Thus, its generic meaning in unrelated settings does not undermine its strength or validity here.

Accordingly, as a matter of law, the TRUMP mark is distinctive when used in connection with Defendant's businesses.

**B.    Identical or Confusingly Similar**

The court next must consider whether the Domain Names are "identical or confusingly similar to" the TRUMP mark. 15 U.S.C. § 1125(d)(1)(A)(ii)(I). The Domain Names, trumpbeijing, trumpindia, trumpmumbai and trumpabudhabi,[4] are not identical to the TRUMP mark because of the geographic terms following the word trump, so the court looks at whether

---

[4] "When evaluating whether a domain name is confusingly similar to a trademark, a district court disregards the top-level domain name (e.g. '.com', '.org', '.net' etc.)." *Omega S.A.*, 228 F. Supp. 2d at 126 n.36.

there are any genuine material factual issues as to whether the Domain Names and the mark are confusingly similar.  In determining whether the Domain Names are confusingly similar to the TRUMP mark within the meaning of the ACPA, the court compares "solely [Defendant's] marks and [Plaintiff's] domain names, including their intrinsic sound, sight, and meaning, without reference to goods or services with which the domain name is associated by the parties' use." *Omega S.A.*, 228 F. Supp. 2d at 127.

A comparison reveals that no reasonable juror could conclude that the Domain Names are not confusingly similar to the TRUMP mark.  The similarities are instantly apparent because of the inclusion of the word "trump" in the Domain Names, and Plaintiff does not argue that the "trump" in the Domain Names reference anything other than Defendant's last name.  The differences between the Domain Names and the TRUMP mark lie in the geographic terms in the Domain Names.  However, names of places, such as Beijing or India, are similar to the types of common words that other courts have held do not distinguish a domain name from a mark.  *See, e.g., id.* at 127 ("[T]he Court concludes . . . that the domain names 'OMEGATIME' and 'OMEGAWATCH' are confusingly similar to the marks 'omega' or 'O'."); *Mattel, Inc. v. Adventure Apparel*, 2001 WL 1035140, at *2 (S.D.N.Y. Sept. 7, 2001) ("The similarities between 'barbiesbeachwear.com', 'barbiesclothing.com' and the BARBIE trademark are apparent on their face."); *Prime Publishers, Inc.*, 160 F. Supp. 2d at 280 ("We do not believe the Defendant's addition of a generic or geographic term such as 'ct' is sufficient to distinguish the domain name from Plaintiff's protected mark.").  The place names actually add confusion in this instance.  The Domain Names' inclusion of geographic terms mimics many of the domain names Defendant uses to promote TRUMP-branded properties in specific places, such as trumpchicago.com, trumphollywood.com, trumptoronto.ca and trumpwaikiki.com.  (*See* Trump

11

Decl. ¶ 19.)  As a result, the inclusion of "mumbai" in trumpmumbai.com, for example, rather than distinguishing the domain name from the TRUMP mark, makes it appear to the unsuspecting internet user that the website is promoting a property in Mumbai, India, associated with Defendant.

Plaintiff asserts that the Domain Names could not cause any confusion because the websites contain disclaimers, such as:  "The content and this website has [sic] NOT been approved by Donald Trump, or by the Trump Organization, or by the shows 'The Apprentice'/'The Celebrity Apprentice.'"  (Pl.'s Opp'n ¶ 6.)  Plaintiff's contention misses the mark.  The relevant inquiry is whether the Domain Names are confusingly similar to the TRUMP mark, not whether the actual websites accessed using the Domain Names cause confusion or compete with Defendant's business.  Under the ACPA, "any similarities or distinctions between the products themselves, *i.e.*, whether or not the content of [Plaintiff's] website might compete with [Defendant's] product, are irrelevant."  *Prime Publishers, Inc.*, 160 F. Supp. 2d at 279; *see also* 15 U.S.C. § 1125(d)(1)(A) (liability attaches under the ACPA "without regard to the goods or services of the parties").  "It is irrelevant under the ACPA that confusion about a Web site's source or sponsorship could be resolved by visiting the Web site identified by the accused domain name."  McCarthy, *supra*, § 25:78 (citing *Coca-Cola Co. v. Purdy*, 382 F. 3d 774 (8th Cir. 2004)).

Congress designed the ACPA to prevent "individuals seeking extortionate profits by reserving Internet domain names that are similar or identical to trademarked names with no intention of using the names in commerce themselves."  H.R. Rep. No. 106-412, at 6 (1999).  In drafting the ACPA, Congress also found that cybersquatters hurt businesses, because "consumers seeking a trademark owner's Web site are diverted elsewhere, which means lost business

opportunities for the trademark owner." *Id.* at 6. These wrongs would hardly be prevented if individuals could register domain names similar or identical to protectable marks, so long as there is a disclaimer somewhere on the website itself. Owners of trademarks still would face extortionate demands for money from individuals looking to profit off of the goodwill associated with the mark and businesses would be robbed of domain names where potential customers could easily find their products and services. *Cf. Savin Corp. v. Savin Grp.*, 391 F. 3d 439, 458 n.12 (2d Cir. 2004) ("A significant purpose of a domain name is to identify the entity that owns the [website]. Customers searching for a company's website will often search using a domain name identical or similar to the company's name or mark . . . . Customers unable to locate [a plaintiff's] website using domain names identical to its marks, . . . may fail to continue to search for [the plaintiff's] own home page, due to anger, frustration, or the belief that [the plaintiff's] home page does not exist." (quoting *Pinehurst, Inc. v. Wick*, 256 F. Supp. 2d 424, 431 (M.D.N.C. 2003)) (alterations in original)).

Accordingly, there is no genuine issue of material fact that Defendant has satisfied the "confusingly similar" prong of his ACPA claim.

### C.      Bad Faith

The court next turns to whether Plaintiff "has a bad faith intent to profit from" the TRUMP mark. 15 U.S.C. § 1125(d)(1)(A)(i). The statute provides nine factors to assist courts in determining whether a party has a bad faith profit motive. These nine factors are:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

*Id.* § 1125(d)(1)(B)(i). The Second Circuit has stressed that courts "are not limited to considering just the listed factors when making [a] determination of whether the statutory criterion has been met. The factors are, instead, expressly described as indicia that 'may' be considered along with other facts." *Sporty's Farm L.L.C.*, 202 F. 3d at 498.

The court finds that the evidence of Plaintiff's bad faith here is overwhelming. This conclusion ineluctably follows from the nine statutory factors, as well as the holdings by both the district court and the Second Circuit in a previous ACPA action involving Plaintiff. That case, *Webadviso v. Bank of America Corp.*, is materially identical to the instant matter. In *Webadviso*,

14

Plaintiff registered the domain names bofaml.com and mlbofa.com on the same day that Bank of America Corporation ("Bank of America") and Merrill Lynch & Co., Inc. ("Merrill Lynch") announced their merger.  *Webadviso v. Bank of Am. Corp.*, 2009 WL 5177997, at *2 (S.D.N.Y. Dec. 31, 2009).  An arbitrator found that the domain names were confusingly similar to Bank of America's and Merrill Lynch's trademarks and that Plaintiff had no legitimate right to bofaml.com and mlbofa.com.  *Id.* at *3.  Plaintiff subsequently filed an action in the Southern District of New York seeking a declaration that he did not violate the ACPA and Bank of America and Merrill Lynch brought counterclaims under federal and state law.  *Id.* at *1.  In granting a preliminary injunction preventing Plaintiff's use of the domain names and then granting summary judgment in favor of Bank of America and Merrill Lynch, then-District Judge Denny Chin of the Southern District of New York held that Plaintiff acted in bad faith because: 1) Plaintiff never had previously used any iterations of "bofa" or "ml" in his business; 2) despite Plaintiff's assertions that he has never sold a domain name, the record shows that he is a "domainer" who "seeks to register domain names incorporating well-known marks with the hope that he can sell the domain names back to the trademark owners;" 3) Plaintiff had registered approximately 180 domain names, some of which included well-known trademarks; 4) Plaintiff registered bofaml.com and mlbofa.com the same day the media reported the Bank of America-Merrill Lynch merger; and 5) an arbitrator found that the domain names at issue were confusingly similar to Bank of America's and Merrill Lynch's trademarks and that Plaintiff registered the domain names in bad faith.  *Id.* at *4-5; *Webadviso v. Bank of Am. Corp.*, 2010 WL 521117, at *1-3 (S.D.N.Y. Feb. 16, 2010).

The Second Circuit summarily affirmed Judge Chin's grant of summary judgment, holding that bad faith was shown because:

By Yung's own admission, he seeks to acquire high value domain names and park them with domain parking service providers to generate pay-per-click revenue. By doing so in this case, Yung ran afoul of the ACPA, for whether or not he had any intention of selling the domain names to appellees, he clearly had the intention to profit from the goodwill associated with the trademarks that comprised the domain names. His business model relied upon diverting internet users (presumably, among others, those who were attempting to access the websites of Bank of America and Merrill Lynch) to his own website – which contained content that could tarnish the infringed marks, or at the very least was not what the searchers sought to find – in order to profit from the "pay-per-click revenue" that their increased web traffic would bring his site.

*Webadviso v. Bank of Am. Corp.*, 448 F. App'x 95, 98 (2d Cir. 2011) (internal citation and quotation marks omitted). The court further explained that summary judgment also was supported by the fact that Plaintiff "had registered some 180 domain names, many of which were composed, in whole or in part, of famous trademarks." *Id.* at 98 n.3.

Summary judgment is warranted here for virtually the same reasons described by Judge Chin and the Second Circuit in *Webadviso*. There is no evidence that Plaintiff has any intellectual property rights in the Domain Names. *See* 15 U.S.C. § 1125(d)(1)(A)(i)(I). He has never done business using the word "trump" or the word trump followed by geographic names. *See id.* § 1125(d)(1)(A)(i)(III). The Domain Names are wholly unrelated to Plaintiff's name or the name of his business, Webadviso. *See id.* § 1125(d)(1)(A)(i)(II). Plaintiff's assertions that he has never tried to sell a domain name to Defendant or any other third-party and that he does not seek to profit from the Domain Names is belied, as the Second Circuit found in *Webadviso*, by admissions elsewhere that he seeks to acquire "interesting and high value domain names and park them initially with domain parking service providers and/or build the website, if feasible, with interesting content." (Compl. ¶ 3; *see also* Trump Decl. Ex. 8 (letter by Plaintiff informing Defendant that trumpmumbai.com and trumpindia.com have "significant value").)

Moreover, Plaintiff states that he registers "high value" domain names, but the only

reason that can be gleaned from the record why the Domain Names have any value is because they use the TRUMP mark and easily could be confused with Defendant's legitimate websites. (Pl.'s Opp'n ¶ 27.)  As discussed above, the Domain Names parrot Defendant's practice of using the TRUMP mark followed by geographic terms to promote specific properties.  (*See supra* § I.B.)  In addition, Plaintiff registered trumpmumbai.com and trumpindia.com shortly after reports in the media surfaced that TRUMP-branded hotel and condominium projects were being developed in Mumbai and Bangalore, India.  (*See* Trump Decl. ¶ 21 & Ex. 4.)

In response to these uncontroverted facts, Plaintiff has failed to provide any explanation of why he included geographic terms, such as Mumbai and Abu Dhabi.  Indeed, the websites located at the Domain Names have no apparent connection to those places.   As a result, the only logical conclusion is that the Domain Names were purposefully designed to confuse internet users into thinking that the Domain Names are used by Defendant to promote his business.  *See* 15 U.S.C. § 1125(d)(1)(A)(i)(V).  Such calculated exploitation of the goodwill associated with another's trademark is precisely the sort of bad faith the ACPA is designed to combat.  *See Vogster Entm't, L.L.C. v. Mostovoy*, 2009 WL 691215, at *3 (E.D.N.Y. Mar. 16, 2009) (The ACPA was intended to prevent "the bad faith, abusive registration and use of the distinctive trademarks of others as internet domain names, with the intent to profit from the goodwill associated with those trademarks.").

As Judge Chin and the Second Circuit also held, Plaintiff's bad faith is further demonstrated by the fact that he owns almost two hundred other domain names, many of which are obvious appropriations well-known brands.  *Webadviso*, 448 F. App'x at 98 n.3; *Webadviso*, 2010 WL 521117, at *1 ("Webadviso has a history of registering domain names that include well-known trademarks. . . .").  For example, besides mlbofa.com and bofaml.com, Plaintiff has

previously         registered         barclayscapitallehman.com,         citigroupwachovia.com,

goldmansachsgroup.com, hulufriend.com, milanvogue.com and xbox360sdk.com, which only

have apparent value because they incorporate the names of businesses or goods. (*See*

Weinberger Decl. Ex. 9.) These other domain names provide further undisputed evidence that

Plaintiff has violated the ACPA in this instance. *See* 15 U.S.C. § 1125(d)(1)(A)(i)(VIII).

In sum, on this record, the conclusion that Plaintiff is a cybersquatter is unavoidable. At

a minimum, applying the uncontested evidence to statutory factors I, II, III, V and VIII

conclusively shows Plaintiff's bad faith in registering the Domain Names, while nothing shows

Plaintiff's good faith. Therefore, there is no genuine issue of material fact that Defendant has

established his burden under the bad faith prong of the ACPA.

D.      **Fair Use and First Amendment Defenses**

Plaintiff asserts that, notwithstanding any other evidence showing bad faith, Defendant is

not entitled to summary judgment because the Domain Names are protected by the "fair use"

doctrine and the First Amendment. (*See* Pl.'s Opp'n ¶¶ 19-25.) The ACPA has a "safe harbor"

for parties who would otherwise be subject to the liability under the ACPA. The statute provides

that bad faith "shall not be found in any case in which the court determines that the person

believed and had reasonable grounds to believe that the use of the domain name was a fair use or

otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). While the Second Circuit has not construed

the limits of the safe harbor, notably, courts in other circuits have cautioned that "courts should

'make use of this "reasonable belief" defense very sparingly and only in the most unusual

cases.'" *Lahoti v. VeriCheck, Inc.*, 586 F. 3d 1190, 1203 (9th Cir. 2009) (quoting *Audi AG v.

D'Amato*, 469 F .3d 534, 549 (6th Cir. 2006)). "Otherwise, the defense would 'undermine the

rest of the statute' because '[a]ll but the most blatant cybersquatters will be able to put forth at

least some lawful motives for their behavior.'" *Id.* (quoting *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F. 3d 264, 270 (4th Cir. 2001) (alterations in original)).

"Fair use" or "otherwise lawful" use are not expressly defined in the ACPA, but, elsewhere in the Lanham Act, use of another's trademark is permitted in connection with a description, parody, criticism, commentary and news reporting. *See* 15 U.S.C. § 1125(c)(3) (dilution context); 15 U.S.C. § 1115(b)(4) (infringement context); *see also TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F. 3d 88, 103 (2d Cir. 2001) (Describing fair use in infringement context as "one party's exclusive right to use a mark will not prevent others from using the word or image constituting the mark in good faith in its descriptive sense, and not as a trademark." (internal quotation marks and alteration omitted)).  In this instance, it appears that Congress intended to protect similar uses of trademarks from liability under the the ACPA. *See* H.R. Rep. No. 106-412, at 11 (fair use factor balances interests of trademark holder with interests of those who make "non-commercial or fair uses of others' marks online, such as in comparative advertising, comment, criticism, parody, news reporting, etc.").  Thus, the court must consider whether Plaintiff had a good faith basis in believing that he was using the TRUMP mark as a description, parody, criticism or commentary.

The court holds that Plaintiff did not have any reasonable grounds to believe that his use of the Domain Names is a fair use or otherwise lawful.  As an initial matter, the scant news, commentary and criticism on the websites provide little evidence that Plaintiff registered the Domain Names in good faith.  The record reflects that Plaintiff has put in minimal resources in developing the websites.  Plaintiff has stated that there are no operating expenses in connection with the websites.  (*See* Weinberger Decl. Ex. 2 (Interrogatory Resp. 14).)  The websites located at the Domain Names, all of which are identical, do not contain any material posted after 2011.

19

*See* www.trumpmumbai.com (last visited Jan. 15, 2013); www. trumpabudhabi.com (last visited Jan. 15, 2013); www.trumpbeijing.com (last visited Jan. 15, 2013); www.trumpindia.com (last visited Jan. 15, 2013).  The content relating to Defendant consists almost entirely of materials taken from third parties, such as videos parodying Defendant that he found on YouTube, generic lawyer jokes with "lawyer" replaced by "Apprentice," and off-color jokes about alcoholics with terms for alcoholics substituted with "Apprentice."   (*See id.*; Weinberger Decl. Ex. 2 (Interrogatory Resp. No. 15).)  The only apparently original commentary relating to Defendant is a chart listing ten seasons of Defendant's television shows, *The Apprentice* and *The Celebrity Apprentice*, containing columns listing the shows' declining ratings and short commentary such as "OK season" and "What kind cheap [sic] low budget show is this?"

Otherwise, the site contains various content unrelated to Defendant under headings that seem to be lifted from the ACPA's safe harbor provision.  For example, under a "News" heading, there is a list of real estate headlines automatically generated by a Google News feed.  The "Political Commentary" section consists largely of off-color jokes about former-Congressman Anthony Weiner posted in 2011.  In sum, the websites give the appearance that they were haphazardly put together as an attempt to post minimal content under each category traditionally associated with fair use (e.g., news, politics, criticism) in an attempt to benefit from the ACPA's safe harbor.  If Plaintiff's conduct were deemed to fall under the safe harbor simply because he has put up websites with token content ostensibly covered by the fair use doctrine, the safe harbor exception would swallow the rule.

Moreover, even if the websites' contents are the result of a bona fide attempt to create news and commentary sites, Plaintiff's conduct does not fall within the ACPA's safe harbor.  As a leading treatise has explained, the safe harbor "is not intended to create a loophole that could

20

'swallow' the Act by allowing a domain name holder to evade liability merely by putting up a seemingly innocent site under an infringing domain name."  McCarthy, *supra*, § 25:78; *see also Coca-Cola Co.*, 382 F. 3d at 786-88 (defendant barred by the ACPA from using domain names incorporating trademarks to drive internet traffic to anti-abortion websites.)  The Domain Names themselves do not provide commentary or criticism about Defendant or his businesses.  They also give no indication that they are addresses for websites that are forums for criticizing Defendant, rather than websites operated by Defendant.  *Cf.* McCarthy, *supra*, § 25:76 ("Those who are unhappy with a company may open a web-site complaining and criticizing the company (a 'gripe site'), using a domain name that makes it clear what kind of a Web site it is.  The typical example is the use of a company trademark followed by '-sucks,' as in 'www.generalmotorssucks.com.'").

The Domain Names merely contain the TRUMP mark followed by geographic names that have nothing to do with commentary, criticism or any content on the websites.  As discussed *supra* § I.B, they mimic domain names Defendant uses to promote his businesses, a tactic Plaintiff has employed with various other well-known trademarks even after court findings that such conduct violates the ACPA.  *See Coca-Cola Co.*, 382 F. 3d at 788 ("Given the extensive evidence of bad faith in the record, we conclude that Purdy lacked reasonable grounds to believe that his conduct was lawful, and he is not entitled to benefit from the safe harbor provision.").  Thus, the use of TRUMP in the Domain Names is not a fair use and there is no evidence that Plaintiff had any good faith reason to believe otherwise.

For similar reasons, Plaintiff's assertion that Defendant's ACPA claim is barred by the First Amendment fails as a matter of law.  The Second Circuit has explained that "[d]omain names . . . *per se* are neither automatically entitled to nor excluded from the protections of the

First Amendment, and the appropriate inquiry is one that fully addresses particular circumstances presented with respect to each domain name." *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F. 3d 573, 586 (2d Cir. 2000). The extent of the First Amendment's protection is based upon whether the domain names are communicative or appear to identify the source of the communication. *Id.* at 585-86; *see also OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 198 (W.D.N.Y. 2000) ("Defendants offer no argument as to why the Court should determine that their use of 'thebuffalonews.com' is a communicative message rather than a source identifier."). This is consistent with the well settled principle that "the First Amendment confers a measure of protection for the unauthorized use of trademarks when that use is a part of the expression of a communicative message." *Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F. Supp. 267, 275 (S.D.N.Y. 1992). However, "[w]hen another's trademark (or a confusingly similar mark) is used without permission *for the purpose of source identification*, the trademark law generally prevails over the First Amendment." *Id.* at 276.

For example, a court in the Southern District of New York, summarily affirmed by the Second Circuit, granted Planned Parenthood's preliminary injunction motion to stop a defendant's use of plannedparenthood.com for a website selling anti-abortion books because the domain name likely infringed on Planned Parenthood's trademark. *See Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313 (S.D.N.Y. Mar. 24, 1997), *summ. aff'd*, 152 F. 3d 920 (2d Cir. 1998) (table decision). The court rejected the defendant's assertion that his use of the domain name was protected by the First Amendment, holding that the domain name plannedparenthood.com was not part of any communicative message against abortion, but was more akin to a source identifier. *Id.* at *10.

Similarly, here, the Domain Names are not communicative and Plaintiff's use of them is

not protected by the First Amendment. The Domain Names provide no commentary or criticism of Defendant or any other topic. The Domain Names appear to identify Defendant, or an authorized user of the TRUMP mark, as the source of the websites, likely to promote Defendant's business interests in the locations indicated in the Domain Names. As explained by the court in *Planned Parenthood*, such misidentification of a website's source is not entitled to First Amendment protection. In coming to this conclusion, the court emphasizes that it is not questioning Plaintiff's First Amendment rights to comment upon and criticize Defendant and his businesses. However, he may not do so by using Defendant's mark to confuse people into visiting his websites. "The First Amendment protects an individual's right to speak out against a markholder, but it does not permit an individual to suggest that the markholder is the one speaking." *SMJ Grp., Inc. v. 417 Lafayette Rest. LLC*, 439 F. Supp. 2d 281, 291 (S.D.N.Y. 2006).

Accordingly, there is no genuine issue of material fact that Plaintiff's registration and use of the Domain Names runs afoul of the ACPA. Defendant is entitled to judgment in his favor on his ACPA claim as well as Plaintiff's ACPA declaratory judgment claim.[5]

## II.     Laches

Plaintiff contends that Defendant's claims to the Domain Names are barred by laches. Plaintiff registered the Domain Names in September and November 2007 and Defendant first demanded Plaintiff transfer the Domain Names in October 2010. (*See* Pl.'s Opp'n ¶¶ 15-18.)

---

[5] The court denies Defendant's motion for summary judgment as moot with respect to his federal and state trademark infringement and federal and state unfair competition counterclaims because of the court's holding that Defendant is entitled to relief under the ACPA. For the same reason, the court dismisses as moot Plaintiff's claim seeking a declaration that the Domain Names do not infringe on Defendant's trademark. *See Webadviso*, 448 F. App'x at 98 n.4 ("We do not address the appellant's arguments regarding the non-ACPA claims, as the relief granted to the appellees was available upon the District Court's grant of judgment for the appellees on the ACPA claim.").

Plaintiff asserts that Defendant's approximately three-year delay in asserting his rights to the Domain Names was unreasonable and prejudiced Plaintiff.  (*See id*.)

As a threshold matter, Plaintiff's laches defense fails because he intentionally exploited Defendant's trademark.  The Second Circuit has held in the Lanham Act infringement context that "[i]t is well established that 'laches is not a defense against injunctive relief when the defendant intended the infringement.'"  *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F. 3d 104, 107 (2d Cir. 2000) (quoting *Harlequin Enters. Ltd. v. Gulf & W. Corp.*, 644 F. 2d 946, 950 (2d Cir. 1981)).  While the court is unaware of any Second Circuit decision addressing whether this principal applies to ACPA claims, the court perceives no reason why it is not equally valid in the ACPA context.  The ACPA is an amendment to the Lanham Act and addresses a similar wrong (the unauthorized use of another's trademark to confuse the public). *See Mashantucket Pequot Tribe v. Redican*, 403 F. Supp. 2d 184, 198 (D. Conn. 2005) ("[T]he ACPA is an amendment to the Lanham Act.  Moreover, the goals of the ACPA, like the rest of the Lanham Act, would appear to include protection against public confusion.")

Furthermore, "[t]his good-faith component of the laches doctrine is part of the fundamental principle that 'he who comes into equity must come with clean hands.'"  *Hermes Int'l*, 219 F. 3d at 107 (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)).  A party with unclean hands is equally unsuited to benefit from the equitable doctrine of laches in an infringement claim for injunctive relief as it is in an ACPA claim for injunctive relief, since they are the same equitable remedies for similar wrongs.  In this instance, Plaintiff does not come to the court with clean hands.  As discussed above, Plaintiff registered the Domain Names in bad faith as part of a scheme to capitalize on the goodwill of another's trademarks.  Thus, his intentional bad faith use of Defendant's trademark prevents him

24

from benefiting from laches as a matter of law.

Even if the laches defense was available to Plaintiff, there is no genuine issue of material fact that he cannot establish such a defense. "A party asserting the defense of laches must establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." *Ikelionwu v. United States*, 150 F. 3d 233, 237 (2d Cir. 1998). A party is prejudiced when it has "changed his position in a way that would not have occurred if the plaintiff had not delayed." *Conopco, Inc. v. Campbell Soup Co.*, 95 F. 3d 187, 192 (2d Cir. 1996).

Other than general speculation that a sophisticated party such as Defendant must have known about the Domain Names before October 2010, when his attorney sent a letter demanding that Plaintiff transfer the Domain Names, Plaintiff has not put forward any evidence that Defendant previously knew about the Domain Names. There also is no evidence that Plaintiff was prejudiced by the three-year delay. Plaintiff asserts that he has renewed the Domain Names' registrations three times and has built "significant traffic and content" at the websites at issue. (Pl.'s Opp'n ¶ 17.) Yet, Plaintiff has not explained what effort or money was expended in re-registering the Domain Names three times. Plaintiff also fails to make any showing that he has built traffic to the websites or has expended meaningful resources on developing the websites. As discussed *supra* § I.D, the websites feature little content, almost all of which is taken from third parties, and has not been updated since 2011. Plaintiff also has stated that he has no expenses from operating any of the websites. (*See* Weinberger Ex. 2 (Interrogatory Resp. No. 14).) Thus, there is no factual basis for Plaintiff's assertion that he has been prejudiced by the three-year delay between his registration of the Domain Names and the October 2010 letter from Defendant's attorney.

Accordingly, Plaintiff's laches defense fails as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted with respect to his ACPA counterclaim and Plaintiff's ACPA declaratory judgment claim.   In addition, the court:  1) denies as moot Defendant's motion for summary judgment on his federal and state trademark infringement and federal and state unfair competition counterclaims because of the court's holding that Defendant is entitled to relief under the ACPA; and 2) dismisses as moot Plaintiff's claim seeking a declaration that the Domain Names do not infringe on Defendant's trademark.   The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and, therefore, *in forma pauperis* status is denied for the purpose of an appeal.   *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).


SO ORDERED.

Dated:  Brooklyn, New York
         February 28, 2013


_____/s/_____
        DORA L. IRIZARRY
     United States District Judge