```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
J. TAIKWOK YUNG d/b/a WEB-ADVISO           :
                                           :
              Plaintiff,                   :    REPORT AND
              Counterclaim Defendant       :    RECOMMENDATION
                                           :
        - v -                              :    CV 11-1413 (DLI) (VVP)
                                           :
DONALD J. TRUMP                            :
                                           :
              Defendant,                   :
              Counterclaim Plaintiff.      :
-------------------------------------------------------------------x
```

**VIKTOR V. POHORELSKY, U.S. Magistrate Judge:**

On February 28, 2013, Judge Irizarry issued an Opinion and Order granting summary judgment against the *pro se* plaintiff-counterclaim defendant J. Taikwok Yung d/b/a Web-Adviso ("plaintiff"), holding that he had violated the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), through his ownership of four domain names that intentionally exploited the defendant-counterclaim plaintiff Donald J. Trump's ("defendant") trademarked surname. Feb. 28 Op. & Order 23, Dkt. Ent. 56. On March 28, 2013, the defendant moved for statutory damages, seeking the maximum available award of $100,000 for each domain name, or $400,000 in total. Judge Irizzary referred that motion to me for a Report and Recommendation pursuant to Title 28 U.S.C § 636(b)(1). After the motion was fully briefed, the plaintiff moved for leave to file a sur-reply. Dkt. Ent. 73. For the reasons that follow, I respectfully recommend that the plaintiff's motion for leave to file a sur-reply be denied and that an aggregate judgment of $32,000 be entered against him.

## FACTS

The facts giving rise to this motion are detailed in Judge Irizarry's February 28, 2013 Opinion and Order, familiarity with which is presumed. In short, the defendant is a well-known real estate developer and hotelier who has registered his surname in capital letters, "TRUMP," as a

trademark with the United States Patent and Trademark Organization. The defendant commonly uses this trademark to brand his many high-profile business ventures, some of which he undertakes personally and others through a privately held business entity, The Trump Organization. The plaintiff is a self-described "domainer" who owns approximately 200 internet domain names.

The facts underlying their dispute begin in 2007, when the Trump Organization announced plans to build TRUMP-branded hotels and condominiums in Mumbai and Bangalore, India. Shortly after the announcement, the plaintiff registered four new domains under the web addresses trumpindia.com, trumpmumbai.com, trumpbeijing.com, and trumpabudhabi.com. The plaintiff then developed these domains into four identical websites containing a sparse but varied collection of content, including some content critical of the defendant's various projects.

In late 2010, an attorney representing the Trump Organization wrote the plaintiff, asserting that the plaintiff's use of the domain names trumpmumbai.com and trumpindia.com was unlawful and threatening to sue if he did not promptly transfer them to the defendant. In his response, the plaintiff declined to transfer the domain names but indicated a willingness to negotiate "in the hope of reaching a more mutually beneficial agreement." Feb. 28 Op. & Order 4, Dkt. Ent. 56. He subsequently rejected the defendant's offer of $100 per domain name, insisting that "the domain names, the large internet traffic from the site, and the development programming labor/work that has gone into building the site have significant value." *Id.*

The defendant then brought an arbitration proceeding against the plaintiff before the World Intellectual Property Organization pursuant to the Uniform Domain Name Resolution Policy. On March 5, 2011, the arbitrator ruled in favor of the defendant and directed the plaintiff to transfer the offending domain names.

Instead of complying, the plaintiff filed the instant action in federal court, seeking a declaration that he is entitled to use the domain names because they do not infringe on the

defendant's trademarks or violate the ACPA. Compl., Dkt. Ent. 1. The defendant then brought counterclaims against the plaintiff under various provisions of the Lanham Act, the ACPA, and New York State statutory and common law. Answer & Countercl., Dkt. Ent. 4. On February 28, 2013, Judge Irizarry issued an Opinion and Order granting summary judgment to the defendant on the ACPA claims, and dismissing the remaining claims as moot. Feb. 28 Op. & Order, Dkt. Ent. 56. The plaintiff's request for interlocutory review of that decision was subsequently denied for want of jurisdiction. *See* Dkt. Ents. 61, 74. In the interim, the defendant brought the instant motion to recover statutory damages. Dkt. Ent. 58.

The defendant now seeks the maximum allowable statutory damages of $100,000 per infringing domain name, or $400,000 in total. He primarily argues that such a substantial award is necessary to deter the plaintiff from committing further violations of the ACPA and to punish him for his bad faith conduct. Def.'s Mem. 6-9, Dkt. Ent. 58-1. The plaintiff, in turn, continues to maintain that no violation of the ACPA occurred because the domain names were maintained for a non-commercial purpose and contained satirical and political content that falls within the statute's safe harbor provision. *See generally* Pl.'s Aff. in Opp'n, Dkt. Ent. 65.

## DISCUSSION

**1. Plaintiff's Motion for Leave to File a Sur-Reply**

As an initial matter, the plaintiff's request for leave to file a sur-reply should be denied because such a filing will not be likely to elicit relevant information and will only needlessly prolong this already protracted litigation. Having established the plaintiff's liability under the ACPA, the defendant's instant motion seeks an award of the maximum allowable statutory damages. Accordingly, the plaintiff's reply should have offered arguments in favor of a lesser award. Instead, the plaintiff's 22-page reply seeks only to re-argue the merits of the underlying case, even though his arguments were already entertained and rejected by Judge Irizarry in her February 28, 2013 Opinion

and Order.[1]  In light of the *pro se* plaintiff's error, this court was initially inclined to permit a sur-reply so that the plaintiff could refocus his arguments on the relevant question.  However, a review of his four-page letter motion requesting leave to file a sur-reply has convinced the court that such leniency would be wasted.  The plaintiff's letter motion suggests no intention to brief the court on the issue of damages.  Instead, he seeks only to further re-argue the merits of this case.  Because additional briefing on this issue will almost certainly be both redundant and irrelevant, I respectfully recommend that the plaintiff's motion for leave to file a sur-reply be denied.

**2. Assessment of Statutory Damages**

Having prevailed on his ACPA claim, the defendant now seeks an award of $400,000 under its statutory damages provision.  Plaintiffs with successful claims under the ACPA are entitled to forgo recovery of actual damages by electing an award of statutory damages instead.  15 U.S.C. § 1117(d).  Statutory damages may be awarded in amounts ranging between $1,000 and $100,000 for each infringing domain, "as the court considers just."  *Id.*  In light of the significant discretion afforded to district courts by this provision, courts in this jurisdiction have sought guidance from the case law construing an analogous provision of the Copyright Act.  *See Mamiya Am. Corp. v. HuaYi Bros.,* No. 09-CV-5501, 2011 WL 1322383, at *7 (E.D.N.Y. Mar. 11, 2011) (collecting cases).  These courts have concluded that, like its copyright analog, the ACPA's statutory damages provision has the same "twofold purpose of compensation and deterrence."  *EMI Entm't World, Inc. v. Karen Records, Inc.,* 806 F.Supp.2d 697, 708 (S.D.N.Y. Aug. 4, 2011); *see also E. & J. Gallo Winery,* 286 F.3d at 278 (statutory damages intended "not merely [to] compel[ ] restitution of profit and the reparation for injury but also is designed to discourage wrongful conduct.") (quoting *F.W. Woolworth Co. v.*

---

[1] Specifically, the plaintiff continues to assert that he lacked the requisite bad faith intent to profit, that the defendant has "no intellectual property rights to the dictionary word 'trump'," and that his conduct is protected by the First Amendment and the ACPA's safe harbor provision.  Pl.'s Mem. in Opp'n 3-5.

*Contemporary Arts, Inc.,* 344 U.S. 228, 233 (1952)). Courts therefore consider a range of factors including:

> (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties.

*Bryant v. Media Right Productions, Inc.,* 603 F.3d 135, 144 (2d Cir. 2010) (citations omitted).

Here, the defendant does not make any claim of lost profits or other actual damages. Accordingly, the court confines its analysis primarily to the question of deterrence, while taking into account relevant aggravating and mitigating factors as justice requires.

Based upon the plaintiff's conduct prior to and throughout this litigation, it is clear that the primary consideration here is the need for specific deterrence of the plaintiff himself. The plaintiff is a repeat-offender who has been held liable for ACPA violations before. *See Webadviso v. Bank of Am. Corp.,* No. 9-cv-5769, 2010 WL 521117, at *2-3 (S.D.N.Y. Feb. 16, 2010), *aff'd,* 448 F. App'x 95, 98 (2d Cir. 2011). In a 2010 case involving materially identical facts, the plaintiff registered the domain names "www.bofaml.com" and "www.mlbofa.com" on the same day that Bank of America Corporation ("Bank of America") and Merrill Lynch & Co., Inc. ("Merrill Lynch") announced their merger. *Id.* After attempts to sell the domain names to these parties were rebuffed, the plaintiff filed suit in the Southern District of New York, seeking a declaratory judgment that he was entitled to keep the domain names. *Id.* at *1. The plaintiff's claim was so weak, however, that the court took the "extraordinary and drastic" step of granting a preliminary injunction to the counterclaiming defendants, *Webadviso v. Bank of Am. Corp.,* No. 9-cv-5769, 2009 WL 5177997, at *3, *5 (S.D.N.Y. Dec. 31, 2009) (citation omitted), before ultimately granting summary judgment to the defendants as well, 2010 WL 521117, at *3. The court in that case did not impose any monetary judgment against the plaintiff, however.

Thus, rather than learn from his mistake, the plaintiff has continued his unlawful conduct unabated. In the instant case, the plaintiff has once again strategically purchased and "parked" a series of domain names that he believes are of significant value to a wealthy, high-profile target. Though he has modified his scheme in ways that he erroneously believes reduce his exposure to liability (see *infra*), he also currently defends his conduct using largely the same legal arguments that Judge Chin and the Second Circuit rejected in the 2010 case. Specifically, he asserts now as he did then that he has never sold a domain name nor attempted to do so, and therefore lacks the requisite "intent to profit." To be sure, his refusal to admit liability is so deeply rooted that he continues to assert his innocence even after liability has been established by both the World Intellectual Property Organization and Judge Irizarry. With the instant motion, a potential judgment of nearly half a million dollars looms over him, urging him to admit fault and plead for leniency. Instead, he thumbs his nose at the courts' rulings and maintains that he is the victim in this case and not the perpetrator. *See generally* Pl.'s Aff. in Opp'n, Dkt. Ent. 65. His ongoing denial of liability demonstrates that he has not yet learned his lesson and has no intention to discontinue his unlawful course of conduct.

This is especially concerning because the plaintiff continues to operate the domain names at issue in this case, and further owns "almost two hundred other domain names, many of which are obvious appropriations of well-known brands." Feb. 28 Op. & Order 17, Dkt. Ent. 56. As such, the plaintiff remains in breach of the ACPA through his ownership of at least four and possibly hundreds of unlawful domain names. Any damages award should therefore be large enough to compel the plaintiff to relinquish these infringing domain names and come into compliance with the statute before other affected parties are also forced to undergo needless litigation.

As the plaintiff has shown, an inadequate judgment is likely to have the opposite effect. Rather than desist, the plaintiff will instead feel emboldened to further refine his craft by trying to

devise and exploit loopholes to the ACPA. The plaintiff has done so in several ways in this case, but the court is particularly troubled by the plaintiff's transparent and cynical attempts to cloak himself in the First Amendment. The ACPA incorporates a "safe harbor" clause that excludes from the Act's coverage any legitimate expression constituting "fair use" of an otherwise proprietary domain name. *See* 15 U.S.C.S § 1125(d)(1)(B)(ii). Fair use includes speech for the purposes of parody, criticism, and political commentary. *See* 15 U.S.C.S § 1125(c)(3)(A)(ii) and (B). Accordingly, the plaintiff formatted his four identical websites to include headings that "seem to be lifted from the ACPA's safe harbor provision," including headings for "News" and "Political Commentary." Feb. 28 Op. & Order 20, Dkt. Ent. 56. Judge Irizarry was not fooled by the "minimal resources" and "scant" content devoted to these websites, *id.* at 19, and neither am I. It is clear, as Judge Irizarry notes, that these websites were "haphazardly put together as an attempt to post minimal content under each category traditionally associated with fair use (e.g. news, politics, criticism) in an attempt to benefit from the ACPA's safe harbor." *Id.* at 20. In fact, the plaintiff admits as much in his reply to the instant motion when he insists that he could not be liable because he consciously "followed the laws of the ACPA safe-harbor provision." Pl.'s Aff. in Opp'n 14, Dkt. Ent. 65. What the plaintiff fails to understand is that the safe harbor provision is not intended as an instruction manual for savvy cybersquatters; rather, its purpose is to protect legitimate, non-commercial expression. The plaintiff cannot transform an unlawful appropriation of the defendant's trademark into "fair use" simply by invoking a few magic words. The plaintiff's apparent belief that the law is so easily circumvented evidences not only his bad faith, but also the strong likelihood of his continued recidivism.[2]

---

[2] The court, however, rejects the defendant's proposition that damages should be heightened because the infringing domain names hosted content critical of the defendant. Def.'s Mem. 10, Dkt. Ent. 58-1. While the domain names themselves fall outside of the First Amendment's scope, Feb. 28 Op. & Order 22, Dkt. Ent. 56, the opinions expressed in the actual websites fall squarely within that sphere of protection. *See SMJ Grp., Inc. v. 417 Lafayette Rest. LLC,* 439 F. Supp. 2d 281, 291 (S.D.N.Y. 2006) ("The First Amendment protects an individual's right to speak out against a

Another example of this problem may be found in the plaintiff's pre-litigation communications with the defendant, where he attempted to evade liability simply by not making overt demands for payment. The crux of the plaintiff's argument is that his domain names are non-commercial because he "never attempted to sell [them]."[3] Pl.'s Aff. in Opp'n 3, Dkt. Ent. 65. Thus, when the defendant initially threatened to sue the plaintiff if he did not transfer the domain names, the plaintiff carefully proposed that the parties negotiate "in the hope of reaching a more mutually beneficial agreement." Feb. 28 Op. & Order 4, Dkt. Ent. 56. When the defendants offered him $100 per domain name, he declined by noting only that the domain names "have significant value," and did not make a specific counter-offer. *Id.* The plaintiff is flatly wrong in his belief that he can avoid liability simply by being cagey, as even without such an overt statement, evidence of his bad faith was found to be "overwhelming." Feb. 28 Op. & Order 14, Dkt. Ent. 56.

Of particular concern to the court is how these statements differ from the statements he made prior to his 2010 case against Bank of America and Merrill Lynch, and what this says about the plaintiff's likelihood of recidivism. Back then, the plaintiff did not hesitate to ask the defendants to make him "a decent offer," and suggested in an email that the infringing domain names were valued at "near 7 figures." *Webadviso v. Bank of Am. Corp.,* 2010 WL 521117, at *2. Having had these statements used against him in that case, it appears plain that the plaintiff carefully avoided making any such overt demands for money when dealing with the defendant this time around. The plaintiff clearly sees these instances of litigation as little more than workshops through which he can refine

---

markholder, but it does not permit an individual to suggest that the markholder is the one speaking."). Awarding punitive damages for such expression would therefore be both unconstitutional and contrary to public policy.

[3] At different times, the plaintiff offers competing explanations for his interest in the at-issue domain names. Primarily, he asserts that the domain names were intended as "gripe sites" through which he could post criticism of the defendant. *See, e.g.,* Pl.'s Aff. in Opp'n 3, Dkt. Ent. 65. He also states that the websites were used to host "hackathons," or programming collaborations, with other programmers. *Id.* at 11. In a news item cited by the defendant, he also represented to a reporter that he simply enjoys collecting domain names. *See* Rich Shapiro and John Marzulli, *Donald Trump Sues Brooklyn Man for $400,000 Over Disparaging Websites*, N.Y. Daily News, Mar. 29, 2013, www.nydailynews.com/new-york/trump-sues-b-klynman-400k-websites-article-1.1303096 (quoting the plaintiff as stating that "[s]ome people collect jewelry, I like domain names").

his cybersquatting tactics in order to evade liability. Any award of statutory damages should therefore be large enough to convince him otherwise.

The court now turns to mitigating factors. Of course, the plaintiff's failure to properly brief the court on the instant motion makes it difficult to properly assess any such factors. However, a few considerations present themselves in the parties' briefs. First, the defendant has not sought to establish that he has suffered any actual damages. Courts in this circuit have consistently held that "statutory damages cannot be divorced from economic reality" and "should bear some relationship to actual damages suffered." *See, e.g., EMI Entm't World, Inc.,* 806 F.Supp.2d at 708 (quotations omitted); *see also Mamiya Am. Corp. v. HuaYi Bros.,* No. 09-CV-5501, 2011 WL 1322383, at *7 (E.D.N.Y. Mar. 11, 2011) (noting "the principle that statutory damages are a substitute for actual damages, and should replicate as nearly as possible the actual harm done to the successful plaintiff without punishing it for lacking information. . ..."). Where such damages are not addressed or are *de minimus*, as is the case here, a lower award is appropriate. *EMI Entm't World, Inc.,* 806 F.Supp.2d at 708.

Second, a lower award is appropriate because the plaintiff's "enterprise" appears to be both unsophisticated and unprofitable. The "Webadviso" name under which he does business does not appear to have any formal structure or legal existence separate from the plaintiff himself. Feb. 28 Op. & Order 1, n.1, Dkt. Ent. 56. Additionally, the plaintiff claims that he has "never sold a domain name in his life," and hence, has yet to realize any profit from his cybersquatting activities. Pl.'s Aff. in Opp'n 19, Dkt. Ent. 65. As for the actual web content found under the plaintiff's infringing domain names, it is clearly non-commercial and certainly does not compete with any of the defendant's enterprises. *Cf.* Def.'s Mot. 11-12, Dkt. Ent. 58-1 (citing cases where higher awards were appropriate because the websites found under the infringing domain names offered commercial products and services that competed with the plaintiffs'). "Congress's decision to

dramatically increase the cap on statutory damages . . . does not require imposition of monumental statutory damages against smaller-scale or shorter-term willful infringers." *EMI Entm't World, Inc.,* 806 F.Supp.2d at 708) (quoting *Yurman Studio, Inc. v. Castaneda,* Nos. 07 Civ. 1241, 07 Civ. 7862, 2008 WL 4949775, at *3 (S.D.N.Y. Nov. 19, 2008)). Though he is certainly a nuisance to the defendant and others, the plaintiff is not nearly enough of a threat to be "the archetypical cybersquatter" the defendant claims. Def.'s Mot. 11, Dkt. Ent. 58-1. Any award should therefore be tempered to reflect the low stakes for which the plaintiff plays.

Finally, a lower award is appropriate because the plaintiff appears to be insolvent. The plaintiff has stated under penalty of perjury that as of March 2011, he was unemployed and had $250 in his bank account. Pl.'s Mot. to Proceed *in Forma Pauperis*, Dkt. Ent. 2. Because the court's analysis is guided primarily by an interest in specific deterrence, any award should take into account the realities of the plaintiff's financial situation. A $400,000 award might be necessary to deter someone in the defendant's financial position, but a much lesser award is required for someone in the plaintiff's shoes. I see no need to impose a judgment that the plaintiff can never hope to repay, not when a smaller award will have the same deterrent effect.

## CONCLUSION

Based on the above considerations, I recommend an award of $8,000 per infringing domain name, for a total judgment of $32,000. Additionally, the plaintiff is instructed to transfer his interest in the domain names trumpmumbai.com, trumpindia.com, trumpbeijing.com, and trumpabudhabi.com to the defendant. It should not have to be noted that the plaintiff now has two strikes against him. Should he see fit to continue his unlawful conduct, he should not expect such leniency the third time around.

\*        \*        \*        \*        \*        \*        \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court with a copy to the undersigned within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir. 1992), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Secretary of Health and Human Serv.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

**Counsel for the defendant shall serve a copy of this Report and Recommendation on the plaintiff by overnight mail and file proof of such service in the record.**

Respectfully recommended,

*Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY

United States Magistrate Judge

Dated: Brooklyn, New York

February 28, 2014